**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN OVERSIGHT,

    *Plaintiff*,

    v.

U.S. DEPARTMENT OF HEATLH AND
HUMAN SERVICES,

    and

OFFICE OF MANAGEMENT AND
BUDGET

    *Defendants*.

Case No. 17-cv-00827 (EGS)

<u>**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................... 3

   I.   Health Care Reform and the AHCA ..................................................................3

   II.  American Oversight's FOIA Requests and the Ensuing Litigation....................................3

ARGUMENT .......................................................................................................................... 6

   I.   FOIA and Summary Judgment Standards of Review ..........................................................6

   II.  The Agencies Conducted Adequate Searches for Responsive Records ............................7

   III. The Agencies Properly Redacted Emails and Calendar Entries Under FOIA
       Exemption 5 ...........................................................................................................9

      A.  The Agencies Properly Redacted Emails Exchanged with Congress Pursuant
            to the Deliberative Process Privilege .........................................................12

          1.   *The Redacted Emails Qualify as "Inter-Agency or Intra-Agency"*
               *Communications for Purposes of Exemption 5 Because They Reflect*
               *Consultations with Congress in Support of Agency Decisions* ............................13

          2.   *The Redacted Emails Also Qualify as "Inter-Agency or Intra-Agency"*
               *Communications Pursuant to the Common Interest Doctrine* ..............................20

          3.   *The Withheld Material is Both "Pre-decisional" and "Deliberative"* ................23

          4.   *Requiring the Agencies to Disclose the Redacted Material Would Frustrate*
               *the Animating Purpose of the Deliberative Process Privilege and Cause*
               *Foreseeable Harm* ...................................................................................25

      B.  The Agencies Properly Redacted Calendar Entries Pursuant to the Deliberative
            Process Privilege.......................................................................................27

      C.  The Agencies Processed and Released All Reasonably Segregable Information........29

CONCLUSION...................................................................................................................... 30

## TABLE OF AUTHORITIES

**CASES**

*Am. Mgmt. Servs., LLC v. Dep't of Army*,
   703 F.3d 724 (4th Cir. 2013) ..................................................................... 20, 21

*August v. FBI*,
   328 F.3d 697 (D.C. Cir. 2003) ......................................................................... 6

*Baker & Hostetler LLP v. Dep't of Commerce*,
   473 F.3d 312 (D.C. Cir. 2006) ......................................................................... 7

*Brayton v. Office of U.S. Trade Representative*,
   641 F.3d 521 (D.C. Cir. 2011) ......................................................................... 6

*Bureau of Nat'l Affairs, Inc. v. DOJ*,
   742 F.2d 1484 (1984) .................................................................................. 24

*Coastal States Gas Corp. v. DOE*,
   617 F.2d 854 (D.C. Cir. 1980) .................................................................. 11, 27

*Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*,
   161 F. Supp. 3d 120 (D.D.C.), *modified*, 185 F. Supp. 3d 26 (D.D.C. 2016) .......................... 23

*CREW v. NARA*,
   583 F. Supp. 2d 146 (D.D.C. 2008) ................................................................. 23

*Davis v. DOJ*,
   460 F.3d 92 (D.C. Cir. 2006) .......................................................................... 9

*DOI v. Klamath Water Users Protective Ass'n*,
   532 U.S. 1 (2001) ....................................................................... 11, 14, 15, 19, 20

*DOJ v. Julian*,
   486 U.S. 1 (1988) .................................................................................. 13, 20

*Dow Jones & Co, Inc.. v. DOJ*,
   917 F.2d 571 (D.C. Cir. 1990) .................................................................... 13, 17

*Dudman Commc'ns. Corp. v. Dep't of Air Force*,
   815 F.2d 1565 (D.C. Cir. 1987) ...................................................................... 25

*Elec. Privacy Info. Ctr. v. DHS*,
   892 F. Supp. 2d 28 (D.D.C. 2012) ................................................................... 19

*Formaldehyde Inst. v. HHS*,
   889 F.2d 1118 (D.C. Cir. 1989) ......................................................................... *passim*

*Frontier Found. [EFF] v. Office of Dir. of Nat'l Intelligence*,
   No. C 08-01023 JSW, 2009 WL 3061975 (N.D. Cal. Sept. 24, 2009), *aff'd in part, vacated in
   part, rev'd in part on other grounds*, 595 F.3d 949 (9th Cir. 2010) ......................................... 18

*Frontier Found. v. DOJ*,
   890 F. Supp. 2d 35 (D.D.C. 2012) ................................................................... 27-28

*Gilliam v. DOJ*,
   128 F. Supp. 3d 134 (D.D.C. 2015) ................................................................... 6

*Gold Anti-Tr. Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
   762 F. Supp. 2d 123 (D.D.C. 2011) ................................................................ 11-12

*Hunton & Williams v. DOJ*,
   590 F.3d 272 (4th Cir. 2010) ..................................................................... 21, 23

*In re Lindsey*,
   158 F.3d 1263 (D.C. Cir. 1998) .................................................................... 21

*In re Sealed Case*,
   121 F.3d 729 (D.C. Cir. 1997) ..................................................................... 11

*John Doe Agency v. John Doe Corp.*,
   493 U.S. 146 (1989) ................................................................................. 6

*Juarez v. DOJ*,
   518 F.3d 54 (D.C. Cir. 2008) ...................................................................... 30

*Judicial Watch v. Export-Import Bank*,
   108 F. Supp. 2d 19 (D.D.C. 2000) ............................................................. 11, 24

*Judicial Watch, Inc. v. DOD*,
   715 F.3d 937 (D.C. Cir. 2013) ...................................................................... 7

*Judicial Watch, Inc. v. DOE*,
   412 F.3d 125 (D.C. Cir. 2005) ................................................................... 14, 15

*Judicial Watch, Inc. v. DOT*,
   950 F. Supp. 2d 213 (D.D.C. 2013) ......................................................... 16, 18, 19

*Judicial Watch, Inc. v. U.S. Secret Serv.*,
   726 F.3d 208 (D.C. Cir. 2013) ..................................................................... 28

*Leopold v. CIA*,
   89 F. Supp. 3d 12 (D.D.C. 2015) ........................................................................ 24, 29

*Light v. DOJ*,
   968 F. Supp. 2d 11 (D.D.C. 2013) .............................................................................. 7

*Mapother v. DOJ*,
   3 F.3d 1533 (D.C. Cir. 1993) .................................................................................... 28

*McKinley v. Bd. of Governors of Fed. Reserve Sys.*,
   647 F.3d 331 (D.C. Cir. 2011) .................................................................................. 15

*Military Audit Project v. Casey*,
   656 F.2d 724 (D.C. Cir. 1981) .................................................................................... 7

*Montrose Chemical Corp. of Cal. v. Train*,
   491 F.2d 63 (D.C. Cir. 1974) .................................................................................... 29

*Murphy v. Dep't of Army*,
   613 F.2d 1151 (D.C. Cir. 1979) .......................................................................... 18, 19

*Nat'l Ass'n of Criminal Def. Lawyers v. Dep't of Justice Exec. Office for U.S. Att'ys*,
   844 F.3d 246 (D.C. Cir. 2016) .................................................................................. 10

*Nat'l Inst. of Military Justice [NIMJ] v. DOD*,
   512 F.3d 677 (D.C. Cir. 2008) .......................................................................... 13, 15

*Nat'l Sec. Archive Fund, Inc. v. CIA*,
   402 F. Supp. 2d 211 (D.D.C. 2005) ........................................................................ 29

*Nat'l Sec. Archive v. CIA*,
   752 F.3d 460 (D.C. Cir. 2014) .................................................................................. 25

*NLRB v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975) .......................................................................................... 10, 25

*Oglesby v. Dep't of Army*,
   920 F.2d 57 (D.C. Cir. 1990) .................................................................................. 7, 9

*Pfeiffer v. CIA*,
   721 F. Supp. 337 (D.D.C. 1989) .............................................................................. 12

*Pub. Citizen, Inc. v. DOJ*,
   111 F.3d 168 (D.C. Cir. 1997) .......................................................................... *passim*

*Pub. Emps. for Envtl. Responsibility v. Office of Sci. & Tech. Policy*,
    881 F. Supp. 2d 8 (D.D.C. 2012) ..................................................................... 28

*Rockwell Int'l Corp. v. DOJ*,
    235 F.3d 598 (D.C. Cir. 2001) ................................................................... 13, 18

*Russell v. Dep't of Air Force*,
    682 F.2d 1045 (D.C. Cir. 1982) ...................................................................... 11

*Ryan v. DOJ*,
    617 F.2d 781 (D.C. Cir. 1980) ................................................................. *passim*

*SafeCard Servs., Inc. v. SEC*,
    926 F.2d 1197 (D.C. Cir. 1991) ........................................................................ 8

*Sierra Club v. DOI*,
    384 F. Supp. 2d 1 (D.D.C. 2004) ............................................................. 26, 26-27

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) ................................................................... 29-30

*United States v. Nixon*,
    418 U.S. 683 (1974) ....................................................................................... 25

*Weisberg v. DOJ*,
    745 F.2d 1476 (D.C. Cir. 1984) ........................................................................ 7

*Welby v. HHS*,
    No. 15-cv-195 (NSR), 2016 WL 1718263 (S.D.N.Y. Apr. 27, 2016) .................... 21

## CONSTITUTION

U.S. Const. art. I ................................................................................................ 16

U.S. Const. art. II .............................................................................................. 16

## STATUTES

5 U.S.C. § 552 ........................................................................................... *passim*

Pub. L. No. 104–231 ............................................................................................ 7

## FEDERAL RULE

Fed. R. Civ. P. 56 ................................................................................................ 7

## LEGISLATIVE MATERIAL

S. Rep. No. 89-813 (1965) ............................................................................. 14, 22

**INTRODUCTION**

Plaintiff American Oversight challenges the decision of the Department of Health and Human Services ("HHS") and the Office of Management and Budget ("OMB," and with HHS, "the agencies") to redact and withhold records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  The agencies identified the records at issue in response to a FOIA request seeking communications between the agencies and Congress about the President's goal of achieving health care reform, as well as calendar entries from certain agency officials on that same subject.  American Oversight's request targeted a period during which the Executive Branch and Congress were engaged in sensitive deliberations over efforts to enact health care reform, principally through the American Health Care Act of 2017 ("AHCA").  Unsurprisingly, the agencies exchanged many emails with Congress during that period.  Those emails were an integral part of the agencies' efforts to shape health care policy and advise the President about health care reform proposals to support and ultimately sign into law.  The emails, in other words, contributed to key Executive Branch decision-making processes and reflected careful deliberation about health care reform— one of the Executive Branch's chief policy priorities.

In light of the role the emails played in the agencies' deliberative processes, the agencies withheld certain information as exempt from disclosure pursuant to FOIA Exemption 5.  That exemption protects information that would not generally be discoverable in litigation, including information subject to the deliberative process privilege.  The agencies' application of the deliberative process privilege to emails with Congress is the principal issue in dispute in this case.

The agencies' application of the privilege was correct.  It was consistent with decades of D.C. Circuit case law, in which the court has repeatedly recognized that certain communications with individuals and entities outside the Executive Branch should be treated as part of an agency's deliberative process.  Those cases, which have applied the deliberative process privilege to

Executive Branch communications with Congress, academic journals, and outside lawyers, control the outcome of this case. Like those communications, the redacted emails at issue in this case contributed to a series of Executive Branch decision-making processes, ranging from the details of specific proposals for inclusion in the AHCA, to the process for advising the President in advance of any ultimate decision about whether to sign particular health care reform legislation. It is particularly appropriate to apply Exemption 5 to the redacted emails in light of the President's constitutionally prescribed role in enacting laws.

In addition, the "common interest doctrine" supplies an alternative and independent basis to sustain the agencies' decision. That doctrine, which courts have applied in cases where the attorney-client and work-product privileges are at issue, recognizes that the Executive Branch does not forfeit the protection of Exemption 5 privileges when it communicates with a party that shares a particularized common legal interest. Here, the common legal interest was enacting health care reform that Congress could pass and the President could sign.

Moreover, ordering the agencies to disclose the withheld information would weaken the protection that the deliberative process privilege is meant to provide for government policy-making. Subjecting to public scrutiny the confidential communications that the Executive Branch and Congress exchange while hammering out the details of public policy would chill the candor and creativity that the privilege is supposed to preserve. A candid and confidential dialogue between the branches ensures that the President receives timely and accurate advice in support of his duty to sign or veto legislation, and it also allows agencies to fulfill their responsibilities to shape policies under consideration and to work with Congress on the details of the Administration's priorities. The agencies' decision to withhold information from the

2

communications at issue in this case furthers each of these aims.  This Court should not order them to reverse course.

## BACKGROUND

### I.   Health Care Reform and the AHCA

The President has made reforming the nation's health care system, by repealing the Affordable Care Act ("ACA") and replacing it with a law focused on patient-centered care, a priority.  *See* Statement from Secretary Price on President Trump's Address to Congress (Feb. 28, 2017),  https://www.hhs.gov/about/news/2017-news-releases#February.    Accordingly,  shortly after his inauguration, the President called on Executive Branch officials to work with Congress to enact legislation that would achieve that policy goal.  Decl. of Jonathan Slemrod ("Slemrod Decl.") ¶ 7.  Officials at OMB and HHS carried out a series of responsibilities in support of that effort, including  discussing  draft  legislative  language  and  policy  ideas  with  congressional personnel, Decl. of Kristin S. Skrzycki ("Skrzycki Decl.") ¶¶ 9-10, 13, and advising the President on the status of health care reform efforts, Slemrod Decl. ¶¶ 8-10.  This coordination between the Executive Branch and Congress is an important component of advancing the President's agenda when a policy goal requires legislation.  Slemrod Decl. ¶¶ 8-9.

During the time period covered by American Oversight's FOIA request—from January 20, 2017, through early April, 2017, Congress and senior officials in the Executive Branch worked towards a reconciliation bill that advanced the Administration's health care aims.  *See* Statement from Secretary Price, *supra*.  The primary bill that advanced those aims during the relevant period was the AHCA, H.R. 1628.  Slemrod Decl. ¶ 7.  Both congressional leadership and senior officials in the Executive Branch focused their efforts on enacting the bill (or one similar to it) into law.  *Id.* That work continued throughout the relevant period, and the House of Representatives passed a variant of the AHCA on May 4, 2017.  *Id.*

3

**II.     American Oversight's FOIA Requests and the Ensuing Litigation**

American Oversight submitted the FOIA requests at issue in this case to the agencies in March, 2017—HHS received the request on or about March 15, 2017, and OMB received the request on March 29, 2017.   Decl. of Michael Bell ("Bell Decl.") ¶ 7; Decl. of Thomas Hitter ("Hitter Decl.") ¶ 6.   The two requests sought essentially the same information from the agencies. Specifically, the requests asked for the following two categories of records:

1)   All communications, meeting notices, meeting agendas, informational material, draft legislation, talking points, or other materials exchanged between [the agency] and any members of Congress or congressional staff relating to health care reform.

2)   All calendar entries for the [Secretary/Director], any political or SES appointees in the [Secretary's/Director's] office, and the Acting [Assistant Secretary for Legislation/Head of Legislative Affairs], or anyone maintaining calendars on behalf of these individuals, relating to health care reform. For calendar entries created in Outlook or similar programs, the documents should be produced in "memo" form to include all invitees, any notes, and all attachments.

Bell Decl., Ex. 1; Hitter Decl., Ex. 2.   The time period for the requests was January 20, 2017, through the date of each agency's search.   *Id.*   American Oversight asked the agencies to order expedited processing of the requests.   *Id.*; *see* 5 U.S.C. § 552(a)(6)(E).

The agencies acknowledged receipt of the requests and commenced a search for responsive records within a matter of weeks—HHS had begun its search and sent its acknowledgment by April 5, 2017, Bell Decl. ¶¶ 9, 12; OMB acknowledged the request a day after receiving it and began its search by April 5, 2017, Hitter Decl. ¶¶ 7, 10.   Neither agency granted American Oversight's request for expedited processing.

On May 4, 2017, American Oversight filed this suit.   Compl., ECF No. 1.   Along with the Complaint, American Oversight filed a motion for preliminary injunction.   Pl.'s Mot. for Prelim. Inj., ECF No. 2.   That motion sought an order requiring the agencies to expedite processing of the FOIA requests, and an order requiring the agencies to produce all responsive (and presumably

4

non-exempt) documents within 20 days (or by a date of the Court's choosing).  *Id.*  At a May 10, 2017 status hearing, the Court declined to set a briefing schedule for the preliminary injunction and instead ordered the parties to confer as to the scope of the searches the agencies had already commenced.  Minute Order, May 10, 2017.

During the ensuing two weeks, the agencies completed their initial searches and identified the universe of documents that were potentially responsive to the FOIA requests.  *See* Joint Status Report, ECF No. 11, at 1.  At that point, HHS had identified approximately 11,000 pages of records as potentially responsive, and OMB had identified more than 2,300 potentially responsive documents.  *Id.*; *see also* Bell Decl. ¶ 19.  At a May 25, 2017 status hearing, the Court ordered the agencies to process these potentially responsive documents, and to produce all responsive, non-exempt material, by September 5, 2017.  Minute Order, May 25, 2017.  The Court set rolling production deadlines—by which approximately a third of each agency's documents had to be processed—of June 30, 2017, and July 31, 2017 (with all remaining documents to be processed by September 5).  *Id.*  The Court also set a briefing schedule for cross-motions for summary judgment.  *Id.*  The agencies complied with the Court's processing schedule and made timely productions to American Oversight.  Hitter Decl. ¶¶ 17-19; Bell Decl. ¶¶ 24-26.  All told, the agencies each produced several thousand pages of unredacted (or mostly unredacted) responsive records.

The agencies also produced a number of pages with redactions, or that were marked as withheld in full.  The principal basis for these redactions and withholdings, from both OMB and HHS, was FOIA Exemption 5, which protects from disclosure certain information that generally would not be discoverable in litigation.  *See* 5 U.S.C. § 552(b)(5).  The agencies also redacted email addresses and other contact information pursuant to FOIA Exemption 6, which protects against disclosures that would cause "clearly unwarranted invasion of personal privacy."  *Id.*

§ 552(b)(6).  The parties have agreed, however, that only certain Exemption 5 redactions are in dispute in this motion, and in American Oversight's forthcoming cross-motion, for summary judgment.[1]

## ARGUMENT

### I.    FOIA and Summary Judgment Standards of Review

Although the Freedom of Information Act "strongly favors prompt disclosure, its nine enumerated exemptions are designed to protect those 'legitimate governmental and private interests' that might be 'harmed by release of certain types of information.'" *August v. FBI*, 328 F.3d 697, 699 (D.C. Cir. 2003) (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989)).  Accordingly, while "disclosure, not secrecy, is the dominant objective of the Act," and while the Act's exemptions must therefore "be narrowly construed," the exemptions also must be given "meaningful reach and application" in order to achieve the "workable balance" that Congress has struck "between the right of the public to know and the need of the Government to keep information in confidence."  *John Doe Agency*, 493 U.S. at 152-53 (citations omitted).  The agencies bear the burden of justifying the withholding of material responsive to American Oversight's FOIA request, and this Court reviews the agencies' response to that request *de novo*. *See* 5 U.S.C. § 552(a)(4)(B).

"Most FOIA cases are appropriately resolved on motions for summary judgment." *Gilliam v. DOJ*, 128 F. Supp. 3d 134, 138 (D.D.C. 2015) (citing *Brayton v. Office of U.S. Trade*

---

[1] The House Committee on Ways and Means, which claims an interest in four emails that were produced to American Oversight, has moved to intervene and has sought leave to file a motion for summary judgment.  Mot. for Leave to Intervene of the Committee on Ways and Means of the U.S. House of Representatives, ECF No. 19; Mot. for Leave to File Mot. for Summ. J. of the Committee on Ways and Means of the U.S. House of Representatives, ECF No. 21.  If the Court permits the Committee to file its proposed summary judgment motion, Defendants would address the issues the Committee raises in that motion through a responsive brief.

*Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011)).   Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The defendant in a FOIA case must show that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information."  *Light v. DOJ*, 968 F. Supp. 2d 11, 23 (D.D.C. 2013).

A court may award summary judgment in a FOIA action solely on the basis of information provided by the agency through declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail," that "demonstrate that the information withheld logically falls within the claimed exemption[s]," and that are "not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (footnote omitted).   "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible."  *Judicial Watch, Inc. v. DOD*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam).

## II.    The Agencies Conducted Adequate Searches for Responsive Records

An agency is entitled to summary judgment in a FOIA case with respect to the adequacy of its search if the agency shows "that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) (citations omitted), *superseded by statute on other grounds by* Electronic FOIA Amendments 1996, Pub. L. No. 104–231, 110 Stat. 3048.  "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*."  *Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (citation omitted).  An agency can establish the reasonableness of its search by "reasonably detailed, nonconclusory

affidavits describing its efforts." *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006). "Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation omitted). Applying these principles, the agencies are entitled to summary judgment with respect to the adequacy of their searches.

Only HHS's search is at issue in this litigation.[2] As detailed in the Bell Declaration, HHS searched all locations where records responsive to American Oversight's FOIA request were reasonably likely to be found. Bell Decl. ¶ 18. Specifically, HHS identified the two offices—the Immediate Office of the Secretary ("IOS") and the Office of the Assistant Secretary for Legislation—with the personnel and subject-matter focus that made it reasonably likely that individuals in those offices would possess records of the communications or calendar entries that American Oversight sought. *Id.* ¶¶ 12, 14-15. HHS accordingly tasked each office with conducting a search,[3] and the offices subsequently identified the custodians who were likely to have responsive records in their possession. *Id.* ¶¶ 12, 16-17.

From there, the offices set appropriate parameters on their searches to locate responsive records. Both ASL and IOS searched for records containing the phrase "health care reform" or the acronyms "ACA" or "AHCA." Bell Decl. ¶¶ 16-17. These search terms were chosen in light of the subject matter of the request—"health care reform"—and the manner in which the ACA and AHCA were discussed in the day-to-day operations of HHS, *i.e.*, by their acronyms, rather than by

---

[2] American Oversight has agreed not to contest the adequacy of OMB's search.
[3] HHS also tasked the Administration for Community Living ("ACL") with conducting a search, but that tasking appears to have been in error. Bell Decl. ¶¶ 12-13. In any event, ACL conducted a search and did not locate any responsive records. *Id.* ¶ 13.

their full titles.  *Id.*  These search terms, which matched the subject matter of the request, yielded an estimated 40,000 pages of potentially responsive records from IOS alone  *Id.* ¶ 17.  HHS's process for reviewing the initial search results reinforces that it carried out a reasonable search in good faith.  When it was discovered that ASL had inadvertently chosen a premature end date for its search, ASL went back and completed the search for the remainder of the appropriate time period and added those records to the other potentially responsive records that were processed for this case.  *Id.* ¶ 16.

The use of broader search terms, by contrast, would not have been workable.  For instance, while OMB was able to run a search for all records containing the word "health"—as a stand-alone word or as part of another word, such as "healthcare," *see* Hitter Decl. ¶ 11—that kind of search would have been infeasible at HHS, where "health" is in the agency's name.  *See Davis v. DOJ*, 460 F.3d 92, 103 (D.C. Cir. 2006) (rejecting the contention that there is "a bright-line set of steps for an agency to take" when conducting a search, and explaining that "the adequacy of an agency's search is measured by a standard of reasonableness, and is dependent upon the circumstances of the case").

By taking the steps described above, HHS employed a reasonable and adequate search "using methods which can be reasonably expected to produce the information requested." *Oglesby*, 920 F.2d at 68 (citations omitted).  The agencies therefore are entitled to summary judgment with respect to the adequacy of their searches.

## III.     The Agencies Properly Redacted Emails and Calendar Entries Under FOIA Exemption 5

American Oversight's FOIA request sought emails and calendar entries the agencies created in the midst of sensitive deliberations over efforts to enact one of the President's chief policy priorities—reforming the nation's health care system.  As would be true for any significant

policy undertaking with a legislative component, those deliberations encompassed discussions that were purely internal to the Executive Branch as well as consultative communications with Congress.   In both circumstances, the agencies exchanged and received views and other information that were central to agency decision-making related to health care reform, including the process for advising the President on legislation to sign or veto, the process for developing Executive Branch policy proposals and technical assistance, the process for drafting Statements of Administration Policy ("SAPs"), and the process for shaping interim decisions about the best legislative and communications strategy to adopt in support of health care reform.   Revealing that information would chill the creativity and candor necessary for the Executive Branch to craft and advance policy on matters of the utmost public concern.   Accordingly, although the agencies released thousands of pages of unredacted (or mostly unredacted) documents to Plaintiffs, they properly redacted the documents whose disclosure would reveal the agencies' deliberative processes pursuant to FOIA Exemption 5.

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  The exemption ensures that members of the public cannot obtain through FOIA records that would be "normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  Accordingly, Exemption 5 "allows the government to withhold records from FOIA disclosure under at least three privileges: the deliberative-process privilege, the attorney-client privilege, and the attorney work-product privilege." *Nat'l Ass'n of Criminal Def. Lawyers v. Dep't of Justice Exec. Office for U.S. Att'ys*, 844 F.3d 246, 249 (D.C. Cir. 2016).

The privilege at issue here is the deliberative process privilege, which protects "materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (citation omitted).  "The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (citations omitted).  The privilege also "protects the public from the confusion that would result from premature exposure to discussions occurring before" a final decision has been made and ensures "the integrity of the decision-making process itself by confirming that officials should be judged by what they decided, not for matters they considered before making up their minds." *Russell v. Dep't of Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (quotation marks, alterations, and citation omitted).

To come within the scope of the deliberative process privilege, a document must be both predecisional and deliberative. *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 866 (D.C. Cir. 1980).  A document is predecisional if "it was generated before the adoption of an agency policy," and it is deliberative if "it reflects the give-and-take of the consultative process." *Id.*  "To establish that a document is predecisional, the agency need not point to an agency final decision, but merely establish what deliberative process is involved, and the role that the documents at issue played in that process." *Judicial Watch v. Export-Import Bank*, 108 F. Supp. 2d 19, 35 (D.D.C. 2000) (citing *Formaldehyde Inst. v. HHS*, 889 F.2d 1118, 1223 (D.C. Cir. 1989)).  Accordingly, "even if an internal discussion does not lead to the adoption of a specific government policy, its protection

under Exemption 5 is not foreclosed as long as the document was generated as part of a definable decision-making process." *Gold Anti-Tr. Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 135–36 (D.D.C. 2011) (citation omitted).  When evaluating deliberative process claims, courts "must give considerable deference to the agency's explanation of its decisional process, due to the agency's expertise in determining what confidentiality is needed to prevent injury to the quality of agency decisions, while the decisionmaking process is in progress." *Pfeiffer v. CIA*, 721 F. Supp. 337, 340 (D.D.C. 1989) (citation omitted).

### A.  The Agencies Properly Redacted Emails Exchanged with Congress Pursuant to the Deliberative Process Privilege

Throughout the period at issue in this case—from January 20, 2017, through early April, 2017—HHS and OMB consulted regularly with Congress in support of the decisions the agencies made, and were preparing to make, towards achieving the President's policy priority of enacting health care reform.  These consultations took the form of meetings, phone calls, and, as relevant here, emails exchanged between agency officials and members of Congress and their staff.  Some of those emails included discussions of drafts of the AHCA or proposed amendments—views and other information that were critical for preparing advice to the President about whether to support, and eventually sign, the AHCA, as well as for the agencies' roles in discussing technical assistance with Congress.  Other emails discussed proposed topics for high-level meetings, which enabled the agencies to prepare senior decision-makers accordingly.  Still others included advice from Congress about official steps the Executive Branch was preparing to take in support of the AHCA. Because these emails formed "an integral part of [the agencies'] deliberative process," they are exempt from disclosure. *Ryan v. DOJ*, 617 F.2d 781, 789 (D.C. Cir. 1980).

**1. The Redacted Emails Qualify as "Inter-Agency or Intra-Agency" Communications for Purposes of Exemption 5 Because They Reflect Consultations with Congress in Support of Agency Decisions**

Although Exemption 5 refers to "inter-agency or intra-agency" communications, 5 U.S.C. § 552(b)(5), it is "well established" that "a document need not be created by an agency or remain in the possession of the agency in order to qualify as 'intra-agency.'" *Nat'l Inst. of Military Justice [NIMJ] v. DOD*, 512 F.3d 677, 684 (D.C. Cir. 2008). Rather, "the language of Exemption 5 clearly embraces" certain situations in which an agency consults with entities that "are not agencies within the meaning of the FOIA." *Ryan*, 617 F.2d at 789; *see also DOJ v. Julian*, 486 U.S. 1, 18 n.1 (1988) (Scalia, J., dissenting) (explaining that this interpretation of Exemption 5 is "supported by a permissible and desirable reading of the statute"). In particular, "communication that aids the agency's deliberative process [may] be protected as 'intra-agency'" under Exemption 5. *Judicial Watch, Inc. v. DOT*, 950 F. Supp. 2d 213, 218 (D.D.C. 2013); *see also NIMJ*, 512 F.3d at 681. Although the D.C. Circuit has held that Congress is not an "agency" within the meaning of FOIA, *Dow Jones & Co, Inc.. v. DOJ*, 917 F.2d 571, 574 (D.C. Cir. 1990), "communications between an agency and Congress [sh]ould receive protection as intra-agency memoranda if they were 'part and parcel of the agency's deliberative process.'" *Rockwell Int'l Corp. v. DOJ*, 235 F.3d 598, 604 (D.C. Cir. 2001) (quoting *Dow Jones*, 917 F.2d at 573–75).

Such communications were at issue in *Ryan*, in which the D.C. Circuit held that senators' responses to a questionnaire from the Attorney General about "procedures for selecting and recommending potential [judicial] nominees" were "exempt from FOIA disclosure under Exemption 5." 617 F.2d at 784, 791. In reaching that conclusion, the court emphasized the role that "the opinions and recommendations of temporary consultants" play in the "day-to-day activities" of an agency. *Id.* at 789. To expose an agency's deliberations with such consultants to "public view would inhibit frank discussion of policy matters and likely impair the quality of

decisions," a result that would undermine Congress's decision to craft Exemption 5 in a manner "consistent with efficient Government operation."  *Id.* at 789–90 (quoting S. Rep. No. 89-813, at 9 (1965)).  The Court therefore held that the senators' questionnaire responses—which revealed, *inter alia*, information about senators' efforts "to identify qualified [judicial] candidates"—were "'intra-agency' memorand[a] for purposes of determining the applicability of Exemption 5."  *Id.* at 790-91.

The D.C. Circuit reaffirmed the holding and reasoning from *Ryan* in a series of cases establishing what has become known as the "consultant corollary."  In *Formaldehyde Institute v. HHS*, 889 F.2d 1118 (D.C. Cir. 1989), the court held that comments sent to HHS from an epidemiology journal's outside reviewers were "clearly . . . part of HHS' deliberative process" because they contributed to the agency's decision over whether to publish a report submitted by an HHS staff member.  *Id.* at 1120.  In *Public Citizen, Inc. v. DOJ*, 111 F.3d 168 (D.C. Cir. 1997), communications relating to presidential records between two former presidents and two agencies were held to be "intra-agency" for purposes of Exemption 5 because the former presidents "clearly qualifie[d]" as outside experts "on the implications of disclosure of Presidential records."  *Id.* at 169, 171.  In *Judicial Watch, Inc. v. DOE*, 412 F.3d 125 (D.C. Cir. 2005), the court followed this "well established" principle by protecting documents shared with or received from a presidentially established entity, the National Energy Policy Development Group, that was clearly not an agency. *Id.* at 130-31.  And in *NIMJ*, the court held that "records containing the opinions and recommendations of non-governmental lawyers" who were advising the Department of Defense about terrorist trial commissions were protected by Exemption 5.  512 F.3d at 678.[4]

---

[4] In *Klamath*, the Supreme Court acknowledged, and expressly declined to overrule, the D.C. Circuit's consultant corollary line of cases.  532 U.S. at 12 n.4 (holding only that "the intra-agency

14

In this case, the agencies' consultations with Congress fit squarely within the consultant corollary line of cases.  As reflected in the redacted emails, the agencies communicated with specific members of Congress and staff who possessed relevant views and other information about the proposals to enact the President's goal of health care reform.  For starters, these individuals provided draft legislation and other non-public information about the AHCA, Slemrod Decl. ¶ 10; Skrzycki Decl. ¶¶ 11, 13, information that by necessity had to come from Congress, Slemrod Decl. ¶ 9.  This same sort of specialized congressional input was at issue in *Ryan*, where senators were uniquely positioned to share their insights about the process of recommending judicial nominees. *See* 617 F.2d at 791.  And as in *Ryan*, this congressional insight served as an input in the Executive Branch's decision-making process.  *Compare id.* at 784 (Attorney General was tasked with determining whether "an affirmative effort has been made to identify qualified [judicial] candidates"), *with* Slemrod Decl. ¶ 10 (describing OMB's role in providing the President with analysis and recommendations for the AHCA); *see also infra* Section III.A.3 (describing redacted emails' role in the agencies' deliberative processes).

---

condition excludes, at the least, communications to or from an interested party seeking a Government benefit at the expense of other applicants," and explaining that such a holding did not require reassessing *Ryan* or *Public Citizen*).  And the D.C. Circuit has reaffirmed *Ryan* and in its progeny on at least three occasions since *Klamath*. *See Judicial Watch*, 412 F.3d at 130 (holding that "[o]ur interpretation of Exemption 5 is not inconsistent with its textual limitation to 'intra-agency' or 'inter-agency' communications" in light of "the principle, well established in this circuit, that a document need not be created by an agency or remain in the possession of the agency in order to qualify as 'intra-agency'"); *NIMJ*, 512 F.3d at 684 ("Our established line of consultant cases is all the more compelling given that we have acknowledged the survival of our 'consultant corollary' in the wake of *Klamath*."); *McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 336–37 (D.C. Cir. 2011) (applying the consultant corollary and explaining that the "dispositive point" from *Klamath* was that American Indian Tribes sought "a decision by an agency of the Government to support a claim . . . that [was] necessarily adverse to the interests of competitors" (quoting *Klamath*, 532 U.S. at 14)).  This Court therefore remains bound by those cases.

Additionally, and as with other consultant corollary cases, the agencies' consultations with Congress were not limited to receiving information—the agencies also engaged in a back-and-forth with the members of Congress and staff who were advising them about health care reform. For instance, agency officials communicated with congressional counterparts about the substance of upcoming health care reform discussions, coordinated joint drafting responsibilities, and discussed the technical details of legislation.  Slemrod Decl. ¶ 16; Decl. of Sarah C. Arbes ("Arbes Decl.") ¶ 8.  This same kind of consultation was present in *Public Citizen*, where the records included back-and-forth communications with the National Archives and Records Administration that led to President Reagan's decision to waive Presidential Records Act restrictions on certain computer tapes, 111 F.3d at 169.  Similarly, in *Judicial Watch, Inc. v. DOT*, the court held that the consultant corollary applied to communications exchanged between the Federal Railroad Administration ("FRA") and California High Speed Rail Authority ("CHRSRA") as part of their effort to "*jointly* develop environmental impact reports" for a proposed high speed rail plan.  950 F. Supp. 2d at 214, 221 (emphasis added).

The Executive Branch's constitutionally prescribed role in the process of enacting laws reinforces the conclusion that the consultations with Congress at issue in this case are subject to Exemption 5.  The Constitution empowers the President to recommend to Congress "such measures as he shall judge necessary and expedient," U.S. Const. art. II, § 3, and it requires presentment of legislation passed by Congress to the President, who can sign the legislation or, *inter alia*, "return it, with his objections," U.S. Const. art. I, § 7.  In exercising these authorities, the President may request the opinions of his Department heads.  U.S. Const. art. II, § 2.  It is particularly "appropriate" to apply the consultant corollary in instances where, as here, "the consultative relationship involved . . . is not only explicit, but is mandated by [the Constitution]."

*Pub. Citizen*, 111 F.3d at 170. Because the redacted emails contributed to the Executive Branch's decision-making process in carrying out the President's responsibilities to recommend and evaluate legislation before Congress, *see* Slemrod Decl. ¶¶ 6-10, they qualify as intra-agency communications for purposes of Exemption 5.

Finally, the two principal limits to the consultant corollary that courts have identified do not apply to this case. First, intra-agency communications must be "part and parcel of *the agency's* deliberative process" to fall within the consultant corollary. *Dow Jones & Co., Inc.*, 917 F.2d at 575. As noted above, and as explained in greater depth *infra,* the redacted emails with Congress played an important role in contributing to a series of OMB and HHS decisions about health care reform, including advice to the President about whether to sign the AHCA, Slemrod Decl. ¶¶ 10, and positions the agencies took on specific health care reform policy proposals, *id.* ¶ 16; Skrzycki Decl. ¶ 14. *See also infra* Section III.A.3.

In *Dow Jones*, by contrast, the court held that a letter sent to Congress was not an intra-agency communication because the agency had *completed* its deliberations by the time it sent the letter, 917 F.2d at 575. Specifically, the Department of Justice "had unquestionably ended its consideration as to whether to prosecute, or in any other way proceed against," a member of Congress who had been under investigation "*before* it sent the letter [communicating that decision] to Congress." *Id.* As the D.C. Circuit later emphasized, the "*sole* purpose" of that letter was to assist Congress "with its deliberations"; the agency's deliberative process therefore was not implicated.[5] *Rockwell Int'l Corp. v. DOJ*, 235 F.3d 598, 604 (D.C. Cir. 2001) (emphasis added).

---

[5] A district court in the Ninth Circuit used similar reasoning to hold that the government had failed to meet its burden in justifying the withholding of certain communications with Congress, pursuant to Exemption 5, about efforts to reform the Foreign Intelligence Surveillance Act. *See Elec. Frontier Found. [EFF] v. Office of Dir. of Nat'l Intelligence*, No. C 08-01023 JSW, 2009 WL

Where, as here, an agency communicates with a non-agency consultant in support of its own decisions—even if those communications also happen to aid the consultant's deliberations—the communication is an intra-agency memorandum for purposes of Exemption 5.  That was the D.C. Circuit's conclusion in *Formaldehyde*, which protected from disclosure the comments provided by a journal's outside referees, even though the court found that releasing the comments would "seriously harm" the *journal's* deliberative process, in addition to the agency's.  889 F.2d at 1124-25; *see also Judicial Watch*, 950 F. Supp. 2d at 214, 219 (communications exchanged between the FRA and the CHSRA were subject to the consultant corollary because they "aided FRA's decisions as to which route alternatives best complied" with federal environmental standards, even though the entities were collaborating more broadly to ensure compliance with "federal *and state* environmental regulation" (emphasis added)).  This result is consistent with the longstanding rule that when Congress receives information, "whether in the form of documents or otherwise," from the Executive Branch, "no waiver occurs of the privileges and exemptions which are available to the executive branch under the FOIA."  *Murphy v. Dep't of Army*, 613 F.2d 1151, 1156-57 (D.C. Cir. 1979) (protecting "executive-legislative communication[s]" that revealed Executive Branch deliberations even when those communications served "official congressional purposes").  This is true regardless of whether the information is sent to individual Members of Congress, committees, or Congress as a whole.  *Id.*  The redacted emails aided the agencies'

---

3061975 (N.D. Cal. Sept. 24, 2009), *aff'd in part, vacated in part, rev'd in part on other grounds*, 595 F.3d 949 (9th Cir. 2010) (additional subsequent history omitted).  Specifically, the court found deficient the government's evidence that the communications "were used in an effort to aid any agency in its *own* deliberative process."  *Id.* at *5.  Here, the government has submitted extensive evidence of the role the emails with Congress played in the agencies' "own deliberative process."  Accordingly, *EFF* is distinguishable on its facts.

decision-making process; they therefore are subject to Exemption 5, irrespective of whether they also aided Congress's.[6]

The second limitation on the consultant corollary is that an "interested part[y] seeking a government benefit" is not a "consultant" for purposes of Exemption 5 when the would-be consultant's interests are "adverse to others seeking that benefit." *Judicial Watch, Inc. v. DOT*, 950 F. Supp. 2d 213, 218 (D.D.C. 2013). This limitation stems from the Supreme Court's decision in *Klamath*. There, the Court held that documents exchanged between American Indian Tribes and the Department of the Interior ("Interior") were not subject to Exemption 5. *Klamath*, 532 U.S. at 4-5. The documents at issue "addressed tribal interests subject to state and federal proceedings to determine water allocations," and the Tribes' interests were adverse to the interests of a local water users association "owing to scarcity of water." *Id.* at 4, 6. The Court concluded that Interior's communications with the Tribes were not intra-agency memoranda because the Tribes were "self-advocates at the expense of others," *i.e.*, entities like the local water users association, and were "seeking benefits inadequate to satisfy everyone." *Id.* at 12.

This limitation is also inapplicable here. The redacted emails involve members of Congress and congressional staff of the Republican Party who shared an interest with agencies in the current Republican administration in working to repeal the ACA and replace it with the health care reform legislation that was under consideration. *See* Slemrod Decl. ¶ 7; *see also* Skrzycki

---

[6] The Supreme Court's observation that the "typical" outsider in a consultant corollary case "does not represent an interest of its own" is not to the contrary. *Klamath*, 532 U.S. at 10–11. *Klamath* did not hold, or even state in dicta, that a consultant must lack any independent interest in order for communications with that consultant to fall within the bounds of the consultant corollary, as defined by Courts of Appeals. *See Elec. Privacy Info. Ctr. v. DHS*, 892 F. Supp. 2d 28, 46 (D.D.C. 2012) (holding that a consultant's "[s]elf-advocacy is not a dispositive characteristic" after *Klamath* "and does not control Exemption 5's scope."). And in any event, the D.C. Circuit has been clear that its consultant corollary line of cases remains intact post-*Klamath*. *See supra* p. 14 n.4.

Decl. ¶ 20.  These members of Congress and staff therefore were not "self-advocates" seeking a particular government benefit "*at the expense of others.*"  *Klamath*, 532 U.S. at 12 (emphasis added).  Rather, they were knowledgeable outsiders, albeit with a shared interest in the legislation, "acting in a governmentally conferred capacity other than on behalf of another agency-e.g., . . . as employee or officer of another governmental unit (not an agency) that is authorized or required to provide advice to the agency."  *Julian*, 486 U.S. at 18 n.1 (Scalia, J., dissenting); *see also Klamath*, 532 U.S. at 10 (quoting this language from *Julian*).  When such non-agency personnel aid the Executive Branch in important policy decisions, "Exemption 5's purpose of protecting the Government's deliberative process is plainly applicable."  *Id.*

### 2. The Redacted Emails Also Qualify as "Inter-Agency or Intra-Agency" Communications Pursuant to the Common Interest Doctrine

As outlined above, the Executive Branch and the relevant personnel in the Legislative Branch (who were members of the President's party) shared the same goal of repealing and replacing the ACA.  While that common interest distinguishes this case from *Klamath*, it also provides an independent basis for concluding that the redacted emails at issue are subject to Exemption 5.  Courts applying Exemption 5 have held that certain communications between agencies and non-agencies are "intra-agency," and may be withheld accordingly, pursuant to the "common interest doctrine."  *Am. Mgmt. Servs., LLC v. Dep't of Army*, 703 F.3d 724, 732 (4th Cir. 2013).  The common interest doctrine, which exists independent of FOIA, is an exception to the rule that "disclosure of attorney-client or work product confidences to third parties waives the protection of the relevant privileges."  *In re Lindsey*, 158 F.3d 1263, 1282 (D.C. Cir. 1998).  If "the third party is a lawyer whose client shares an overlapping 'common interest' with the primary client," then "the privileges may remain intact."  *Id.* (citations omitted)

Because the "clear thrust" of Exemption 5 is "to ensure that FOIA does not deprive the government of the work-product and attorney-client protections otherwise available to it in litigation," the common interest doctrine applies to otherwise-privileged material sought through a FOIA request. *Hunton & Williams v. DOJ*, 590 F.3d 272, 278 (4th Cir. 2010); *see also Welby v. HHS*, No. 15-cv-195 (NSR), 2016 WL 1718263, at *8 (S.D.N.Y. Apr. 27, 2016) (holding that communications with a non-federal agency were subject to Exemption 5 pursuant to the attorney-client privilege and the common interest doctrine). Courts applying the common interest doctrine in the context of Exemption 5 require an agency claiming the attorney-client or work product privileges to show "that it had agreed to help another party prevail on its legal claims at the time of the communications at issue because doing so was in the public interest." *Am Mgmt. Servs.*, 703 F.3d at 732-33 (citation omitted). But no written agreement is required, and the parties to the communication need not be "co-parties in litigation." *Id.*

The common interest doctrine should not be limited, however, to just two of the three main Exemption 5 privileges. Like the consultant corollary, the common interest doctrine is relevant to Exemption 5's threshold inquiry—*i.e.*, "whether [a] document qualifies as 'inter-' or 'intra-agency,'"—and "not to the question of whether [a document] is privileged." *Hunton*, 590 F.3d at 280. The logic behind treating records subject to the attorney-client and work product privileges as "intra-agency" applies with equal force here to the deliberative process privilege. As the Fourth Circuit explained in *Hunton*, the "impact on the government's ability to conduct complex and multi-faceted litigation would be staggering" if the act of partnering with non-agencies in litigation "would somehow subject that party to the loss of its most basic civil discovery privileges." *Id.* at 277-78. Similarly, the Executive Branch's ability to engage in effective policy-making would be constrained if agencies lose the most basic protections of the deliberative process privilege the

21

moment they enlist allies in Congress in their efforts.  *See* Slemrod Decl. ¶¶ 22-23; *see also* Skrzycki Decl. ¶¶ 19-20. Without that protection, FOIA would provide public access to the most sensitive agency deliberations with Congress about pressing policy matters, in many circumstances shortly after those deliberations occurred.  *Cf.* 5 U.S.C. § 552 E(a)(6)(E)(ii)(I) (requiring a determination as to whether to grant expedited processing "within 10 days" of receipt of a FOIA request).   An exemption crafted to ensure "efficient government operation," *Ryan*, 617 F.2d.at 789–90 & n.28 (quoting S. Rep. No. 89-813, at 9 (1965)), should not to be narrowed to the point of permitting such a result.

Rather, the redacted emails should be considered "intra-agency" communications when applying the deliberative process privilege in light of the defined common interest shared by the agencies and the relevant members of Congress and their staff.  That interest is a narrow one—the repeal of the Affordable Care Act and the enactment of the AHCA (or substantially similar legislation).  *See* Slemrod Decl. ¶ 7; *see also* Skrzycki Decl. ¶ 20.  And the communications that would be subject to the common interest doctrine in this case were all exchanged as part of the constitutionally prescribed collaboration between Congress and the Executive Branch—branches that are controlled by the same political party.  *See supra*, pp. 16-17.  In other words, there was both a formal relationship between the parties to the emails and a particular policy goal those parties were pursuing.  Under these circumstances, which are analogous to the limited settings in which courts apply the common interest doctrine, members of the Legislative and Executive Branches with convergent interests should be permitted "to communicate within the terms of . . . Exemption [5] and to do so in a manner that does not strip [them] of those deliberative privileges . . . that are widely recognized as necessary."  *Hunton*, 590 F.3d at 278.

### 3.   The Withheld Material is Both "Pre-decisional" and "Deliberative"

The redacted emails contain the kind of information that courts routinely protect under the deliberative process privilege, including draft documents, *Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 161 F. Supp. 3d 120, 128 (D.D.C.), *modified*, 185 F. Supp. 3d 26 (D.D.C. 2016), and assessments of policy proposals, *CREW v. NARA*, 583 F. Supp. 2d 146, 162 (D.D.C. 2008). This information was integral to a series of agency decision-making processes about health care reform. *See generally* Hitter Decl., Ex. 1 ("OMB Vaughn[7] Index"); Slemrod Decl.; Bell Decl., Ex. 6 ("HHS Vaughn Index"); Skrzycki Decl; Arbes Decl.

First, and most significantly, the redacted emails contributed to the process for advising the President on whether to sign or veto health care reform legislation.  Providing such advice to the President was a significant responsibility throughout the debate over health care reform, and the redacted communications with Congress were critical in carrying it out.  Slemrod Decl. ¶¶ 8-11.  In those emails, agency personnel and members of Congress and staff provided and analyzed draft legislative language, exchanged proposals for suggested amendments, and discussed possible policy and political challenges the AHCA would face.  *See id.* ¶¶ 10, 15-18.  These materials allowed agency officials to advise the President on what policy options realistically were and were not on the table—information that "would inform his decision on whether or not to veto potential legislation." *Id.* ¶ 10.

The fact that the AHCA ultimately did not make it to the President's desk for a final decision does not detract from the role the communications played in the Executive Branch's decision-making process.  The deliberative process privilege does not require the government to identify "an agency *final* decision," but instead requires only that the government "establish what

---

[7] *See Vaughn v. Rosen*, 523 F.2d 1136 (D.C. Cir. 1975).

deliberative process is involved, and the role . . . that the documents at issue played in that process." *Judicial Watch*, 108 F. Supp. 2d at 35 (emphasis added).  The process for advising the President on an eventual decision about health care reform legislation was, unsurprisingly, in place well before any particular bill could have reached his desk.  Slemrod Decl. ¶¶ 9-10; *see Bureau of Nat'l Affairs, Inc. v. DOJ*, 742 F.2d 1484, 1496–97 (1984) (holding that OMB could withhold as "predecisional, deliberative interagency memoranda" the EPA's budget recommendations, which the EPA submitted to OMB and which OMB then used to make its own recommendations to the President, because "the President, not the EPA, makes the final decision concerning what budget requests should be submitted to the Congress"); *cf. Leopold v. CIA*, 89 F. Supp. 3d 12, 20 (D.D.C. 2015) (upholding the agency's invocation of the deliberative process privilege when "[t]he agency was . . . engaged in an ongoing, multi-year, deliberative process about how to handle the[] issues" arising from a detention program).  The agencies' discussions with Congress as part of that process therefore were both pre-decisional and deliberative.

Second, the redacted emails contain deliberations that preceded a number of interim decisions the agencies made with respect to health care reform.  For instance, the emails include discussions of the details surrounding a SAP that the administration issued about the AHCA. Slemrod Decl.¶ 13.  As explained in the Slemrod declaration, OMB prepares SAPs to communicate the administration's position on particular legislation.  *Id.* ¶ 12.  In several of the emails responsive to American Oversight's FOIA request, OMB solicited input from congressional personnel regarding the wording and potential effect of the SAP.  *Id.* ¶ 13.  That advice preceded, and contributed to, the final SAP.  *Id.*  Additionally, several of the redacted emails include deliberations about specific strategic decisions—such as the placement of a particular op-ed, or which Executive Branch officials should attend a given meeting—that were part and parcel to the Executive

24

Branch's overall efforts in support of health care reform.  *See, e.g.*, OMB Vaughn Index Doc. Nos. 25, 29.  Discussions about who should attend a particular meeting, draft language, or advocate a position all contributed to the Executive Branch's legislative strategy for health care reform. Slemrod Decl. ¶ 16.  Other communications similarly contributed to the Executive Branch's strategy for communicating with external stakeholders and the media.  Arbes Decl. ¶ 8.  The redacted emails that contributed to and preceded these strategic decisions thus are also subject to the deliberative process privilege.

### 4. *Requiring the Agencies to Disclose the Redacted Material Would Frustrate the Animating Purpose of the Deliberative Process Privilege and Cause Foreseeable Harm*

Disclosing the information contained in the redacted emails would chill agency deliberations and hobble the process through which the Executive Branch and Congress tackle the most challenging public policy problems.  As the Supreme Court has long recognized, "those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decision making process."  *Sears, Roebuck & Co.*, 421 U.S. at 150-51 (quoting *United States v. Nixon*, 418 U.S. 683, 705 (1974)).  The deliberative process privilege thus protects agencies from "operat[ing] in a fishbowl," and preserves "the frank exchange of ideas and opinions" that is necessary for effective decision-making.  *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 462 (D.C. Cir. 2014) (quoting *Dudman Commc'ns. Corp. v. Dep't of Air Force,* 815 F.2d 1565, 1567 (D.C. Cir. 1987)).

Requiring the disclosure of the redacted emails would inflict precisely the kinds of injuries on government decision-making that the deliberative process privilege was intended to prevent. First, it would jeopardize important channels of communication between the Executive Branch and Congress.  The Executive Branch relies on the ability to exchange confidential communications with Congress in order to carry out its constitutionally prescribed role in enacting

laws.  Slemrod Decl. ¶¶ 8-9, 23; *see also Formaldehyde*, 889 F.2d at 1120 (disclosing comments

of outside reviewers on Centers for Disease Control ("CDC") report could "seriously hamper the

efforts of CDC to fulfill its clear Congressional mandate to conduct and publish scientific research

for the public benefit").  Such communications allow Congress to provide draft legislation, offer

insight into the political dynamics that affect a bill's chance of success, and share other information

that shapes Executive Branch decisions.  Slemrod Decl. ¶¶ 8-10.  Those consultations, in turn,

allow Executive Branch agencies to advise the President on his ultimate decision about whether to

sign or veto particular legislation, to develop and refine important policies, and to communicate

about the President's policy priorities.  *Id.*  Accordingly, without the ability to keep confidential

the kinds of sensitive emails at issue in this case, the President would receive less effective advice

on pending legislation that he may be asked to sign, the pool of potential—and politically viable—

policy options would shrink, and the Executive Branch would communicate less effectively with

the public about pressing issues.  *Id.* ¶ 23; *see Sierra Club v. DOI*, 384 F. Supp. 2d 1, 16 (D.D.C.

2004) ("The privilege protects the 'deliberative process' because it is the very process of debating,

shaping, and changing a proposed major policy that needs candor, vigorous to-and-fro, and

freedom of expression.").

Second, disclosing the redacted emails also would harm the Executive Branch's ability to

share its thinking with Congress.  OMB and HHS, for example, would be deterred from discussing

technical assistance with Congress for pending legislation, and OMB would coordinate less

effectively with Congress in crafting SAPs.  Skrzycki Decl. ¶ 20; Slemrod Decl. ¶¶ 12, 23.  In fact,

the chilling effect would spread to communications between *agencies*, Slemrod Decl. ¶ 23, as other

agencies are unlikely to be fully candid about their views on policies or legislation if there is

concern that such views will be shared in deliberations with Congress and thereby made subject to

FOIA.  *See Sierra Club*, 384 F. Supp. 2d at 16 (noting that although the President had "advocated [a particular legislative policy], the [Executive Branch agency] faced multiple policy debates and decisions as to whether, where, and how" to further that policy goal "and how to achieve its success in Congress").

At bottom, the disclosure of the sensitive information that American Oversight seeks would cause foreseeable harm by impairing the government decision-making that the deliberative process privilege is meant to protect.  This Court should not narrow the D.C. Circuit's reading of Exemption 5 to impose that result.

**B.  The Agencies Properly Redacted Calendar Entries Pursuant to the Deliberative Process Privilege**

The remaining documents at issue in this case are calendar entries, which contain information that the agencies withheld because it is protected by the deliberative process privilege. The Court should award the agencies summary judgment with respect to each of these redactions.

First, HHS properly withheld briefing materials prepared for Secretary Price in advance of calls or meetings he had with members of Congress.  *See* HHS Vaughn Index Bates Nos. HHS-July 2017-000002-000003, 005-011, 013-023, 084-085, 087, 089-090, 092-094, 099, 0136-0137, 279-281, 283-285.  These intra-agency documents preceded the calls and meetings, contributed to HHS's legislative strategy for health care form, and are quintessentially deliberative—they reflect the information that HHS staff believed would be relevant for the calls and meetings, including an assessment of the issues might arise and suggested talking points for the Secretary.  *Id.*; *see also Coastal States Gas Corp.*, 617 F.2d at 866 (explaining that the deliberative process privilege applies to "recommendations, . . . proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency").  Where, as here, "briefing materials [that] were prepared for senior policy officials" reflect the judgment of agency

staff in "anticipating what information the[] officials would need in order to be prepared to address any questions or issues" that would arise at the meeting, the "material qualifies as deliberative." *Elec. Frontier Found. v. DOJ*, 890 F. Supp. 2d 35, 52-53 (D.D.C. 2012).  These briefing materials therefore are protected under Exemption 5.

Second, OMB properly redacted limited information from the title and body of select calendar entries that would reveal details about the agency's deliberations.  The records with these redactions are described at Document Nos. 18, 23, 37, 38, and 39 in the OMB Vaughn Index.  Each of the redactions identifies an issue that was (or issues that were) under consideration by the agency at the time of the meeting, or the deliberative purpose behind holding the meeting.  *Id.*  As such, the redacted material "reveals what the agency [was] considering" and therefore should "be exempt from disclosure."  *Pub. Emps. for Envtl. Responsibility v. Office of Sci. & Tech. Policy*, 881 F. Supp. 2d 8, 17 (D.D.C. 2012) (upholding decision to redact document title and agenda topics pursuant to deliberative process privilege).  This is true even if the agenda or title for a calendar entry could be considered "factual," as the deliberative process privilege "serves to protect the deliberative process itself, not merely documents containing deliberative material."  *Mapother v. DOJ*, 3 F.3d 1533, 1537 (D.C. Cir. 1993) (citations omitted).  Because these redactions protect details of the agency's process for advancing health care reform, the withheld material is subject to Exemption 5.

Finally, OMB properly redacted the location and the list of attendees from calendar entries for a handful of meetings.  OMB Vaughn Index Doc. Nos. 1A, 18, 31, 32.  These redactions are necessary to protect sensitive details of the Executive Branch's deliberations over health care reform, including the participation of the senior-most White House officials.  "In both the 1974 FOIA Amendments and the 1978 Presidential Records Act, Congress made clear that it did not

want documents like the appointment calendars of the President and his close advisors to be subject to disclosure under FOIA." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 211 (D.C. Cir. 2013).   That is precisely the information that would be revealed if OMB's redactions to these calendar entries were not upheld—redactions that protect the names of the senior officials involved in these meetings, as well as locations that would provide the public with that same information. Hitter Decl. ¶¶ 28-29.   Releasing the information therefore would shed light into when and how the President and/or his closest advisors engaged in the effort to enact health care reform— information that reveals the Executive Branch's deliberative process, *see Montrose Chem. Corp. of Cal. v. Train*, 491 F.2d 63, 71 (D.C. Cir. 1974) ("Exemption 5 was intended to protect not simply deliberative material, but also the deliberative process of agencies.").

Similarly, the decision to redact the list of meeting attendees in two calendar entries where senior White House officials were present, *see* OMB Vaughn Index Doc. Nos. 31, 32, protects the Executive Branch's deliberations.   The attendees were all members of Congress, and releasing those names would reveal which individuals senior White House officials sought to engage during the ongoing negotiations over health care reform.   *Id.*   That information "reflects [those officials'] exercise of discretion and judgment" as to which stakeholders were particularly important and persuadable in the health care reform effort, and therefore "would enable the public to probe [the Executive Branch's] deliberative processes."   *Leopold*, 89 F. Supp. 3d at 21 (citation omitted). The decision to withhold this information thus was appropriate.

### C.  The Agencies Processed and Released All Reasonably Segregable Information

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."   5 U.S.C. § 552(b)(9).   But an agency need not disclose records in which the nonexempt information remaining is meaningless.   *See Nat'l Sec. Archive Fund, Inc. v. CIA*, 402

F. Supp. 2d 211, 220-21 (D.D.C. 2005).   "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material."   *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).   And a court "may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated."   *Juarez v. DOJ*, 518 F.3d 54, 61 (D.C. Cir. 2008).

Here, the agencies conducted a careful, line-by-line review of each document and withheld information only after they concluded that there was no reasonably segregable factual or non-deliberative information responsive to American Oversight's request.   Hitter Decl. ¶ 30; Bell Decl. ¶ 28.   In fact, while certain attachments—such as briefing materials—were withheld in full, all of the underlying emails and calendar entries were produced with redactions, rather than withheld in full.   There are thus no facts rebutting the presumption that the agencies complied with their segregability obligations, and the agencies are entitled to summary judgment on that issue.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully requests that this Court grant their motion for summary judgment.

Dated:   September 26, 2017

Respectfully Submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Michael H. Baer*
MICHAEL H. BAER
Trial Attorney (New York Bar No. 5384300)
U.S. Department of Justice,
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW

Washington, D.C. 20530
Telephone:            (202) 305-8573
Facsimile:  (202) 616-8460
E-mail:      Michael.H.Baer@usdoj.gov

*Counsel for Defendants*