**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN OVERSIGHT, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Case No. 17-cv-827 (EGS) |
| | ) |
| U.S. DEPARTMENT OF | ) |
| HEALTH AND HUMAN SERVICES et al., | ) |
| | ) |
| *Defendants*. | ) |
| | ) |
| COMMITTEE ON WAYS AND MEANS OF | ) |
| THE U.S. HOUSE OF REPRESENTATIVES, | ) |
| | ) |
| *Defendant-Intervenor.* | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO DEFENDANTS' AND DEFENDANT-INTERVENOR'S
MOTIONS FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

BACKGROUND ................................................................................................................ 1

ARGUMENT .................................................................................................................... 2

I.     Legal Standards ................................................................................................ 4

II.    HHS's Search Was Inadequate. ...................................................................... 5

III.   Exemption 5 Does Not Protect Communications Between Agencies and Congress. ................................................................................................ 7

    A.   Communications Between Congress and HHS & OMB Are Not "Inter-Agency" or "Intra-Agency" Communications. ............................... 7

        1.   The Plain Text of Exemption 5 and the Supreme Court's Interpretation of that Text Preclude HHS & OMB's Position Here ................................................................................ 7

        2.   The "Consultant Corollary" Does Not Apply to Inter-Branch Negotiations Regarding Potential Health Care Reform Legislation ................................................................................ 9

        3.   Congress Did Not Have a Protected "Common Interest" with HHS and OMB in Negotiations Regarding Health Care Reform Legislation. ................................................... 16

        4.   HHS and OMB's Position Rests on a Fundamental Misunderstanding of Our Constitutional Scheme. ...................... 20

        5.   Adopting HHS and OMB's Positions Would Have Wide-Ranging, Deleterious Consequences at Odds with FOIA's Animating Purpose. ................................................... 22

    B.   The Communications Between Congress and HHS and OMB Are Not Protected by the Deliberative Process Privilege. ................................... 23

        1.   The Communications Are Not Part of an Agency Deliberation. ... 24

        2.   The Communications Are Not "Pre-Decisional" and "Deliberative" Inputs to Agency Decisionmaking. ...................... 26

IV.   The Remaining Records Are Not Protected by the Deliberative Process Privilege. ........................................................................................................ 28

V.    At a Minimum the Court Should Conduct an *In Camera* Review ...................... 30

VI.   The Records Contested by the Committee Are Not Congressional Records ........ 31

A.    The Records Contested by the Committee Are Agency Records. ............ 31

B.    The Contested Records Are Not Congressional Records. ........................ 33

    1.    The Committee's Overbroad Claims Encompass Emails
        Exchanged with No Contemporaneous Congressional Claim
        of Confidentiality. .......................................................................... 33

    2.    Congress Has Not Manifested a Clear Intent to Control the
        Contested Records with Sufficient Particularity. ......................... 34

        a.    The Generic Footers Do Not Reflect a Particularized
            Judgment with Respect to These Records. ............................. 34

        b.    The Footers Do Not Reflect a Decision by Someone
            Authorized to Act on Behalf of Congress. ............................. 36

    3.    HHS and OMB Possess the Contested Records for the
        General Use and Purposes of the Agency, Not for a
        "Limited Purpose." ....................................................................... 38

    4.    The Contested Records Are Not Protectable
        Oversight Inquiries. ...................................................................... 40

    5.    The Defendant Agencies Did Not Consent to Be Bound by
        Congress's Claim of Confidentiality. ........................................... 42

C.    If the Contested Records Were Congressional Records Under
    D.C. Circuit Case Law, that Would Conflict with Controlling
    Supreme Court Precedent. ........................................................................ 44

VII.    American Oversight Is Entitled to Discovery Before Summary Judgment
    in Favor of the Defendant Agencies or the Committee. ..................................... 44

CONCLUSION ..................................................................................................................... 45

# TABLE OF AUTHORITIES

**CASES**

*ACLU v. CIA*,
    823 F.3d 655 (D.C. Cir. 2016) ............................................................. 32, 36, 38, 40

*Am. Mgmt. Servs., LLC v. Dep't of the Army*,
    703 F.3d 724 (4th Cir. 2013) ............................................................. 18

*Assassination Archives & Res. Ctr. v. CIA*,
    334 F.3d 55 (D.C. Cir. 2003) ............................................................. 4

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*,
    160 F.R.D. 437 (S.D.N.Y. 1995) ............................................................. 17

*Bowsher v. Synar*,
    478 U.S. 714 (1986) ............................................................. 21

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ............................................................. 20

*Burka v. HHS*,
    87 F.3d 508 (D.C. Cir. 1996) ............................................................. 32

*Citizens Progressive Alliance v. Bureau of Indian Affairs*,
    241 F. Supp. 2d 1342 (D.N.M. 2002) ............................................................. 12

*Coastal States Gas Corp. v. DOE*,
    617 F.2d 854 (D.C. Cir. 1980) ............................................................. 26

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992) ............................................................. 7, 9

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*,
    447 U.S. 102, 108 (1980) ............................................................. 7

*CREW v. DHS*,
    514 F. Supp. 2d 36 (D.D.C. 2007) ............................................................. 12

*Ctr. for Int'l Envtl. Law v. USTR*,
    237 F. Supp. 2d 17 (D.D.C. 2002) ............................................................. 11, 12

*Cunningham v. DOJ*,
    961 F. Supp. 2d 226 (D.D.C. 2013) ............................................................. 5

*Dexia Credit Local v. Rogan*,
    231 F.R.D. 268 (N.D. Ill. 2004) ............................................................. 18

*DOI v. Klamath Water Users Protective Ass'n*,
    532 U.S. 1 (2001) ............................................................. passim

*DOJ v. Reporters' Comm. for Freedom of the Press*,
  489 U.S. 749 (1989)......................................................................................22

*\*DOJ v. Tax Analysts*,
  492 U.S. 136 (1989)................................................................................passim

*Dow Jones & Co. v. DOJ*,
  917 F.2d 571 (D.C. Cir. 1990) ...................................................................8, 15

*Elec. Frontier Found. v. DOJ*,
  826 F. Supp. 2d 157 (D.D.C. 2011) ..................................................................29

*Elec. Frontier Found. v. ODNI*,
  No. 08-1023, 2009 WL 3061975 (N.D. Cal. Sept. 24, 2009) ...............................25

*EPA v. Mink*,
  410 U.S. 73 (1973).........................................................................................26

*EPIC v. DOJ*,
  511 F. Supp. 2d 56 (D.D.C. 2007) ....................................................................29

*FBI v. Abramson*,
  456 U.S. 615 (1982).........................................................................................4

*Fisher v. United States*,
  425 U.S. 391 (1976).......................................................................................19

*Formaldehyde Institute v. HHS*,
  889 F.2d 1118 (D.C. Cir. 1989) .......................................................................15

*Forsham v. Harris*,
  445 U.S. 169 (1980).......................................................................................31

*Fox News Network v. Dep't of the Treasury*,
  678 F. Supp. 2d 162 (S.D.N.Y. 2009) ........................................................5, 6, 29

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010).......................................................................................20

*Georgacarakos v. FBI*,
  908 F. Supp. 2d 176 (D.D.C. 2012) ....................................................................5

*Goland v. CIA*,
  607 F.2d 339 (D.C. Cir. 1978) .....................................................35, 38, 39, 40, 41

*Gov't Land Bank v. GSA*,
  671 F.2d 663 (1st Cir. 1982).............................................................................12

*Gulf Islands Leasing, Inc. v. Bombardier Cap., Inc.*,
  215 F.R.D. 466 (S.D.N.Y. 2003) .......................................................................18

*Hallstrom v. Tillamook Cty.*,
   493 U.S. 20 (1989) ..................................................................................................... 9

*Holy Spirit Ass'n for the Unification of World Christianity v. CIA*,
   636 F.2d 838 (D.C. Cir. 1980) ............................................................................. 34, 39

*Hoover v. DOI*,
   611 F.2d 1132 (5th Cir. 1980) .................................................................................. 12

*Hunton & Williams v. DOJ*,
   590 F.3d 272 (4th Cir. 2010) ..................................................................................... 18

*In re Lindsey*,
   158 F.3d 1263 (D.C. Cir. 1998) ................................................................................ 20

*In re Pacific Pictures Corp.*,
   679 F.3d 1121 (9th Cir. 2012) ............................................................................. 17, 18

*In re Teleglobe Commc'ns Corp.*,
   493 F.3d 345 (3d Cir. 2007) ...................................................................................... 17

*Intex Recreation Corp. v. Team Worldwide Corp.*,
   471 F. Supp. 2d 11 (D.D.C. 2007) ............................................................................ 17

*Jordan v. DOJ*,
   591 F.2d 753 (D.C. Cir. 1978) (*en banc*) ................................................................. 23

*Judicial Watch v. Dep't of State*,
   875 F. Supp. 2d 37 (D.D.C. 2012) ............................................................................ 30

*Judicial Watch v. Dep't of the Treasury*,
   796 F. Supp. 2d 13 (D.D.C. 2011) ............................................................................ 30

*Judicial Watch v. DOE*,
   412 F.3d 125 (D.C. Cir. 2005) .................................................................................. 16

*Judicial Watch v. DOT*,
   950 F. Supp. 2d 213 (D.D.C. 2013) .......................................................................... 16

*Judicial Watch v. U.S. Secret Serv.*,
   726 F.3d 208 (D.C. Cir. 2013) ............................................................................. 30, 32

*Judicial Watch v. USPS*,
   297 F. Supp. 2d 252 (D.D.C. 2004) .......................................................................... 29

*Judicial Watch, Inc. v. Reno*,
   154 F. Supp. 2d 17 (D.D.C. 2001) ............................................................................ 26

*Larson v. Dep't of State*,
   565 F.3d 857 (D.C. Cir. 2009) .................................................................................. 30

*Lead Indus. Ass'n v. OSHA,*
   610 F.2d 70 (2d Cir. 1979) ............................................................................ 12

*Leopold v. CIA,*
   177 F. Supp. 3d 479 (D.D.C. 2016) ............................................................... 5

*Loving v. United States,*
   517 U.S. 748 (1996) ....................................................................................... 21

*Lucaj v. FBI,*
   852 F.3d 541 (6th Cir. 2017) .............................................................. 9, 10, 18

*McCullough v. Fraternal Order of Police, Chicago Lodge 7,*
   304 F.R.D. 232 (N.D. Ill. 2014) ................................................................... 17

*McKinley v. Bd. of Governors of Fed. Reserve Sys.,*
   647 F.2d 331 (D.C. Cir. 2011) ............................................................... 11, 15

*Miller v. DOJ,*
   562 F. Supp. 2d 83 (D.D.C. 2008) ............................................................... 12

*Milner v. Dep't of the Navy,*
   562 U.S. 562 (2011) ......................................................................................... 4

*Morley v. CIA,*
   699 F. Supp. 2d 244 (D.D.C. 2010) ............................................................. 29

*Murphy v. Dep't of the Army,*
   613 F.2d 1151 (D.C. Cir. 1979) ................................................................... 16

*Nat'l Inst. of Military Justice v. DOD,*
   512 F.3d 677 (D.C. Cir. 2008) ........................................................... 10, 12, 15

*Nat'l Inst. of Military Justice v. DOD,*
   No. 06-5242, 2008 WL 1990366 (D.C. Cir. Apr. 30, 2008) ......................... 10

*NLRB v. Robbins Tire & Rubber Co.,*
   437 U.S. 214 (1978) ....................................................................................... 23

*NRDC v. NRC,*
   216 F.3d 1180 (D.C. Cir. 2000) ................................................................... 31

*Oglesby v. Dep't of the Army,*
   920 F.2d 57 (D.C. Cir. 1990) ......................................................................... 4

*Paisley v. CIA,*
   712 F.2d 686 (D.C. Cir. 1983) ........................................................ 34, 35, 40, 41

*Pampered Chef v. Alexanian,*
   737 F. Supp. 2d 958 (N.D. Ill. 2010) ........................................................... 18

*People for the Am. Way Found. v. Nat'l Park Serv.*,
    503 F. Supp. 2d 284 (D.D.C. 2007) ........................................................................ 24

*Petroleum Info. Corp. v. DOI*,
    976 F.2d 1429 (D.C. Cir. 1992) ............................................................................. 24

*Pierce Cnty., Wash. v. Guillen*,
    537 U.S. 129 (2003) ................................................................................................ 19

*Public Citizen v. DOJ*,
    111 F.3d 168 (D.C. Cir. 1997) ......................................................................... 14, 15

*Public Citizen v. OMB*,
    598 F.3d 865 (D.C. Cir. 2010) ............................................................................... 27

*Renegotiation Bd. v. Grumman Aircraft*,
    421 U.S. 168 (1975) ................................................................................................ 27

*Rockwell Int'l Corp. v. DOJ*,
    235 F.3d 598 (D.C. Cir. 2001) ............................................................................... 16

*Ryan v. DOJ*,
    617 F.2d 781 (D.C. Cir. 1980) ..................................................................... 9, 10, 13

*Sakamoto v. EPA*,
    443 F. Supp. 2d 1182 (N.D. Cal. 2006) ................................................................. 12

*Soucie v. David*,
    448 F.2d 1067 (D.C. Cir. 1971) ............................................................................... 9

*Stevens v. Dep't of State*,
    No. 13-5152, 2015 WL 1744131 (N.D. Ill. Apr. 14, 2015) .................................... 6

*Strunk v. Dep't of State*,
    845 F. Supp. 2d 38 (D.D.C. 2012) ........................................................................... 5

*Taxation With Representation Fund v. IRS*,
    646 F.2d 666 (D.C. Cir. 1981) ............................................................................... 27

*Truitt v. Dep't of State*,
    897 F.2d 540 (D.C. Cir. 1990) ................................................................................. 4

*United States v. BDO Seidman, LLP*,
    492 F.3d 806 (7th Cir. 2007) .................................................................................. 17

*United States v. Nobles*,
    422 U.S. 225 (1975) ............................................................................................... 17

*United States v. Weber Aircraft Corp.*,
    465 U.S. 792 (1984) ................................................................................................. 8

*United We Stand Am. v. IRS*,
  219 F. Supp. 2d 14 (D.D.C. 2002) ............................................................. 4

*United We Stand Am., Inc. v. IRS*,
  359 F.3d 595 (D.C. Cir. 2004). .............................................. 34, 38, 40, 41

*Univ. of Penn. v. EEOC*,
  493 U.S. 182 (1990) ............................................................................... 19

*Valencia-Lucena v. Coast Guard*,
  180 F.3d 321 (D.C. Cir. 1999) ................................................................. 4

*Vaughn v. Rosen*,
  523 F.2d 1136 (D.C. Cir. 1975) ................................................. 23, 27, 29

*Vietnam Veterans v. DHS*,
  8 F. Supp. 3d 188 (D.D.C. 2014) ............................................................ 6

*Wu v. Nat'l Endowment for the Humanities*,
  460 F.2d 1030 (5th Cir. 1972) ............................................................... 12

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 6, cl. 2 ............................................................................ 21

## STATUTES

5 U.S.C. § 551(1)(A) ....................................................................................... 8

5 U.S.C. § 552(a)(4)(B) .............................................................................. 4, 31

5 U.S.C. § 552(b)(5) ...................................................................................... 1, 7

## FEDERAL RULES

Fed. R. Civ. P. 56(a) ....................................................................................... 4

## OTHER AUTHORITIES

Auth. of Ind. Members of Congress to Conduct Oversight of the Executive Branch, 41 Op.
  O.L.C. ___ (2017) .................................................................................... 37

Department of Justice Guide to the Freedom of Information Act,
  Exemption 5 (May 7, 2014) ................................................................... 10

The Federalist No. 51 (J. Madison) ............................................................... 20

In response to Plaintiff American Oversight's Freedom of Information Act (FOIA)

requests, the defendant agencies—the Department of Health & Human Services (HHS) and the

Office of Management & Budget (OMB)—advance the novel claim that their communications

with Congress are exempt from disclosure under FOIA because those communications are "inter-

agency or intra-agency memorandums or letters that would not be available by law to a party

other than an agency in litigation with the agency." *See* 5 U.S.C. § 552(b)(5) (Exemption 5).

Notwithstanding the fact that Congress is decidedly not an "agency" for purposes of FOIA and

under fundamental principles of the separation of powers, HHS and OMB argue that these

external communications relating to potential health care reform legislation are exempt from

release because Congress participated in them as an "outside consultant" with "common

interests" in these agency decisionmaking processes. Congress disagrees, arguing for its part that

at least certain of these communications arise so directly from core congressional functions that

these communications, including even exchanges initiated by agency personnel, should be

viewed as "congressional records" under Congress's control and not subject to FOIA. Both of

these claims, of course, cannot simultaneously be correct. And the unredacted portions of the

communications at issue make clear that neither is. Rather, they are just what one might expect:

the back-and-forth discussions between two independent, co-equal branches, discussing and

negotiating the contours of potential health care reform legislation. Consequently, these agency

records reflecting inter-branch communications must be disclosed as a matter of law.

## BACKGROUND

In March 2017, Plaintiff American Oversight submitted virtually identical FOIA requests

to HHS and OMB seeking, broadly speaking, communications between the defendant agencies

and Congress related to health care reform legislation. *See* Ex. 1, HHS FOIA Request; Ex. 2,

OMB FOIA Request. When neither Defendant responded to Plaintiff's FOIA requests, American Oversight filed suit. Compl., ECF No. 1. This Court ordered Defendants to review and process the responsive records on a rolling basis, completing production by September 5, 2017. *See* May 25, 2017 Minute Order. Defendants' productions totaled 658 records from OMB and 5,384 pages of records from HHS, comprising roughly 295 records (some with attachments). *See* Exs. 3–8, Agency Production Letters. The records produced contained extensive redactions under Exemption 5, most of which covered communications between the agencies and Congress.

Defendants' September 5, 2017 production included four partially-redacted email exchanges between HHS or OMB and individuals who work for the Committee on Ways and Means of the U.S. House of Representatives ("the Committee"). Certain messages within these email chains bore a footer stating that the Committee considered the records to be congressional records not subject to FOIA. The record does not contain evidence of how or why these footers were appended. The Committee has intervened in the lawsuit to argue that these four email chains are congressional records not subject to FOIA.

## **ARGUMENT**

The two primary issues in this case are, at base, questions of statutory interpretation. *First*, do discussions and negotiations between Congress and the Executive Branch regarding potential legislation qualify, as HHS and OMB contend, as privileged "inter-agency or intra-agency memorandums or letters" exempt from disclosure under 5 U.S.C. § 552(b)(5)? And, *second*, are certain of these inter-branch discussions and negotiations agency "records" subject to FOIA, or are they, as the Committee contends, congressional records by virtue of generic footers unilaterally asserting congressional control mechanically appended to a few of the contested records? Straightforward application of controlling Supreme Court precedent resolves each of

these questions in favor of Plaintiff and public disclosure. *See DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 12 (2001) (*Klamath*) (holding that there is "no textual justification" for ignoring Exemption 5's limitation to "inter-agency or intra-agency" communications, excluding the inter-branch communications here); *DOJ v. Tax Analysts*, 492 U.S. 136, 145 (1989) (holding that records, like those contested by the Committee, that an agency "created or obtained" and that came "into the agency's possession in the legitimate conduct of its official duties" are "agency records" for FOIA purposes).

HHS and OMB's contention that Congress was acting effectively as a retained outside consultant performing a role akin to an agency employee in agency deliberations demeans Congress and its place in our constitutional scheme and ignores important features of the cases that recognize a "consultant corollary" to the "inter-agency or intra-agency" component of Exemption 5. The agencies' back-up claim that they were operating pursuant to a protected "common interest" with Congress is likewise unmoored from both case law and the fundamental principles of the separation of powers. Accepting either one of these expansive views would upend decades of FOIA precedent and threaten to allow agencies to conceal every external influence on agency policymaking, however pernicious.

For its part, the Committee's claim that simply appending a generic footer to an email, without any agreement by the agency or considered judgment by Congress specific to that email, suffices to place the email (and any related agency communications) under congressional control wreaks havoc on case law holding that agency communications with Congress are "congressional records" not subject to FOIA only in carefully delineated, narrow circumstances, and again ignores the separation of powers. For the reasons that follow, American Oversight is entitled to summary judgment.

## I.     Legal Standards

Summary judgment is appropriate when the record as a whole demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment on the adequacy of an agency's search may only be granted if the agency demonstrates "beyond material doubt" that its search was "reasonably calculated to uncover all relevant documents." *Valencia-Lucena v. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999). "[T]he agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). An agency "cannot limit its search to only one or more places if there are additional sources that are likely to turn up the information requested." *Valencia-Lucena*, 180 F.3d at 326. If "the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990). With respect to the agencies' withholding of materials as exempt from FOIA, federal courts apply *de novo* review. 5 U.S.C. § 552(a)(4)(B). The agency "bears the burden of establishing the applicability of the claimed exemption." *Assassination Archives & Res. Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003). The nine FOIA exemptions are "explicitly made exclusive," and must be "narrowly construed." *Milner v. Dep't of the Navy,* 562 U.S. 562, 565 (2011) (quoting *FBI v. Abramson*, 456 U.S. 615, 630 (1982)). With respect to whether the four records contested by the Committee are congressional records not subject to FOIA, "[t]he burden is on the [government] to demonstrate, not the requester to disprove, that the materials sought are not 'agency records.'" *Tax Analysts*, 492 U.S. at 142 n.3; *see also United We Stand Am. v. IRS*, 219 F. Supp. 2d 14, 16–17 (D.D.C. 2002).

**II.      HHS's Search Was Inadequate.**

HHS's search used only three search terms: "health care reform," ACA, and AHCA. *See*

Bell Decl. ¶¶ 16–17, ECF No. 25-4. Doing so was inadequate as a matter of law in several ways.

First, HHS erred by searching only for the acronyms; at a minimum, HHS's search should have

used each Act's official title ("Affordable Care Act" and "American Health Care Act") and the

most common way to refer to the current law ("Obamacare"). Similarly, searching only the full

phrase "health care reform" to identify communications about reform efforts, including efforts

other than the AHCA, was unreasonable. Again, the most common way of referring to the

Republicans' reform efforts over the past several months has been to "repeal and replace" current

law. The agency's failure to use that phrase, or any part of it, in its search significantly decreased

the likelihood that the search would uncover all relevant records.

HHS's sole justification for using only the acronyms was that those terms are "frequently

used in the day-to-day operations of the Department, as opposed to the unabbreviated versions."

Bell Decl. ¶ 16. But the fact that one term may be used more frequently than another does not

mean that a search for only the first term is reasonably calculated to identify relevant documents.

Courts regularly recognize the value of using common variations on a term in a search. *See, e.g.*,

*Cunningham v. DOJ*, 961 F. Supp. 2d 226, 242–43 (D.D.C. 2013); *Georgacarakos v. FBI*, 908 F.

Supp. 2d 176, 182–82 (D.D.C. 2012); *Strunk v. Dep't of State*, 845 F. Supp. 2d 38, 43–45

(D.D.C. 2012); *Leopold v. CIA*, 177 F. Supp. 3d 479, 493 (D.D.C. 2016). The terms "Affordable

Care Act," "ACA," and "Obamacare"—like "AHCA" and "American Health Care Act"—are all

variations on the laws' names; limiting the search to only one of these common variations was

not reasonable. HHS also has not explained why searching for the full titles or "Obamacare"

would not have been likely to produce additional records. *See Fox News Network v. Dep't of the*

*Treasury*, 678 F. Supp. 2d 162, 166 (S.D.N.Y. 2009) (finding agency had failed to justify searching for "Bank of New York Mellon" and not its more common acronym, "BONY").

Likewise, HHS's only defense of using just the term "health care reform" was that the FOIA request used that term. *See* Bell Decl. ¶ 16. But "[a] FOIA request and appropriate search terms . . . will rarely be coterminous." *Fox News Network*, 678 F. Supp. 2d at 166. It is the agency's obligation to identify search terms that are reasonably likely to uncover all relevant documents; HHS failed to satisfy that obligation. It is simply not reasonable to omit "the most obvious search term." *Stevens v. Dep't of State*, No. 13-5152, 2015 WL 1744131, at *3 (N.D. Ill. Apr. 14, 2015); *see also Vietnam Veterans v. DHS*, 8 F. Supp. 3d 188, 199, 217 (D.D.C. 2014).

HHS's claims also cannot withstand the available factual evidence. Public statements show HHS Secretary Tom Price repeatedly referred to the ACA as "Obamacare." *See* Creighton Decl. ¶ 23. The responsive records show that HHS regularly did the same in writing. *See id*. ¶ 13. The claim that HHS officials only (or primarily) referred to the law as the "ACA" is simply untenable. And even were it true, HHS cannot state with any credibility—and has made no showing—that their interlocutors in Congress would likely use "ACA" to refer to current law, rather than the "Affordable Care Act" or "Obamacare." Nor could it, as even the records produced by HHS in this case show members of Congress and their staff using the term "Obamacare." *See id*. ¶ 14. Likewise, the available evidence shows that HHS officials regularly referred to the reform efforts not as "health care reform" but rather in more colloquial fashion. In both public statements and the records produced in this case, Secretary Price often referred to efforts to "repeal" Obamacare. *See id*. ¶¶ 15, 24. The same is true of the members of Congress with whom HHS was communicating on this issue. *See id*. ¶ 16. Accordingly, HHS's limited set of search terms was inadequate.

**III.    Exemption 5 Does Not Protect Communications Between Agencies and Congress.**

HHS and OMB improperly redacted communications between agency personnel and Congress under Exemption 5, which provides that an agency may withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency . . . ." 5 U.S.C. § 552(b)(5). The Supreme Court has explained that to qualify under Exemption 5, "a document must . . . satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Klamath*, 532 U.S. at 8. Neither of those requirements is satisfied here.

**A.    Communications Between Congress and HHS & OMB Are Not "Inter-Agency" or "Intra-Agency" Communications.**

Notwithstanding the fact that Congress is not an "agency" under FOIA, Defendants argue that communications between Congress and the defendant agencies constitute "inter-agency" or "intra-agency" memoranda based on two theories: first, that Congress was acting as an outside "consultant" to HHS and OMB (thereby operating as a *de facto* component of the agencies); and second, that Congress shares a "common interest" with the agencies sufficient to render their communications "intra-agency." *See* Mem. of Points and Authorities in Support of Defs.' Mot. for Summary Judgment at 13–22, ECF No. 25-1 ("Defs.' Br."). These arguments are neither consistent with the plain language of the statute nor viable under controlling legal precedent.

**1.    The Plain Text of Exemption 5 and the Supreme Court's Interpretation of that Text Preclude HHS & OMB's Position Here.**

Any examination of a statutory exemption must begin with the text of the statute itself. *See, e.g., Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). The plain text of Exemption 5 applies only to "inter-*agency* or intra-*agency*" records. 5 U.S.C. § 552(b)(5) (emphasis added).

Elsewhere, the statute itself explicitly excludes Congress from its definition of the term "agency." *See* 5 U.S.C. § 551(1)(A) (defining "agency" as "each authority of the Government of the United States, . . . but *does not include . . . the Congress*" (emphasis added)).

The Supreme Court has emphasized the importance of Exemption 5's threshold requirement that records be "inter- or intra-agency." In *Klamath*, the Court explained that "the first condition of Exemption 5 is no less important than the second; the communication must be 'inter-agency or intra-agency.'" 532 U.S. at 9. "Statutory definitions underscore the apparent plainness of this text," the Court added. *Id.* Although the Court acknowledged (with apparent skepticism) the line of cases applying a "consultant corollary" under Exemption 5 (discussed below), it stressed that "there is . . . no textual justification for draining the first condition of independent vitality." *Id.* at 12; *see also United States v. Weber Aircraft Corp.*, 465 U.S. 792, 802 (1984) (noting that "compelling evidence of congressional intent . . . would be necessary to persuade us to look beyond the plain statutory language of [Exemption 5]").

Circuit courts have similarly focused on Exemption 5's textual requirement that the communications at issue be "inter-agency or intra-agency." In *Dow Jones & Co. v. DOJ*, the D.C. Circuit rejected the government's argument that the word "inter-agency" should be read to include inter-branch communications, reasoning that "[i]t may well be true that if Congress had thought about this question, the Exemption would have been drafted more broadly to include Executive Branch communications to Congress . . . . But Congress did not, and the words simply will not stretch to cover this situation." 917 F.2d 571, 574 (D.C. Cir. 1990). Reviewing the statutory definition of "agency," the D.C. Circuit continued, "Congress is simply not an agency," and thus Exemption 5 could not protect a letter sent from DOJ to Congress. *Id.* The Sixth Circuit similarly relied on the plain text of Exemption 5 and FOIA's definition of "agency" to conclude

that communications between DOJ and a foreign law enforcement entity were not "inter-agency

or intra-agency" communications. *See Lucaj v. FBI*, 852 F.3d 541, 546 (6th Cir. 2017) (holding

that for Exemption 5 to apply, not only must a document's source be a government agency, but

"the destination of the document must be a Government agency as well").

This clear precedent establishes that the communications at issue here are not "inter-

agency or intra-agency" records. This threshold incompatibility with the statutory text provides a

sufficient basis for the Court to reject HHS and OMB's claims. *See Conn. Nat'l Bank*, 503 U.S.

at 254 ("[W]hen the words of a statute are unambiguous, then, this first canon is also the last:

judicial inquiry is complete.") (citation omitted); *Hallstrom v. Tillamook Cty.*, 493 U.S. 20, 28

(1989) (stating that "absent a clearly expressed legislative intention to the contrary, the words of

the statute are conclusive") (citation omitted).

### 2. The "Consultant Corollary" Does Not Apply to Inter-Branch Negotiations Regarding Potential Health Care Reform Legislation.

To avoid the straightforward consequence of Exemption 5's plain language, HHS and

OMB attempt to recast their back-and-forth negotiations with Congress regarding potential

legislation as, instead, the reports of an outside consultant retained to inform an agency

decisionmaking process. But this effort to refashion Congress as equivalent to a retained outside

consultant fails for multiple reasons.

A handful of circuit courts have expanded Exemption 5 beyond its plain language to

encompass communications with outside consultants in certain narrow and limited circumstances

not present here. This "consultant corollary" arose from a view that federal agencies may at

times have "a special need for the opinions and recommendations of temporary consultants,"

*Soucie v. David*, 448 F.2d 1067, 1079 n.44 (D.C. Cir. 1971), and out of a desire to "ensur[e] that

persons [acting] in an advisory role would be able to express their opinions freely to agency

decisionmakers without fear of publicity." *Ryan v. DOJ*, 617 F.2d 781, 789 (D.C. Cir. 1980).

*Klamath* expressed skepticism about the validity of the "consultant corollary" line of cases, given its tension with the plain language of Exemption 5.[1] The Sixth Circuit has held that the corollary did not survive *Klamath*, and at least one judge in this Circuit has raised questions about the scope of the corollary after *Klamath*.[2] But even assuming its continued vitality, decades of case law reveal several commonalities necessary for the application of the corollary:

- *First*, the agency must have solicited the outside advice. *See, e.g.*, *Ryan*, 617 F.2d at 790 (extending "intra-agency" requirement to records submitted by outside consultants where they were "solicited by that agency"); *Nat'l Inst. of Military Justice v. DOD*, 512 F.3d 677, 680 (D.C. Cir. 2008) (*NIMJ*) (finding important the fact that the agency formally solicited the outside advice).

- *Second*, the outside consultant understood itself to be acting as a consultant to agency deliberations through some formal or informal arrangement. *See NIMJ*, 512 F.3d at 686 (finding that "consultant corollary" cases have all reflected "indicia of a consultant relationship between the outsider and the agency").[3]

- *Third*, in providing their expertise, "the consultants effectively functioned as agency employees, providing the agencies with advice similar to what it [*sic*] might have received from an employee." DOJ FOIA Manual, Exemption 5 at 5 n.27 (May 7, 2014) (citing *Klamath*, 532 U.S. at 10).

- *Fourth*, the consultants were readily identifiable entities, essentially individuals or

---

[1] *See Klamath*, 532 U.S. at 12 (assuming, but not deciding, that consultants' reports "*may* qualify" as intra-agency under Exemption 5 (emphasis added)); *id.* at 12 n.4 ("We need not decide whether either instance should be recognized as intra-agency, *even if* communications with paid consultants are ultimately so treated." (emphasis added)).

[2] *See Lucaj*, 852 F.3d at 549 (holding that extending Exemption 5 to communications sent or received outside the government cannot be reconciled with *Klamath*); *Nat'l Inst. of Military Justice v. DOD*, No. 06-5242, 2008 WL 1990366, at *1 (D.C. Cir. Apr. 30, 2008) (Tatel, J., dissenting from denial of rehearing en banc) ("It is precisely this same first step that this court's decisions skip, permitting agencies to place the 'intra-agency' label on any advice that they solicit in aid of the deliberative process. As the *Klamath* Court admonished, however, '[t]here is no textual justification for draining the first condition of independent vitality.'" (quoting *Klamath*, 532 U.S. at 12)).

[3] *See generally* Department of Justice Guide to the Freedom of Information Act, Exemption 5 at 4 n.22 ("DOJ FOIA Manual") (May 7, 2014) (collecting cases involving contracts with outside consultants); *id.* at 4–5 n.23 (collecting cases involving volunteer consulting arrangements with agencies); *id.* n.24 (collecting cases involving other official capacity interactions).

organizations available for hire. *See infra* n.6 (citing examples from cases, such as property appraisers, toxic exposure experts, English barristers, and auditors).

- ▪ *Fifth*, and most importantly, the consultant must be disinterested and provide neutral expert advice, rather than representing an interest of its own or of a client. *Klamath*, 532 U.S. at 10–11 (observing that what "is constant in the typical cases is that the consultant does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it. Its only obligations are to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do.").[4]

None of those factors is satisfied here: *First*, the records reveal ordinary back-and-forth discussions and negotiations between two co-equal branches, not agencies soliciting advice and recommendations from a retained outside consultant. *See* Creighton Decl. ¶ 25 (citing examples). Indeed, Congress initiated many of the email exchanges, not HHS or OMB. *Second*, Congress had not agreed to act as a consultant to agency deliberation, nor did it understand itself to be playing a consultant role. *See* Mem. in Support of Mot. for Summary Judgment of the Committee on Ways and Means at 8–11, ECF No. 27 ("Committee's Br."); Halataei Decl. ¶ 12, ECF No. 27-2. *Third*, Congress was not performing functions that might otherwise have been performed by agency employees, but rather was negotiating as a co-equal branch. *Fourth*, the government has not identified who, precisely, was serving as a consultant. Congress contains multitudes, especially on health care. Just whom did the agencies retain?[5] *Fifth*, far from an independent, neutral, and disinterested expert, Congress has its own interests potentially adverse

---

[4] *See also McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 647 F.2d 331, 337 (D.C. Cir. 2011) ("Unlike the Indian tribes the [Federal Reserve Bank of New York did] not represent an interest of its own, or the interest of any other client, when it advise[d] the [Board of Governors] on the Bear Stearns loan."); *Ctr. for Int'l Envtl. Law v. USTR*, 237 F. Supp. 2d 17 (D.D.C. 2002) (finding the "degree of self-interest" pursued by the outside party, "as compared to its interest in providing neutral advice" was a "critical factor").

[5] The entire, divided, bicameral body? The Republican Caucuses? Individual members? Individual staff? The Freedom Caucus? The Republican Study Committee? Or, as the record shows, did the agencies simply correspond in ad hoc ways with ad hoc factions in Congress?

to the agencies.' The members of Congress and staff were necessarily representing their own interests as well as the interests of their constituents and (for staff) the interests of their principal.

The array of circumstances where courts have extended Exemption 5 to reach communications with outside consultants highlights, by comparison, how different and unique the circumstances here are. The members of Congress and staff here are plainly not comparable to a property appraiser, a toxic exposure expert, an English barrister, an outside auditor, military law experts, or Chinese history experts.[6] The difference is that members of Congress and their staff simply cannot stand in the shoes of agency personnel in the manner necessary to be transformed, effectively, into part of the agency for purposes of its internal deliberative processes. Congress is not acting on behalf of HHS or OMB. The members of Congress and staff who participated here have independent, potentially adverse interests to HHS and OMB in the crafting of health care reform legislation. They are representing these interests, and the interests of their constituents, in their back-and-forth discussions and negotiations with Executive Branch agencies. They were not acting as experts interested in "providing neutral advice." *Ctr. for Int'l Envtl. Law*, 237 F. Supp. 2d at 27. Their "only obligations" were not to "truth and [their] sense of what good judgment calls for." *Klamath*, 532 U.S. at 11. There is no evidence that they

---

[6] *See, e.g.*, *Hoover v. DOI*, 611 F.2d 1132, 1138 (5th Cir. 1980) (protecting appraiser's report solicited by the agency); *Gov't Land Bank v. GSA*, 671 F.2d 663, 665 (1st Cir. 1982) (same); *Lead Indus. Ass'n v. OSHA*, 610 F.2d 70, 83 (2d Cir. 1979) (protecting consultant's report on safe levels of workplace lead exposure); *Miller v. DOJ*, 562 F. Supp. 2d 83, 113 (D.D.C. 2008) (protecting formal legal opinion for agency prepared by English barrister on English law); *CREW v. DHS*, 514 F. Supp. 2d 36, 44 (D.D.C. 2007) (protecting documents prepared by FEMA contractors); *Sakamoto v. EPA*, 443 F. Supp. 2d 1182, 1191 (N.D. Cal. 2006) (protecting documents prepared by contractor hired to audit agency); *Citizens Progressive Alliance v. Bureau of Indian Affairs*, 241 F. Supp. 2d 1342, 1355 (D.N.M. 2002) (protecting recommendations by private company hired by the agency); *NIMJ*, 512 F.3d at 681 (protecting advice solicited by the Army from legal experts concerning military commission regulations); *Wu v. Nat'l Endowment for the Humanities*, 460 F.2d 1030, 1032 (5th Cir. 1972) (protecting recommendations of Chinese historians who agreed to act as volunteer consultants).

understood their role to be acting as a consultant to the agencies or to be participants in agency deliberations, functioning "just as an employee would be expected to do." *Id*. Indeed, as parties on two sides of a negotiation, it is unclear how one could be viewed as a "consultant" to the other at all. In our constitutional scheme, the position of members of Congress enacting legislation is "a far cry from the position of the paid consultant" to the Executive Branch. *See id*. at 15.

HHS and OMB have only pointed to one case where communications between an agency and Congress were found to be "intra-agency" communications under the consultant corollary: *Ryan v. DOJ*, 617 F.2d 781 (D.C. Cir. 1980). *See* Defs.' Br. at 13–16. In *Ryan*, the D.C. Circuit held that Exemption 5 could be applied to responses to questionnaires sent by the Attorney General to several senators relating to "their procedures for selecting and recommending potential [judicial] nominees." *Ryan*, 617 F.2d at 784, 791.

*Ryan* does not control the outcome here for two reasons. First, in *Klamath* the Supreme Court expressly indicated that *Ryan* likely went too far in applying the consultant corollary to communications with Congress. *See Klamath*, 532 U.S. at 12 n.4. Thus, to the extent *Ryan* even remains good law, there is clear guidance from the Supreme Court that expanding it further to cover routine inter-branch negotiations would be improper. Second, the facts here differ materially from those in *Ryan*. Unlike here, the records in *Ryan* arguably satisfied most—if not all—of the factors above. In sending the questionnaires, the agency explicitly "solicited" advice from each of the 100 senators, and there was at least an informal understanding that the senators' responses would be used to assist the agency in its own policymaking endeavors, that is, in an agency deliberative process distinct from the senators' performance of their own constitutional functions. This case is quite different; the task at hand here was Congress's own efforts to pass health care reform legislation. The members of Congress and congressional staff who

participated in the communications at issue were representing the diverse interests of members of the legislative branch in discussions about that potential legislation. These regular and informal back-and-forth exchanges—many of which were initiated by representatives of the legislative branch—are a far cry from DOJ's intentional, formal request for input in *Ryan*. Consequently, none of the first four factors is present here.

With respect to the final factor—whether the consultant was acting in its own interest— the facts of *Ryan* at least come closer to meeting the test than do the facts here, and even *Ryan* likely went too far. In *Klamath*, the Supreme Court made clear that even if the "consultant corollary" were found to be permissible, it could not be extended to entities who were "communicating with the Government in their own interest or on behalf of any person or group whose interests might be affected by the Government action addressed by the consultant." *Id.* at 12. In a footnote, the Court expressly addressed *Ryan* and characterized it as one of two cases that "arguably went beyond" the "typical" situation for expanding Exemption 5 to encompass retained outside consultants, noting that "we would expect a Senator to have strong personal views on the matter" of the judicial nomination process. *Id.* at 12 n.4. This is all the more true here: undoubtedly members of Congress have strong personal views on Congress's own efforts to pass a major piece of legislation. And members of Congress would almost certainly not be giving disinterested, neutral advice to the agencies. Indeed, the position of Congress in this very case makes clear that Congress always believed itself to be serving congressional (not agency) purposes in these communications. *See* Committee's Br. at 8–11; Halataei Decl. ¶ 2.

The remaining cases HHS and OMB point to in support of their expansive claims are similarly unavailing. Some of the cases, like *Ryan*, precede and may not survive *Klamath*, and are nonetheless readily distinguished from the facts here. In *Public Citizen v. DOJ*, considering

communications with two former presidents regarding the disposal of records under the

Presidential Records Act (PRA), the D.C. Circuit found that the former presidents were serving

as "outside consultants" to the agencies for purposes of Exemption 5, relying on two

circumstances unique to the situation: first, a former president "retains aspects of his former

role—most importantly, for current purposes, the authority to assert the executive privilege

regarding Presidential communications," and second, "the consultative relationship involved

here is not only explicit, but is mandated by [the PRA]." 111 F.3d 168, 169–70 (D.C. Cir. 1997).

The facts of *Formaldehyde Institute v. HHS* are equally distinguishable: the Court found that

communications with a scholarly journal evaluating a report submitted by the agency for

publication were protectable where such consultation were both necessary and authorized by

Congress in order to enable the agency to make "the deliberative decision about whether and in

what form to publish the Report in the name of the agency." 889 F.2d 1118, 1120, 1124 (D.C.

Cir. 1989). For similar reasons, HHS and OMB's reliance on dicta in *Dow Jones* misses the

mark, as the withheld material is not "part and parcel of the *agency's* deliberative process," 917

F.2d at 575, but rather contains discussions with Congress about health care reform legislation.

    The post-*Klamath* cases HHS and OMB cite do no more than reiterate the D.C. Circuit's

support for the "typical" application of the consultant corollary to communications with a

consultant who "does not represent an interest of its own, or the interest of any other client, when

it advises the agency that hires it." *Klamath*, 532 U.S. at 10–11. The facts in each of these cases

readily meet the conditions for the application of the consultant corollary in "typical"

circumstances identified in *Klamath* and outlined above.[7] None involved adverse interests. And

---

[7] *See, e.g.*, *NIMJ*, 512 F.3d at 683 (protecting communications with non-governmental lawyers whose advice DOD had solicited in promulgating regulations); *McKinley*, 647 F.3d at 337 (protecting communications between the Federal Reserve Board and the Federal Reserve Bank

in none of these cases was Congress the purported consultant.

Finally, HHS and OMB rely on two D.C. Circuit cases that are wholly inapposite: *Murphy v. Dep't of the Army*, 613 F.2d 1151 (D.C. Cir. 1979), and *Rockwell Int'l Corp. v. DOJ*, 235 F.3d 598 (D.C. Cir. 2001). Both cases asked whether a proper claim of privilege under Exemption 5 is waived when a pre-existing, privileged agency record is shared with Congress in response to an oversight inquiry. *See* 613 F.2d at 1154–55; 235 F.2d at 603–04. In both cases, the court reached the unremarkable conclusion that the mere act of sending an otherwise privileged record to Congress in an oversight context did not constitute a waiver of any privileges otherwise applicable under Exemption 5. *See* 613 F.2d at 1156; 235 F.2d at 604. Neither case involved the question of when "outside consultants" can be viewed as part of an agency. But the records at issue here are not pre-existing, privileged agency records shared with Congress; they are direct communications *with* Congress. Any reliance on these cases here is misplaced.

### 3. Congress Did Not Have a Protected "Common Interest" with HHS and OMB in Negotiations Regarding Health Care Reform Legislation.

HHS and OMB also contend that the back-and-forth discussion and negotiation with Congress regarding health care can be deemed "intra-agency" for purposes of Exemption 5 because the defendant agencies purportedly share a "common interest" with their congressional interlocutors regarding the policy issue of enacting potential health care reform legislation. *See* Defs.' Br. at 20–22. This expansive view of the operation of the common interest doctrine has no

---

of New York because FRBNY was an "operating arm" of the Board and "[did] not represent an interest of its own"); *Judicial Watch v. DOE*, 412 F.3d 125, 129–30 (D.C. Cir. 2005) (protecting communications with the National Energy Policy Development Group, an entity established by President George W. Bush to advise and assist the President on energy policy); *Judicial Watch v. DOT*, 950 F. Supp. 2d 213, 214, 219–20 (D.D.C. 2013) (protecting communications with a state transportation agency because any distinct interests the state agency may have had were "too remote from its communications with [DOT] and from the decision [DOT] was making").

footing in the law, and, in any event, the defendant agencies and Congress do not share common legal interests of the sort necessary to implicate the doctrine.

To begin with, the common interest doctrine is simply inapplicable to the deliberative process privilege—the privilege HHS and OMB assert here. Rather, the common interest doctrine is uniquely a creature of the legal context, and operates as an exception to the waiver rules of the attorney-client privilege and the work product doctrine. While the attorney-client privilege protects confidential communications made by a client to his or her lawyer seeking legal advice, knowing disclosure of those confidential communications to a third party almost invariably surrenders the privilege. *United States v. Nobles*, 422 U.S. 225, 239 (1975). The common interest doctrine is an exception to this familiar waiver rule, protecting communications between parties with common *legal* interests. *United States v. BDO Seidman, LLP*, 492 F.3d 806, 816 (7th Cir. 2007). The doctrine protects only communications between *attorneys* regarding the common legal undertaking of their clients, and does not typically protect communications among the parties themselves. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 364 (3d Cir. 2007).

Thus the common interest doctrine turns on several factors, all of which are absent here:

- *First*, the common interest shared by the parties must be *legal*; common commercial, business, personal, or political interests do not suffice. *See, e.g.*, *BDO Seidman*, 492 F.3d at 815–16; *Intex Recreation Corp. v. Team Worldwide Corp.*, 471 F. Supp. 2d 11, 16 (D.D.C. 2007); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995).

- *Second*, the parties must not just have a common legal interest but also must be actively engaged in a common *legal effort*, typically in litigation. A shared "rooting" interest in achieving a particular outcome does not suffice. *See, e.g.*, *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012); *McCullough v. Fraternal Order of Police, Chicago Lodge 7*, 304 F.R.D. 232 (N.D. Ill. 2014).

- *Third*, the communications must occur pursuant to an agreement, whether formal or informal, to pursue a common interest through a joint legal strategy, although it need not be written. *See, e.g.*, *In re Pacific Pictures Corp.*, 679 F.3d at 1129.

- ▪ *Finally*, the doctrine only comes into play when the party asserting it can establish that the communications were otherwise privileged before being shared. *See id.* at 1128–31; *Pampered Chef v. Alexanian*, 737 F. Supp. 2d 958, 968 (N.D. Ill. 2010); *Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 273–74 (N.D. Ill. 2004); *Gulf Islands Leasing, Inc. v. Bombardier Cap., Inc.*, 215 F.R.D. 466, 470 (S.D.N.Y. 2003).

To understand the common interest doctrine is to understand that it makes no sense to apply it in the context of the deliberative process privilege. And indeed, HHS and OMB cite no case where the common interest doctrine has been extended to the deliberative process privilege. Rather, the only cases the defendant agencies cite in support of their "common interest" argument involve the attorney-client privilege and the work product doctrine. *See Am. Mgmt. Servs., LLC v. Dep't of the Army*, 703 F.3d 724 (4th Cir. 2013); *Hunton & Williams v. DOJ*, 590 F.3d 272 (4th Cir. 2010). Apart from the question of whether this Court should follow the Fourth Circuit in finding the common interest doctrine to override the plain text of Exemption 5—a position rejected by other circuits, *see Lucaj*, 852 F.3d at 547–49, and inconsistent with the Supreme Court's reasoning in *Klamath*—these Fourth Circuit cases are readily distinguishable: they were simply evaluating whether certain records would have been discoverable in civil litigation in light of the protection afforded attorney-client communications and work product when shared among counsel with common legal interests pursuing a joint legal strategy. *Am. Mgmt. Servs.*, 703 F.3d at 732–34; *Hunton & Williams*, 590 F.3d at 279–82.

By contrast, here the argument HHS and OMB advance is wholly unmoored from the features of the common interest doctrine found in case law. *First*, the defendant agencies and Congress have no common *legal interest*; their alleged shared interest is purely a matter of policy. *Second*, they are not pursuing a *joint legal strategy* in a matter in litigation. *Third*, there is no evidence that that the defendant agencies and Congress have entered into a common interest agreement, formal or informal. And *fourth*, the defendant agencies are not trying to protect

otherwise privileged agency information from the waiver that would occur when the information is shared between parties, but rather trying to create a privilege to cover the act of sharing itself. Indeed, they have not even posited any *pre-existing* privilege that might possibly apply to the information Congress shared with the agencies.[8]

More broadly, HHS and OMB do not share a cognizable "common interest" (legal or policy) with the members of Congress and congressional staff involved in the communications at issue. As discussed above and more fully in Part III.A.4 below, Congress and the Executive Branch are two independent, co-equal branches who inherently have adverse interests in connection with the crafting of potential legislation as a matter of constitutional structure and design. The various recent votes on health care reform indicate as much: the bodies were divided, both between and among political parties.[9] *See also* Slemrod Decl. ¶ 16, ECF No. 25-3 (discussing communications with Congress summarizing areas of agreement and disagreement with the Executive Branch). These conflicting institutional interests are inconsistent with them having sufficiently identical common interests to warrant application of the doctrine. As the D.C. Circuit has recognized, distinct institutional roles may preclude two parties, even parties having

---

[8] There are good reasons not to extend the common interest doctrine to encompass something as amorphous as the alleged common policy goals between Congress and the agencies. Privileges against discovery, by their nature, make the search for truth more difficult and so courts construe them narrowly and limit them to the circumstances necessary to achieve their purpose. *See*, *e.g.*, *Pierce Cnty., Wash. v. Guillen*, 537 U.S. 129, 144–45 (2003); *Univ. of Penn. v. EEOC*, 493 U.S. 182, 189 (1990); *Fisher v. United States*, 425 U.S. 391, 403 (1976). Extending the common interest doctrine to encompass common policy goals would be a radical expansion of the doctrine without any basis in existing law. Shared policy goals alone simply do not suffice to qualify as cognizable common interests any more than shared commercial or rooting interests.

[9] HHS and OMB's position is also problematic insofar as it relies on the claim that their interests are aligned with those of Congress simply because they are all "controlled by the same political party." *See*, *e.g.*, Defs.' Br. at 22; *id.* at 20. This suggestion that Congress and the Executive Branch have a common interest when controlled by the same political party, but otherwise do not, not only misunderstands the structural differences between the two branches but also creates a specter of shifting legal rules that change with the parties in power.

significant overlapping interests, from having a common legal interest cognizable under the common interest doctrine. *In re Lindsey*, 158 F.3d 1263, 1282–83 (D.C. Cir. 1998).

### 4.     *HHS and OMB's Position Rests on a Fundamental Misunderstanding of Our Constitutional Scheme.*

HHS and OMB's contention that their communications here with members of Congress and their staff are "intra-agency" communications for purposes of Exemption 5—whether because their congressional interlocutors were "outside consultants" performing roles akin to agency personnel, *see* Defs.' Br. at 13–20, or because they allegedly had shared policy goals that created an identity of interest with the defendant agencies so compelling that this "common interest" merits treating them as part of the agency, *id.* at 20–22—is fundamentally inconsistent with the respective roles of Congress and the executive branch in our constitutional scheme.

The Constitution establishes Congress and the executive branch as separate and co-equal branches of government, a separation of powers designed to permit each branch to check and balance the other. *See Buckley v. Valeo*, 424 U.S. 1, 124 (1976). By constitutional structure and design, the relationship between Congress and the executive branch is necessarily adversarial. The Constitution sets up a structure with three branches of government to serve as a check on each other because of their distinctive institutional interests, powers, and responsibilities. As the famous quote by James Madison explains in Federalist 51, the Constitution is designed to let "[a]mbition . . . counteract ambition." The Federalist No. 51, at 349 (J. Madison); *see also Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 501 (2010) ("The Framers created a structure in which '[a] dependence on the people' would be the 'primary control on the government.' The Federalist No. 51, at 349 (J. Madison). That dependence is maintained . . . [by] giving each branch 'the necessary constitutional means, and personal motives, to resist encroachments of the others,' *id.*, No. 51, at 349.").

The vision of executive-legislative relations advanced by HHS and OMB is fundamentally at odds with this constitutional structure. We do not have a parliamentary system where the party in control of the legislature forms the executive ministries. *See Loving v. United States*, 517 U.S. 748, 766 (1996) ("Far from attempting to replicate the English system, . . . the Framers separated the powers of the Federal Government into three branches to avoid dangers they thought latent or inevitable in the parliamentary structure."). The Framers intended a government of "opposite and rival interests," The Federalist No. 51, at 349, and accepted the attendant loss in efficiency of government, recognizing that "in the long term, structural protections against abuse of power were critical to preserving liberty." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).

Placed in this context, it is clear that the suggestion that members of Congress and congressional staff serve as "outside consultants" to federal agencies on legislation akin to agency employees, providing confidential advice and recommendations to agency decisionmakers, is fundamentally incompatible with the constitutional scheme established by the Framers. The Executive Branch and Congress cannot waive the separation of powers out of convenience. Indeed, not only is the notion that Congress is acting "akin to an agency employee" incompatible with the structure and design of the constitutional scheme, it also is, at least in spirit, in tension with the express constitutional prohibition against members of either house of Congress serving as officers of the United States contained in the Incompatibility Clause. *See* U.S. CONST. art. I, § 6, cl. 2 (". . . no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office."). The Incompatibility Clause reflects the Framers' deep concern with the mixing of executive and legislative decisionmaking.

Likewise, the notion that Congress and the executive branch share a protected "common

interest" simply because both co-equal branches are necessary participants in the enactment of legislation reflects a profound misunderstanding of the Framers' design. The fact that members of Congress and federal agencies may, occasionally, share policy goals does not eliminate the inherent conflicts of interest between the two branches, as each represents different constituents and has different institutional interests, powers, and responsibilities. These "opposite and rival interests" cannot be reconciled with the identity of interests common interest doctrine requires.

### 5. Adopting HHS and OMB's Positions Would Have Wide-Ranging, Deleterious Consequences at Odds with FOIA's Animating Purpose.

Agencies routinely gather a broad range of input from a diverse array of interested parties outside the government, ranging from think tanks and advocacy organizations to trade groups and regulated entities, as part of their decisionmaking process. These external interactions by agencies are regularly the subject of FOIA requests seeking transparency regarding government operations and accountability regarding the influences shaping agency policymaking. HHS and OMB's expansive view of who can serve as an outside consultant protected under FOIA threatens to sweep all agency interactions with outside groups under the Exemption 5 rug. If shared policy goals alone suffice to create protectable "common interests" in agency deliberations, a broad swath of interactions with outside groups or political organizations and parties could be shielded from disclosure under FOIA. HHS and OMB's arguments would sweep in not just Congress but also Exxon Mobil, the Sierra Club, and the Chamber of Commerce.

These sweeping consequences of HHS and OMB's positions conflict with the animating spirit of FOIA: to promote transparent and accountable government. FOIA starts from the premise that the public has an overwhelming interest in the release of information that "shed[s] light on an agency's performance of its statutory duties." *DOJ v. Reporters' Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989). "The basic purpose of [ ] FOIA is to ensure an informed

citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). The radical expansion of the scope of material potentially protected from disclosure under Exemption 5 that would be effected by implementing HHS and OMB's expansive views of the "consultant corollary" and the common interest doctrine is wholly contrary to this animating purpose. This Court should reject the defendant agencies' invitation to expand the "inter- or intra-agency requirement" of Exemption 5 to reach these communications.

### B. The Communications Between Congress and HHS and OMB Are Not Protected by the Deliberative Process Privilege.

Because the communications in question fail to meet the threshold requirement of Exemption 5 that the records be "inter- or intra-agency" communications, the Court need not "reach step two of the Exemption 5 analysis and enquire whether the communications would normally be discoverable in civil litigation." *See Klamath*, 532 U.S. at 12 n.3. However, HHS and OMB have also failed to meet their burden of establishing that the communications at issue meet the requirements for any applicable privilege against discovery in civil litigation. HHS and OMB have asserted that the redactions at issue contain internal agency deliberations protected by the deliberative process privilege. Defs.' Br. at 23–25. For that privilege to apply, the documents must be (1) pre-decisional, and (2) deliberative. *See Jordan v. DOJ*, 591 F.2d 753, 774 (D.C. Cir. 1978) (*en banc*); *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975). For a document to be pre-decisional, it must be "actually antecedent to the adoption of an agency policy." *Jordan*, 591 F.2d at 774. To be deliberative, a document must be a "direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Vaughn*, 523 F.2d at 1144. Defendants have failed to meet their burden of demonstrating that the communications at issue qualify for protection under the deliberative process privilege.

### 1.   *The Communications Are Not Part of an Agency Deliberation.*

The communications here cannot be said to be "part of the deliberative process" of the *agencies*. These records contain just the sort of back-and-forth discussions and negotiations regarding Congress's potential enactment of legislation that one might expect between two co-equal branches—a process that falls outside the scope of Exemption 5. Indeed, in applying the deliberative process privilege, "the D.C. Circuit has focused its inquiry on 'whether disclosure of the requested material would tend to discourage candid discussion *within an agency*.'" *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 298 (D.D.C. 2007) (quoting *Petroleum Info. Corp. v. DOI*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (emphasis added).

HHS and OMB attempt to shoehorn their back-and-forth discussions and negotiations with Congress into Exemption 5 by suggesting the communications were part of HHS and OMB's agency deliberations regarding whether to recommend the president sign or veto the proposed legislation; the drafting of administration statements; the placement of an op-ed; and decisions regarding which personnel should attend which meetings. Defs.' Br. at 23–25. But a review of the records themselves, as well as the agencies' description of them in their declarations, makes clear that the communications pertained to joint discussions and negotiations regarding Congress's efforts to pass potential health care reform legislation. And while these communications may well have contained factual information that agency officials might have subsequently used in providing advice and recommendations internal to the agency, this does not somehow transform the back-and-forth with Congress into an agency deliberation. While Congress and the Executive Branch "hammering out the details of public policy," Defs.' Br. at 2,

is undoubtedly an important endeavor, what it is not is an internal agency deliberation.[10]

    HHS and OMB point to no prior case where these sorts of inter-branch communications regarding potential legislation were protected under Exemption 5. To the contrary, federal agencies regularly release agency communications with Congress to FOIA requesters without Exemption 5 redactions. *See* Creighton Decl. ¶ 26. The defendant agencies point to only one case where the government previously advanced this position (the only case American Oversight is aware of to consider it). In that case, the district court sensibly concluded that the records in question did not relate to an *agency* deliberative process. *See Elec. Frontier Found. v. ODNI*, No. 08-1023, 2009 WL 3061975 (N.D. Cal. Sept. 24, 2009) (*EFF*). There, the plaintiff requested, among other things, communications between agency officials and members of Congress "concerning amendment to [the Foreign Intelligence Surveillance Act (FISA)]." *Id.* at *1. As here, the government argued that those communications were exempt under the consultant corollary theory. *Id.* at *5. The court rejected that argument, concluding:

> To the extent the withheld materials reflect communications between ODNI and DOJ and members of Congress in an effort to facilitate Congress' own deliberative process to craft legislation to reform FISA, these communications do not fall under the exemption as there is no evidence that they were used in an effort to aid any agency in its own deliberative process.

*Id.* at *5, *amended and superseded on other grounds*, 639 F.3d 876 (9th Cir. 2010). HHS and

---

[10] HHS and OMB's own language betrays this attempt to repackage their communications with Congress as part of internal agency deliberations. The agencies discuss their communications as "exchanges" with Congress. An "exchange," of course, is a transaction in which both parties receive something. Other materials are described as "technical assistance." But "technical assistance" is typically used to describe agency assistance provided to *Congress* in drafting legislation. Exchanges with Congress, and technical assistance provided by agency personnel to congressional staff drafting potential legislation may well play an important role in the negotiations between Congress and the executive branch and may inform the legislation ultimately passed by Congress. What such exchanges are not, however, is advice and recommendations made as part of an internal agency deliberation.

OMB's attempt to distinguish that case by comparing the "extensive" evidence of the role played by the communications in agency deliberations here to the "deficient" evidence the government provided in *EFF* fails for the reasons discussed above. The evidence in this case is no more compelling than in *EFF*; like *EFF*, these records reflect the agencies' efforts to work with Congress to pass health care reform.

**2. The Communications Are Not "Pre-Decisional" and "Deliberative" Inputs to Agency Decisionmaking.**

The communications between Congress and the defendant agencies at issue also fail to qualify for the deliberative process privilege because they are not "pre-decisional" and "deliberative" inputs to an agency decisionmaking process. *First*, HHS and OMB fail to establish that the redacted material was "pre-decisional" to any agency decision. To show that records are "pre-decisional," an agency must establish "what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 868 (D.C. Cir. 1980). HHS and OMB's vague allusions to deliberations the agencies might have been involved in, *see* Defs.' Br. at 23-24, do not suffice. Rather, HHS and OMB must establish the *role* played by the email exchanges with Congress in a particular agency deliberation. *Cf. Judicial Watch, Inc. v. Reno*, 154 F. Supp. 2d 17, 18 (D.D.C. 2001) ("It is not enough to say that a memorandum 'expresses the author's views' on a matter [because the] *role played by the document in the course of the deliberative process* must also be established.") (emphasis added). That agency employees may have referred to the communications in developing subsequent advice or recommendations for internal agency consideration is beside the point, because those are not the records at issue in this case. *See EPA v. Mink*, 410 U.S. 73, 91 (1973) (refusing to extend deliberative process privilege protection to "factual material otherwise available on discovery merely [on the basis that] it was placed in a memorandum with

matters of law, policy, or opinion"). Nor were the congressional communications "*prepared* in order to assist an *agency* decisionmaker in arriving at his decision." *See Renegotiation Bd. v. Grumman Aircraft*, 421 U.S. 168, 184 (1975) (emphasis added).

*Second*, the withheld content is not "deliberative" material that informs an agency decisionmaking process. The redacted materials do not "reflect[ ] the give-and-take of the deliberative process" within the agencies. *Vaughn*, 523 F.3d at 1144.[11] HHS and OMB have failed to establish that the withheld materials contain the sorts of advice and recommendations to senior agency decisionmakers that the deliberative process privilege is intended to protect, that is, "advisory opinions, recommendations, or deliberations" offered in the course of agency decisionmaking. Rather, the available evidence makes clear that the redacted material relates to the negotiations, factual updates, and policy back-and-forth one would expect between two co-equal branches concerning the passage of legislation by Congress. *See* Creighton Decl. ¶ 25. A review of the descriptions of the withheld material in HHS and OMB's declarations reinforces this conclusion. *See* Arbes Decl. ¶ 8.a, ECF No. 25-6 ("technical assistance pertaining to the details of draft legislation"), ¶ 8.b ("up-to-date information regarding legislative developments"); Skrzycki Decl. ¶ 13, ECF No. 25-5 ("technical aspects of draft legislation, such as the details of legislative options and language"), ¶ 16 ("the ACHA and its potential impact"); Slemrod Decl. ¶ 10 ("various drafts [of legislation] and justifications or analysis of language included in those drafts"), ¶ 11 ("a specific Member's intent behind proposed language"), ¶ 13 ("the status of the

---

[11] *See also Taxation with Representation Fund v. IRS*, 646 F.2d 666, 677 (D.C. Cir. 1981) (holding that to be "deliberative" records must "reflect[] advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated"); *Public Citizen v. OMB*, 598 F.3d 865, 875 (D.C. Cir. 2010) (stating that "[t]o the extent the documents at issue in this case neither make recommendations for policy change nor reflect internal deliberations on the advisability of any particular course of action, they are not . . . deliberative").

ACHA throughout the drafting and debate process"), ¶ 16 ("potential strategies for passing and enacting legislation" and information regarding "who should draft language or advocate a position"), ¶ 17 ("technical expertise . . . to assist Congress in drafting legislation"), ¶ 18 ("views on the potential impact of proposed legislation on [Medicaid]").

The disconnect between this content and any agency decision, including in particular the "decisions" proffered in the agencies' declarations and brief, is palpable. That is because the agencies are coordinating with Congress to pass legislation, not with respect to any internal agency decision. "Technical assistance," or information provided to Congress for its use in drafting legislation, simply is not a deliberative input to an agency decisionmaking process. Likewise, updates regarding the status of legislative proposals or Congress's draft language or the level of support in Congress for various legislative proposals is not deliberative content for an agency decisionmaking process. In sum, the government has failed to meet its burden of establishing that these redacted materials concern advice and recommendations to agency decisionmakers akin to those an agency employee might supply.

## IV.    The Remaining Records Are Not Protected by the Deliberative Process Privilege.

The remaining records produced by HHS and OMB also contain redactions that fail as a matter of law. *First*, HHS improperly withheld talking points from briefing materials prepared for HHS officials in advance of meetings with members of Congress. Talking points, of course, are prepared with the intention that the material be delivered and thus are not the sort of advice and recommendations protected by the privilege. Moreover, even if the records were pre-decisional and deliberative at the time of their creation, if those materials were adopted as the agency position or were, in fact, later used and therefore were shared outside the agency, then the agency waived any privilege with respect to them. *See Judicial Watch v. USPS*, 297 F. Supp. 2d

28

252, 265–66 (D.D.C. 2004) (denying summary judgment on "draft talking points" where agency "identifie[d] nothing more specific about the content of this document, [did] not specify its place in a particular decisionmaking context, and [did] not indicate whether, as a draft, these talking points were actually used in a communication with the public"). Indeed, this Court has noted that the "likelihood of . . . adoption is particularly high in the case of 'talking points.'" *EPIC v. DOJ*, 511 F. Supp. 2d 56, 71 (D.D.C. 2007); *see also Elec. Frontier Found. v. DOJ*, 826 F. Supp. 2d 157, 170–71 (D.D.C. 2011). HHS has not met its burden to establish that the talking points were deliberative and were neither adopted as official agency policy nor disclosed outside the agency.

*Second*, OMB improperly redacted portions of the titles of meetings on several calendar entries. *See* OMB *Vaughn* Index, Doc. Nos. 18, 23, 37, 38, and 39. The subject matter of a meeting, standing alone, does not "make[] recommendations or express[] opinions on legal or policy matters," *Vaughn*, 523 F.2d at 1144, nor does it contain any advice whatsoever, *see Fox News Network*, 739 F. Supp. 2d at 551 (ordering release of meeting agendas containing "a list of items to be discussed, such as the status of particular documents to be drafted," none of which was deliberative). Releasing just the topic of discussion—but none of the contents of the discussions themselves—would not "chill[] future government employees from engaging in frank discussions during the deliberative process." *Morley v. CIA*, 699 F. Supp. 2d 244, 255–56 (D.D.C. 2010). OMB has failed to establish that the topic of these meeting "reflect[s] the give-and-take of the deliberative process" within the agencies. *Vaughn*, 523 F.3d at 1144. Thus, the redacted meeting titles cannot be withheld under Exemption 5.

*Third,* OMB improperly redacted meeting locations and the names of attendees under Exemption 5. OMB asserts that both pieces of information would reveal "the names of the senior officials involved in these meetings, as well as locations that would provide the public with that

same information." Defs.' Br. at 29. But information regarding who attended a meeting is simply

not deliberative. This court has been clear that even when the contents of meeting minutes are

properly withheld under Exemption 5, the basic information about the meeting, including "the

date and time of the meeting, *the names of . . . members present*, and the names of observers"

remains nonexempt and, where reasonably segregable, must be released. *Judicial Watch v. Dep't*

*of the Treasury*, 796 F. Supp. 2d 13, 29 (D.D.C. 2011) (emphasis added); *see also id.* at 29–30;

*cf. Judicial Watch v. Dep't of State*, 875 F. Supp. 2d 37, 45 (D.D.C. 2012). Decisions about

which members of Congress should attend a meeting are, by definition, decisions, not protected

pre-decisional and deliberative advice. For the same reasons, there is no basis to withhold the

names of Executive Branch officials who attended meetings with members of Congress, or

internal meetings on health care reform, as disclosing their identities reveals no deliberative

content.[12] Nor, for the reasons just discussed, can OMB withhold the locations of meetings

simply because those locations would reveal the attendance of certain high-level officials.

V.      **At a Minimum the Court Should Conduct an *In Camera* Review.**

As described above, the redactions on these documents cannot survive scrutiny as a

matter of law. However, to the extent the face of the redacted documents does not make the legal

result clear, the Court should conduct an *in camera* review of the records (or a representative

sample of them) to confirm that the redacted portions of the records meet the requirements for

protection under the deliberative process privilege. The government bears the burden of

establishing that the redacted materials were lawfully withheld. *See* 5 U.S.C. § 552(a)(4)(B);

---

[12] OMB seems to premise this argument on the D.C. Circuit's opinion in *Judicial Watch v. U.S. Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013). But that case simply held that the White House visitor logs themselves were not "agency records" subject to FOIA. At the same time, the Court of Appeals expressly noted that the records of OMB—"including the calendars of their personnel"—may be obtained by FOIA requests made directly to them. *Id.* at 232.

*NRDC v. NRC*, 216 F.3d 1180, 1190 (D.C. Cir. 2000). FOIA grants the Court broad discretion to conduct *in camera* review of withheld materials. 5 U.S.C. § 552(a)(4)(B). Given the vague and novel claims HHS and OMB advance and the disconnect between the withheld content and the agency decision, the Court should engage in an *in camera* review of the redacted materials before accepting them. *See Larson v. Dep't of State*, 565 F.3d 857, 869–70 (D.C. Cir. 2009).

**VI.   The Records Contested by the Committee Are Not Congressional Records.**

**A.     The Records Contested by the Committee Are Agency Records.**

The records contested by the Committee ("Contested Records") are "agency records" for FOIA purposes under the test established by the Supreme Court in *DOJ v. Tax Analysts*, 492 U.S. 136 (1989). FOIA does not provide a statutory definition of the term "agency records." However, the Supreme Court has established a two-part test for what constitutes an agency "record" subject to FOIA. *See id*. at 144–45. *First*, an agency must "either create or obtain" a requested record. *Id.* at 144. The Court has made clear that agency records are not limited to records "generated internally" by the agency, as such a limitation "would frustrate Congress' desire to put within public reach the information available to an agency in its decisionmaking process." *Id.*; *see also Forsham v. Harris*, 445 U.S. 169, 184 (1980). The Contested Records were undoubtedly "either created or obtained" by the defendant agencies. *Second*, the agency "must be in control of the requested materials at the time the FOIA request is made." *Tax Analysts*, 492 U.S. at 145. The Court clarified that "[b]y control we mean that the materials have come into the agency's possession in the legitimate conduct of its official duties." *Id.* Again, there is no dispute that the Contested Records came into the possession of HHS and OMB in the course of the legitimate conduct of their official duties. Consequently, applying the test provided

by the Supreme Court, the Contested Records are agency records under FOIA.

The D.C. Circuit has used a four-factor test to evaluate whether an agency exercises "sufficient control" over a document to satisfy the second prong of the *Tax Analysts* test:

> (1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files.

*Burka v. HHS*, 87 F.3d 508, 515 (D.C. Cir. 1996). An evaluation of these factors further supports the view that the Contested Records are agency records.[13]

The first factor may cut in both directions: the Contested Records include emails created by the agencies and emails created by congressional staffers, and there is no indication that the former intended or understood themselves to be constrained in their ability to exercise control of the records. The remaining factors all support the conclusion that the records are agency records. The defendant agencies had the ability to use and dispose of the records as they saw fit and read or relied upon the records in connection with the performance of agency functions; neither the Committee nor the agencies have proffered evidence to the contrary, such as a legitimate agreement limiting the agencies' discretion. Especially given the agencies' declarations that these exchanges were used to inform executive branch decisionmaking, it is clear that personnel at HHS and OMB were free to use—and did use—the Contested Records for the performance of

---

[13] Recent D.C. Circuit cases have not always considered all of those factors when considering documents that an agency has "obtained from, or prepared in response to a request from" Congress." *ACLU v. CIA*, 823 F.3d 655, 662–63 (D.C. Cir. 2016); *accord Judicial Watch*, 726 F.3d at 221. However, in each of those cases, the Executive Branch had agreed that the records at issue were under Congress's control and consequently refused to produce the records in response to a FOIA request; inquiry into the Executive Branch's use of the documents was therefore less necessary. Here, by contrast, the Executive Branch has produced the records in question and asserted that they were used by the agencies in performing their duties. *See* Defs.' Br. at 12–20. Thus, it is appropriate to consider all four *Burka* factors in this case.

agency functions. Indeed, HHS and OMB apparently concluded that the records were agency records subject to FOIA and produced them in response to FOIA requests notwithstanding the footer, demonstrating actual control over the disposition of the records. Finally, there is no evidence in the record that HHS or OMB did or were required to segregate the Contested Records in any way. It appears that the agencies integrated the Contested Records into their recordkeeping systems, as they were discovered in a search of those email systems to identify records responsive to the FOIA request. *See* Bell Decl. ¶¶ 16–17, 19–20; Hitter Decl. ¶¶ 8–12. Consequently, applying the test provided in D.C. Circuit precedent, the Contested Records are agency records subject to FOIA.

**B.      The Contested Records Are Not Congressional Records.**

D.C. Circuit case law recognizes carefully defined, narrow circumstances where records in the possession of an agency might nonetheless be deemed congressional records not subject to FOIA. The Contested Records do not fall within this narrowly defined category for multiple reasons. The Committee's expansive view of congressional records—that by mechanically attaching a generic footer to all correspondence between Committee staff and any federal agency, the Committee can insulate its policy back-and-forth with those agencies from FOIA—is inconsistent with D.C. Circuit case law, threatens to exclude broad swaths of government activity from FOIA, and undermines the broad purposes of transparency that animate the Act.

*1.      The Committee's Overbroad Claims Encompass Emails Exchanged with No Contemporaneous Congressional Claim of Confidentiality.*

At the outset, the Committee's overbroad claim seeks to encompass portions of the email chains at issue that precede the inclusion of the footer, and for which there is no evidence of any contemporaneous claim of confidentiality by Committee staff. The OMB email chain was initiated by an OMB employee, s*ee* Halataei Decl. Ex. A, followed by policy discussion and

negotiation responding to this initial agency request. Only with the fourth message is the Committee's footer introduced to the chain. Similarly, each of the three HHS email chains at issue begins with a series of three messages, none of which contain the footer; the footer is only introduced into the chain in the fourth message. *See* Halataei Decl. Exs. B-D. Even if the footer alone were sufficient to render the messages to which it was appended congressional records (and as discussed below, it is not), there is no colorable argument that the first three messages in each chain—which lack any contemporaneous indication of Congress's intent to control the emails—are congressional records. The D.C. Circuit does not permit retroactive assertions of congressional control. *See United We Stand Am., Inc. v. IRS*, 359 F.3d 595, 602 (D.C. Cir. 2004).

### 2. *Congress Has Not Manifested a Clear Intent to Control the Contested Records with Sufficient Particularity.*

#### a. *The Generic Footers Do Not Reflect a Particularized Judgment with Respect to These Records.*

To qualify as congressional records, a clear assertion of congressional control over the particular documents at issue is required. *See Holy Spirit Ass'n for the Unification of World Christianity v. CIA*, 636 F.2d 838, 842 (D.C. Cir. 1980). D.C. Circuit cases make clear that Congress must manifest a clear intent to control the *particular* records at issue, not just a generalized assertion of confidentiality. *See, e.g.*, *Paisley v. CIA*, 712 F.2d 686, 694 (D.C. Cir. 1983) (finding "no *contemporaneous* and *specific* instructions from [the Committee] to the agencies limiting either the use or disclosure of the documents"); *id.* (requiring "sufficient evidence of Congress' intent to retain control over these particular documents"); *United We Stand*, 359 F.3d at 602 (requiring "a more specific showing of congressional intent to control documents sought by FOIA requesters"). Unlike these cases, the Committee bases its claim that the documents at issue here are congressional records solely on the fact that certain of the messages in the email chain included a generic footer containing boilerplate language asserting

34

control. This does not suffice under D.C. Circuit precedent.

The D.C. Circuit has required evidence of a specific intent to transfer the particular records at issue to an agency for a limited purpose and on condition of confidentiality. For instance, in *Paisley*, the court rejected standing letters—comparable to the footers at issue here—that expressed a committee's general desire to prevent release, without its approval, of any record generated by the committee or by an agency in response, where there was "no discussion of any particular documents or of any particular criteria by which to evaluate and limit the breadth of this interdiction," reasoning that the letters were "too general and sweeping to provide sufficient proof, when standing alone, of a specific intent to transfer these . . . documents to the [agencies] for a 'limited purpose and on condition of secrecy,'" 712 F.2d at 694 (quoting *Goland v. CIA*, 607 F.2d 339, 348 n.48 (D.C. Cir. 1978)). The Court of Appeals viewed this limitation as serving an important purpose: "Many agencies, not simply the intelligence community, must work frequently and closely with congressional committees on matters of budget and policy or on individual cases. We decline to hold, in the absence of some stronger indicia of congressional intent, that all documents so generated in this or similar 'joint' congressional and agency investigations constitute records within Congress' exclusive control." *Id.*

To be sure, unlike the letters in *Paisley*, the footers here were appended to individual records: two of the four emails in the chain sent from the Committee to HHS, and one of the two emails sent from the Committee to OMB. However, the broad and generic language of the footer does not rise to the level of specificity required by this circuit. The footer simply refers to "[t]his document and any related documents," as well as "any response to this Committee document or any related Committee communications." *See* Halataei Decl. Exs. A-D (Contested Records), ECF No. 27-2. There is no indication of how the agency is to determine what constitutes a

"related document"—a challenge made more difficult by the Committee's failure to include the footer on other seemingly related messages in the very same chain. Nor does the footer evince any particularized consideration by Congress of the need to keep these documents, in particular, under congressional control. Rather, the generic language contained in the footers appears to have been drafted so as to be appended to many emails automatically or with no more thought than clicking "insert," and indeed the Committee has submitted no evidence that the footer was affixed to these particular emails as the result of any particularized judgment by the Committee, rather than automatically by the staffer's email program.[14]

By contrast, the expressions of intent that the D.C. Circuit has found to be sufficient were significantly more particularized to the records at issue. For instance, in *ACLU v. CIA*, 823 F.3d 655 (D.C. Cir. 2016), the D.C. Circuit determined that a letter from Senator Dianne Feinstein to the Director of the CIA did evidence sufficient intent when it clearly indicated that it related to records exchanged as part of the Senate Select Committee on Intelligence's "intention to conduct a thorough review of the CIA's detention and interrogation program." Joint Appendix at 92, *ACLU v. CIA*, No. 15-5183 (D.C. Cir. Nov. 16, 2015), Doc. No. 1583855. That letter left little doubt about which records it applied to and the particularized judgment of the Committee with respect to those specific records; the same cannot be said of the footer in this case.

> b.    *The Footers Do Not Reflect a Decision by Someone Authorized to Act on Behalf of Congress.*

Even if a generic assertion such as the language in the footers might suffice to establish congressional intent, the footers in this case are insufficient for a second reason: they do not

---

[14] The use of a generic footer is akin to law firms and companies including boilerplate circulars in emails asserting that the message may be privileged and confidential. Such footers do not make the message privileged or confidential, nor do they prevent against waiver when a recipient is not bound by an actual agreement such as a protective order. Similarly, here, the use of the footer does not make the records "congressional records" absent more.

reflect a decision by Congress *as a body* to assert control over the emails to which the footers are appended. Rather, the footers in question appear to have been automatically generated by the email program used by certain Committee staffers, and therefore may have been appended without any individual assessment or judgment about the propriety of proclaiming such emails to be congressional records. Alternatively, even if the authors of the emails did, in fact, intentionally decide to append the footer to those particular emails (a possibility for which there is no support in the record), the record reflects no decision by anyone other than those individual congressional staffers, who are unable to speak for Congress or bind the Executive Branch.

Individual staffers do not have authority to assert control over records on behalf of Congress; the Committee has pointed to no rule conferring this authority. Similarly, according to the executive branch, agencies cannot be bound by individual staff or even individual members of Congress. Rather, Congress as a body acts in specific ways: through a joint resolution of both houses of Congress; through a resolution by one house; or through the actions of committees established by the rules of each house and imbued by those rules with authority to act on behalf of the house. Indeed, DOJ's own Office of Legal Counsel has noted that "individual members, including ranking minority members, generally do not act on behalf of congressional committees." Auth. of Ind. Members of Congress to Conduct Oversight of the Executive Branch, 41 Op. O.L.C. __ (2017), https://www.justice.gov/olc/file/966326/download.

The notion that an individual staffer can declare congressional control over documents with a few clicks of his or her mouse, or that the Executive Branch would be bound by the casual actions of such low-level actors, cannot be squared with how either branch organizes itself. The inclusion of the footers on the emails here are, at best, the *ipse dixit* claim of individual staffers that their work is entitled to confidential treatment by the defendant agencies, and at worst an

automatic inclusion generated by the email application used by those staffers. In neither case does the footer reflect the intent of Congress, manifested through one of the avenues through which Congress is empowered to act under Congress's own rules.

By contrast, in every case where the D.C. Circuit concluded that records in the possession of an agency were congressional records not subject to disclosure under FOIA, there was an official assertion by a committee formally communicated to the agency that the particular records at issue were congressional records. *See ACLU*, 823 F.3d at 659–60 (congressional intent established by chairman's letter addressing congressional control over the conduct and results of investigation); *United We Stand*, 359 F.3d at 597, 600 (congressional intent established by contemporaneous committee letter from chief of staff to committee); *Goland*, 607 F.2d at 347– 48 (congressional intent established by fact that committee oversight hearing was held in executive session, contemporaneously marked secret, and provided to the CIA with contemporaneous direction that it could only be used for limited purposes). Because there was no such formal communication by the Committee on Ways and Means regarding the Contested Records, the Records cannot be considered congressional records outside the scope of FOIA.[15]

### 3.  HHS and OMB Possess the Contested Records for the General Use and Purposes of the Agency, Not for a "Limited Purpose."

The D.C. Circuit has also required a showing that Congress provided its records to a federal agency only for "a limited purpose." For example, in *Goland*, the Court relied on the fact

---

[15] To the extent the Committee claims that there was, in fact, a formal assertion of congressional intent from a Committee Chairman or any other entity authorized to act on behalf of Congress, Plaintiff seeks leave to take discovery on the circumstances of that assertion. Similarly, if the Court concludes that a decision by an individual staffer to include the footer on an email would be sufficient to reflect congressional intent, but that the application of an automatically generated footer through the Committee's email software would not be sufficient, Plaintiff seeks leave to take discovery of the circumstances surrounding the application of the footer to the emails.

that the document at issue was given to the CIA expressly for "limited purposes as a reference document only," and that a contemporaneous letter made clear that conditions attached to the CIA's possession of the document. 607 F.2d at 345. Similarly, in *Holy Spirit*, the D.C. Circuit noted that the evidence there was not sufficient to establish "that Congress forwarded the documents to the [CIA] only 'for a limited purpose and on the condition of secrecy,'" 636 F.2d at 842 (quoting *Goland*, 607 F.2d at 348 n.48), and concluded that the documents were agency records. That was contrasted with other records that were transferred to the CIA with a contemporaneous memorandum indicating that the committee retained jurisdiction over the documents, that they contained confidential information, and that access to the files was limited to those with authorization by the Clerk of the House of Representatives. *Id.* Consistent with those instructions, the boxes of records remained sealed and unopened by the CIA. *Id.* Unsurprisingly, the categorization of those records as congressional records was uncontested. *Id.* Finally, the congressional direction the court relied on in *ACLU* left no doubt about the agency's (in)ability to use and dispose of the records in particular ways: it expressly prohibited the agency from integrating the records into its own files, from disseminating or copying the records, or from using the records for any other purpose, and further required the agency to return the records to the committee if requested. Joint Appendix at 93–94, *ACLU v. CIA*, No. 15-5183 (D.C. Cir. Nov. 16, 2015), Doc. No. 1583855.

Here, by contrast, it is not clear what limitation the Committee intended to place on the agencies' use of the emails. The footer states only that the emails are entrusted to the agency for "use in handling this matter," but the agencies appear to believe that "this matter" was part of an "Executive Branch decisionmaking process." Defs.' Br. at 2. Surely Congress cannot unilaterally declare that documents relating to the Executive Branch's decisionmaking process are

congressional records that the Executive Branch cannot use and dispose of as it sees fit.

And indeed, the record here shows that HHS and OMB did in fact use records containing the Committee's footer for various agency purposes, including allegedly in connection with advising the President.[16] Any lingering doubt about the agencies' ability to control the Contested Records was put to bed when both defendant agencies produced the records in response to a FOIA request, despite the express language of the footer asserting that they had no right to do so. The production of the records itself manifests HHS and OMB's clear control over the records.

### 4.  The Contested Records Are Not Protectable Oversight Inquiries.

Every case where the D.C. Circuit has found records in the possession of an agency to be congressional records not subject to FOIA arose in the context of congressional oversight.[17] This is because the special policy considerations that underlie the D.C. Circuit's interpretation of the FOIA statute as it applies to records exchanged with Congress apply most directly to the oversight context (an exclusive congressional function); the D.C. Circuit was concerned that disclosure regarding the oversight process might impair those oversight efforts, stating:

> Congress exercises oversight authority over the various federal agencies, and thus has an undoubted interest in exchanging documents with those agencies to facilitate their proper functioning in accordance with Congress' originating intent. If plaintiffs' argument were accepted, Congress would be forced either to surrender its constitutional prerogative of maintaining secrecy, or to suffer an impairment of its oversight role.

*Goland*, 607 F.2d at 346. And indeed, the only time the D.C. Circuit has found agency-created

---

[16] *See* OMB *Vaughn* Index, Doc. No. 42 (describing one Contested Record as an "[e]xchange characterizing attached policy analysis . . . for use in crafting Executive Branch legislative strategy and ultimately advising the President on whether he should sign or veto the bill"); HHS *Vaughn* Index, Bates Nos. HHS-Sept 2017-01621-35; *see generally* Defs.' Br. at 12–20.

[17] *See ACLU*, 823 F.3d at 659–60, 665–66 (committee oversight investigation report); *United We Stand*, 359 F.3d at 597, 602 (committee oversight inquiry and parts of agency response revealing the inquiry's content); *Goland*, 607 F.2d at 347 (committee oversight hearing transcript).

records to be congressional records was when the records were created in response to a specific congressional oversight inquiry and revealed the details of Congress's oversight interests. *See United We Stand*, 359 F.3d at 602.

The email chains at issue here, on their face, are not related to any oversight investigation undertaken by the Committee, but rather arise in the context of ordinary back-and-forth policy discussions between two co-equal branches of government. A review of the unredacted portion of the agency-created emails at issue makes clear that the redacted portions of the records relate to policy discussions between the branches, and do not reveal the confidential contents of any committee oversight activities. *See* Creighton Decl. ¶ 25. The descriptions of the redacted material—and the uses made of that material by the defendant agencies reflected in the defendant agencies' motion for summary judgment and associated declarations—only reinforces this conclusion. *See* Defs.' Br. at 13–20; OMB *Vaughn* Index, Doc. No. 42; HHS *Vaughn* Index, Bates Nos. HHS-Sept 2017-01621-35. That these emails do not relate solely to exclusive congressional activities is further underscored by the fact that the policy discussion contained in one of the emails was initiated by an agency employee. *See* Halataei Decl. Ex. A (OMB Contested Record).

Rather than confidential oversight activities, the communications here involve precisely the sort of discussions the D.C. Circuit has expressed concern about broadening the concept of congressional records to encompass:

> Many agencies . . . must work frequently and closely with congressional committees on matters of budget and policy or on individual cases. We decline to hold, in the absence of some stronger indicia of congressional intent, that all documents so generated in this or similar "joint" congressional and agency investigations constitute records within Congress' exclusive control.

*Paisley*, 712 F.2d at 696. The Committee's broad view of congressional records conflicts with

FOIA's commitment to transparency and would allow broad swaths of the activities and conduct

of federal agencies to be shielded from disclosure under FOIA where agencies are engaged in

joint discussions or negotiations with Congress over policy or budget, including where an agency

is performing quintessentially executive functions. Congress chose not to include an exemption

for such back-and-forth discussions and negotiations when enacting (or amending) FOIA, and

Congress's commitment to transparency through FOIA should take precedence over individual

staff members' (or even individual members of Congress') personal, subjective attempts to

operate outside the statutory scheme.

### 5. *The Defendant Agencies Did Not Consent to Be Bound by Congress's Claim of Confidentiality.*

In every prior case where the D.C. Circuit considered whether particular records were

congressional records not subject to FOIA, that question arose because the Executive Branch

declined to disclose the records to a FOIA requester based on a view that it lacked the authority

to do so. By contrast, here, the defendant agencies by their actions in producing redacted

versions of the Contested Records demonstrated that they have control over those records and

can (and did) dispose of them as they see fit. Moreover, the defendant agencies have, as reflected

in the declarations attached to their motion for summary judgment, demonstrated that they can

(and did) use the records for various Executive Branch purposes notwithstanding the footer.

Consequently, even assuming, *arguendo*, that Congress had manifested a clear intent to control

these records, the Committee's claim that these records are congressional records not subject to

FOIA raises an issue of first impression: whether Congress's intent to control the records is

sufficient in the absence of agreement or acquiescence by the receiving agency to accept the

conditions that Congress purports to impose on the records.

If an Executive Branch agency does not recognize, or believe itself bound by conditions

that Congress purports to place on records provided by congressional staffers to federal agencies,

then the agency has control of the records and they are agency records for purposes of FOIA. *See*

*Tax Analysts*, 492 U.S. at 144–45. The contemporaneous agreement of the Executive Branch that

the records at issue were congressional records was a fundamental premise underlying every

D.C. Circuit decision considering whether particular records qualified as congressional records.

The absence of an agreement here should be dispositive. (Indeed, evidence of a

contemporaneous agreement or acquiescence by the receiving agency to any conditions placed

by Congress should be required, but the Court need not go that far here).[18]

The very idea that Congress could unilaterally declare discussions or negotiations with a

co-equal branch to be congressionally controlled records runs counter to the central principles of

separation of powers.[19] Absent the agreement, or at least acquiescence, of the defendant agencies

that the records are subject to the control of Congress, the Committee has no legally enforceable

interest in the control of the documents. It cannot be, under D.C. Circuit case law, that the

Committee can append what is effectively a boilerplate contract of adhesion to its

communications and thereby not only dictates what the receiving agency (which did not consent

to the conditions) does with those communications but also controls what the receiving agency is

permitted to do with any agency-generated response to it.

---

[18] As addressed above, there is good reason to believe that the Executive Branch would not view itself as bound by a footer inserted by an individual staffer, rather than a Committee chairman. *See supra* Part VI.B.2.b.

[19] Contemplate a hypothetical in a converse circumstance: the Executive Branch provides records to Congress in connection with an oversight inquiry and asserts ongoing control over the "Executive Branch records," stating that they are "entrusted to the committee only for its investigation and should not be disclosed or otherwise used without the consent of the agency." If Congress did not affirmatively consent to that condition, would the executive branch agency really be entitled to an injunction prohibiting Congress from disclosing the records? That is precisely what the Committee invites the Court to do here.

**C.**     **If the Contested Records Were Congressional Records Under D.C. Circuit Case Law, that Would Conflict with Controlling Supreme Court Precedent.**

For the reasons above, the Contested Records do not qualify under existing D.C. Circuit precedent as congressional records not subject to FOIA. *See supra* Part VI.B. To the extent the Court reaches a different view, however, the Contested Records are nonetheless agency records under controlling Supreme Court precedent, and are therefore subject to FOIA. As noted above, in *Tax Analysts*, the Supreme Court laid out a clear test for what constitutes an "agency record" subject to FOIA, and these records readily satisfy that two-part test. *See supra* Part VI.A. To the extent the D.C. Circuit precedent focuses solely on congressional intent and fails to consider as a functional matter how the agencies maintain and use the records, the D.C. Circuit approach conflicts with both the FOIA statute and controlling Supreme Court precedent.

**VII.**     **American Oversight Is Entitled to Discovery Before Summary Judgment in Favor of the Defendant Agencies or the Committee.**

Were the Court to conclude that the undisputed material facts do not support summary judgment for American Oversight, there are ambiguities in the record involving facts uniquely under the control of the defendant agencies and the defendant-intervenor committee that create material disputes of fact inconsistent with issuing summary judgment in favor of either HHS and OMB or the Committee. Those facts are laid out in the accompanying affidavit of American Oversight Counsel Sara Creighton under Federal Rule of Civil Procedure 56(d). As presented more fully therein, American Oversight is entitled to discovery into a range of topics including, but not limited to, the nature of the purported consultancy arrangement and/or common interest agreement between HHS/OMB and Congress; the process and procedures for affixing the email footers to the Contested Records; whether there are any official or formal committee communications to the defendant agencies regarding the treatment of email communications or

other records exchanged between the Committee and the defendant agencies; how the Contested Records and other records bearing the email footer were maintained in agency files; and how the Contested Records and other records bearing the email footer were used by the defendant agencies. Summary judgment in favor of HHS and OMB or the Committee would be premature before American Oversight has an opportunity to engage in discovery on these issues, because there remain genuine disputes of facts necessary to arrive at the conclusions that the redacted material withheld by HHS and OMB may be withheld pursuant to Exemption 5 or that the Contested Records are properly characterized as congressional records.

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff American Oversight respectfully requests that this Court deny Defendants' and Defendant-Intervenor's motions for summary judgment, grant American Oversight's cross-motions for summary judgment, require HHS to conduct a new search using adequate search terms; and require both HHS and OMB to promptly release non-exempt materials previously redacted under FOIA Exemption 5.

Dated: October 17, 2017

Respectfully submitted,

*/s/ Sara Kaiser Creighton*
Sara Kaiser Creighton
D.C. Bar No. 1002367
Austin R. Evers
D.C. Bar No. 1006999
John E. Bies
D.C. Bar No. 483730
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 869-5246
sara.creighton@americanoversight.org
austin.evers@americanoversight.org
john.bies@americanoversight.org
*Counsel for Plaintiff*