**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN OVERSIGHT,

    *Plaintiff*,

    v.

U.S. DEPARTMENT OF HEATLH AND
HUMAN SERVICES,

    and

OFFICE OF MANAGEMENT AND
BUDGET

    *Defendants*.

Case No. 17-cv-00827 (EGS)

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN REPLY IN SUPPORT
OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................ 2

   I.   The Redacted Emails Between the Agencies and Congress Are Subject to
       Exemption 5. ..................................................................................................... 2

      A.  The Redacted Emails Satisfy Exemption 5's Threshold Requirement. ........................ 4

           *1.*   *Binding D.C. Circuit Precedent Establishes that the Redacted Emails*
                 *Are "Inter-Agency or Intra-Agency" Communications for Purposes*
                 *of Exemption 5.* ........................................................................................ 4

           *2.*   *American Oversight's Attempt to Reshape the D.C. Circuit's Consultant*
                 *Corollary Is Unavailing.* ............................................................................ 7

           *3.*   *The Common Interest Doctrine Further Supports the Conclusion that*
                 *the Redacted Emails Are "Inter-Agency or Intra-Communications"*
                 *Under Exemption 5.* ................................................................................. 17

           *4.*   *American Oversight's Reading of Exemption 5 Would Expose the Kind*
                 *of Sensitive Government Deliberations that the Deliberative Process*
                 *Privilege Was Designed to Protect.* ........................................................... 20

      B.  The Redacted Emails Are Protected by the Deliberative Process Privilege. ............... 22

  II.  The Redacted Calendar Entries Are Subject to the Deliberative Process Privilege. ......... 26

 III. HHS Used Search Terms Reasonably Calculated to Locate Responsive Records
       in Conducting Its Search. ................................................................................. 29

 IV. *In Camera* Review is Unnecessary. ...................................................................... 33

  V.  Discovery with Respect to the Agencies Is Inappropriate. .................................... 34

CONCLUSION ............................................................................................................ 35

i

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*ACLU v. Dep't of Def.*,
628 F.3d 612 (D.C. Cir. 2011) ................................................................................. 21

*Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*,
252 F.R.D. 163 (S.D.N.Y. 2008) ............................................................................ 19

*Am. Fed'n of Gov't Emps., Local 812 v. Broad. Bd. of Governors*,
711 F.Supp.2d 139 (D.D.C. 2010) .......................................................................... 33

*Am. Mgmt. Servs., LLC v. Dep't of the Army*,
703 F.3d 724 (4th Cir. 2013) .................................................................................. 20

*Asarco, Inc. v. EPA*,
Civil Action No. 08-cv-1332 (EGS/JMF), 2009 WL 1138830 (D.D.C. Apr. 28, 2009) .......... 34

*Baker & Hostetler, LLP v. Dep't of Commerce*,
473 F.3d 312 (D.C. Cir. 2006) ............................................................................... 34

*Buckley v. Valeo*,
424 U.S. 1 (1976) .................................................................................................. 16

*Canning v. DOJ*,
Civil Action No. 11-cv-1295 (GK), 2013 WL 1333422 (D.D.C. Apr. 2, 2013) ..................... 34

*Climate Investigations Ctr. v. Dep't of Energy*,
No. 16-CV-124 (APM), 2017 WL 4004417 (D.D.C. Sept. 11, 2017) .............................. 32, 33

*CNA Fin. Corp. v. Donovan*,
830 F.2d 1132 (D.C. Cir. 1987) ............................................................................... 9

*Coastal States Gas Corp. v. Dep't of Energy*,
617 F.2d 854 (D.C. Cir. 1980) ..................................................................... 23, 26, 27

*Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*,
161 F. Supp. 3d 120 .............................................................................................. 26

*Convertino v. DOJ*,
684 F.3d 93 (D.C. Cir. 2012) ............................................................................ 34, 35

*Dep't of the Interior v. Klamath Water Users Protective Ass'n*,
532 U.S. 1 (2001) ......................................................................................... 4, 5, 6, 7

*DiBacco v. U.S. Army*,
  795 F.3d 178 (D.C. Cir. 2015) ................................................................ 30

*DOJ v. Julian*,
  486 U.S. 1 ........................................................................................... 8, 9

*\*Dow Jones & Co, Inc.. v. DOJ*,
  917 F.2d 571 (D.C. Cir. 1990) .......................................................... 4, 7, 9

*Dudman Commc'ns. Corp. v. Dep't of Air Force*,
  815 F.2d 1565 (D.C. Cir. 1987) ............................................................. 18

*Elec. Frontier Found. [EFF] v. Office of Dir. of Nat'l Intelligence*,
  No. C 08-01023 JSW, 2009 WL 3061975 (N.D. Cal. Sept. 24, 2009) ................... 24

*Elec. Privacy Info. Ctr. [EPIC] v. DOJ*,
  511 F. Supp. 2d 56 (D.D.C. 2007) .......................................................... 27

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*,
  No. CV H-10-4969, 2017 WL 2331679 (S.D. Tex. Apr. 26, 2017) ........................ 22

*\*Formaldehyde Inst. v. HHS*,
  889 F.2d 1118 (D.C. Cir. 1989) ....................................................... passim

*Fox News Network, LLC v. Dep't of the Treasury*,
  678 F. Supp. 2d 162 (S.D.N.Y. 2009) ...................................................... 32

*Gilliam v. DOJ*,
  128 F. Supp. 3d 134 (D.D.C. 2015) ........................................................ 34

*Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
  545 U.S. 409 (2005) ........................................................................... 8

*Hayden v. NSA/Cent. Sec. Serv.*,
  608 F.2d 1381 (D.C. Cir. 1979) ............................................................. 33

*Hunton & Williams v. DOJ*,
  590 F.3d 272 (4th Cir. 2010) ................................................................ 18

*In re Islamic Republic of Iran Terrorism Litig.*,
  659 F. Supp. 2d 31 (D.D.C. 2009) .......................................................... 16

*In re Lindsey*,
  158 F.3d 1263 (D.C. Cir. 1998) ............................................................. 17

*In re Pac. Pictures Corp.*,
  679 F.3d 1121 (9th Cir. 2012) ........................................................ 19, 22

iii

*Johnson v. Exec. Office for U.S. Att'ys,*
   310 F.3d 771 (D.C. Cir. 2002) ......................................................... 30

*Judicial Watch, Inc. v. Dep't of Energy,*
   412 F.3d 125 (D.C. Cir. 2005) ...................................................... 8, 10

*Judicial Watch, Inc. v. Dep't of Transp.,*
   950 F. Supp. 2d 213 (D.D.C. 2013) ........................................... passim

*Judicial Watch, Inc. v. U.S. Postal Serv.,*
   297 F. Supp. 2d 252 (D.D.C. 2004) ................................................. 27

*Lardner v. DOJ,*
   No. CIV.A.03-0180(JDB), 2005 WL 758267 (D.D.C. Mar. 31, 2005) .................................... 6

*Lucaj v. FBI,*
   852 F.3d 541 (6th Cir. 2017) ........................................................... 5

*Mapother v. DOJ,*
   3 F.3d 1533 (D.C. Cir. 1993) ......................................................... 28

*McKinley v. Bd. of Governors of Fed. Reserve Sys.,*
   647 F.3d 331 (D.C. Cir. 2011) ...................................................... 6, 10

*Military Audit Project v. Casey,*
   656 F.2d 724 (D.C. Cir. 1981) ....................................................... 34

*Minebea Co. v. Papst,*
   228 F.R.D. 13 (D.D.C. 2005) ......................................................... 17

*Morley v. CIA,*
   699 F. Supp. 2d 244 (D.D.C. 2010) ................................................. 28

*Nat'l Archives & Records Admin.,*
   583 F. Supp. 2d 146 (D.D.C. 2008) ................................................. 26

*\*Nat'l Inst. of Military Justice [NIMJ] v. Dep't of,*
   Def., 512 F.3d 677 (D.C. Cir. 2008) ........................................ 4, 12, 13

*Nat'l Sec. Archive v. CIA,*
   752 F.3d 460 (D.C. Cir. 2014) .................................................... 18, 21

*Nielsen v. U.S. Bureau of Land Mgmt.,*
   252 F.R.D. 499 (D. Minn. 2008) .................................................... 30

*NLRB v. Sears, Roebuck & Co.,*
   421 U.S. 132 (1975) ...................................................................... 18

iv

*Oglesby v. Dep't of Army*,
    920 F.2d 57 (D.C. Cir. 1990) ................................................................. 31

*Pfeiffer v. CIA*,
    721 F. Supp. 337 (D.D.C. 1989) ........................................................... 25

*Physicians for Human Rights v. Dep't of Def.*,
    675 F. Supp. 2d 149 (D.D.C. 2009) ................................................. 30, 33

*Pub. Emps. for Envtl. Responsibility v. Office of Sci. & Tech. Policy*,
    881 F. Supp. 2d 8 (D.D.C. 2012) .......................................................... 27

*\*Public Citizen, Inc. v. DOJ*,
    111 F.3d 168 (D.C. Cir. 1997) ....................................................... passim

*\*Ryan v. DOJ*,
    617 F.2d 781 (D.C. Cir. 1980) ....................................................... passim

*SafeCard Servs., Inc. v. SEC*,
    926 F.2d 1197 (D.C. Cir. 1991) ........................................................... 29

*Schaeffler v. United States*,
    806 F.3d 34 (2d Cir. 2015) ................................................................... 17

*Thomas v. HHS*,
    587 F. Supp. 2d 114 (D.D.C. 2008) ..................................................... 34

*United States ex rel. Folliard v. Gov't Acquisitions, Inc.*,
    764 F.3d 19 (D.C. Cir. 2014) ............................................................... 34

*United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*,
    No. Civ. 99-3298, 01-MS-50(MDL)(RCL), 2004 WL 2009413 (D.D.C. May 17, 2004) . 17, 19

*United States v. McPartlin*,
    595 F.2d 1321 (7th Cir. 1979) ............................................................. 19

*United States v. Schwimmer*,
    892 F.2d 237 (2d Cir. 1989) ................................................................ 19

## **Statutes**

5 U.S.C. § 551(1)(A) ............................................................................. 8, 9

5 U.S.C. § 552(b)(5) ....................................................................... 1, 3, 4, 8

5 U.S.C. § 552(f) ...................................................................................... 9

44 U.S.C. § 2204(e) ............................................................................... 14

**<u>U.S. Constitution</u>**

U.S. Const. art. II, § 2 cl.. ........................................................................................... 15

U.S. Const. art. II, § 3 ................................................................................................... 16

## INTRODUCTION

Plaintiff American Oversight contends that the Freedom of Information Act ("FOIA") compels full disclosure of the most sensitive deliberations involving the Executive and Legislative branches, even when those deliberations are integral to the Executive Branch's own process for shaping and executing the President's policy priorities.  According to this view, an agency must make available upon request any discussion of policy options, legislative language, or political strategy—all of which is pre-decisional, deliberative material—simply by virtue of the fact that these discussions included a member of Congress or a congressional staffer.  If Plaintiff's view prevails, the Executive Branch and members of Congress and their staffs, fearing disclosure of their communications, will no doubt curtail them; the Executive Branch will be deprived of honest views and valuable insights from Congress; and the policy-making process envisioned by the Framers will suffer.

For much of 2017, and for all of the period relevant to this case, officials at the two Defendant agencies, the Department of Health and Human Services ("HHS") and the Office of Management and Budget ("OMB," and with HHS, "the agencies"), worked hard in support of one of the President's most pressing policy goals: the enactment of health care reform.  By constitutional design, that work entailed extensive consultation with certain members of Congress and their staff, as the President's duty to execute the laws and his prerogative to sign or veto legislation are intertwined with the laws Congress passes or contemplates passing.  Those consultations, including the emails at issue in this case, formed an integral part of the agencies' own deliberations with respect to health care reform.  Accordingly, the agencies redacted portions of emails that revealed those deliberations pursuant to FOIA Exemption 5.  That exemption permits an agency to redact deliberative material from "inter-agency or intra-agency" communications, 5 U.S.C. § 552(b)(5), and under binding D.C. Circuit case law, communications between an agency

1

and certain non-agency entities satisfy this threshold requirement when the communications are part and parcel of the agency's deliberative process.

American Oversight does not meaningfully contest the factual premise that there were extensive agency deliberations about health care reform or that emails with congressional personnel contributed to those deliberations. Nor could it, in light of the declarations the agencies supplied on these points. Instead, American Oversight rests its challenge to the majority of the withholdings at issue here on what is, in essence, a "deliberative dichotomy." American Oversight is of the view that, because Congress also clearly had a role in the effort to enact health care reform, the redacted emails cannot, as a matter of law, have played a role in the agencies' deliberations.

This cramped view of the deliberative process is foreclosed by the D.C. Circuit's cases, which have repeatedly held that Exemption 5 can apply to back-and-forth communications between an agency and a non-agency entity, including Congress. It is also in tension with cases that extend litigation privileges to cover third parties in certain circumstances where the parties share a defined common interest. More fundamentally, American Oversight's view is at odds with the animating purpose of the deliberative process privilege, which was incorporated into FOIA for the manifest purpose of protecting the most sensitive government deliberations from public disclosure and enhancing the quality of government decision making. Because disclosing the redacted emails would directly undermine those aims, the agencies are entitled to summary judgment.

## ARGUMENT

### I.   The Redacted Emails Between the Agencies and Congress Are Subject to Exemption 5.

The agencies properly withheld material from the redacted emails pursuant to FOIA Exemption 5, which protects from disclosure "inter-agency or intra-agency memorandums or

letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).

At the outset, the redacted emails qualify as "inter-agency or intra-agency" communications for two independent, but related, reasons.  First, they reflect consultations with congressional personnel in support of agency decision-making about health care reform, and as such, they fall squarely within the D.C. Circuit's "consultant corollary" line of cases.  Although American Oversight tries several approaches to distinguish these binding decisions, each of those efforts fails.  Second, the redacted emails are also "inter-agency or intra-agency" communications pursuant to the common interest doctrine, which extends litigation privileges where, as here, a party otherwise entitled to claim a privilege communicates with a third party that shares a particular common interest.  Because the agencies and the relevant congressional personnel had a shared deliberative interest in, and a shared responsibility for, enacting the AHCA (or similar legislation), their communications should be subject to Exemption 5.  Additionally, the uncontested harm that disclosing the redacted emails would cause to government deliberations and policy-making should guide the Court's resolution of the Exemption 5 threshold issue, regardless of whether it opts for the consultant corollary or the common interest doctrine.

Once the Court has held that the redacted emails meet the Exemption 5 threshold requirement, the conclusion that the withheld material is protected by the deliberative process inexorably follows.  American Oversight does little to rebut the explanations that the agencies set forward in their opening brief and supporting materials[1] as to why the withheld material is both

---

[1] As explained in the Supplemental Declaration of Thomas Hitter ("Hitter Suppl. Decl."), the Vaughn index that OMB submitted along with the agencies' motion for summary judgment inadvertently omitted six entries due to a clerical error.  Hitter Suppl. Decl. ¶ 5.  The corrected version of the Vaughn index, which is identical to the original version but for the missing six

pre-decisional and deliberative.  Instead, it relies on a re-packaged version of its contention that the emails are not "inter-agency or intra-agency" communications for purposes of Exemption 5. That argument is equally unavailing on the merits of the deliberative process privilege as it is at Exemption's 5 threshold.  Accordingly, the agencies are entitled to summary judgment with respect to their decision to withhold material from the redacted emails pursuant to Exemption 5.

## A.  The Redacted Emails Satisfy Exemption 5's Threshold Requirement.

### 1.  *Binding D.C. Circuit Precedent Establishes that the Redacted Emails Are "Inter-Agency or Intra-Agency" Communications for Purposes of Exemption 5.*

For decades, the D.C. Circuit has held that "Exemption 5 permits an agency to protect the confidentiality of communications from outside the agency so long as those communications are part and parcel of *the agency's* deliberative process."  *Dow Jones & Co, Inc.. v. DOJ*, 917 F.2d 571, 575 (D.C. Cir. 1990).  The D.C Circuit adopted that rule by looking at "the language of Exemption 5" and interpreting that language "in light of its purpose."  *Ryan v. DOJ*, 617 F.2d 781, 789 (D.C. Cir. 1980).  It found that Exemption 5 "was created to protect the deliberative process of the government" and that consultations involving "the opinions and recommendations of temporary consultants" are "an integral part of [that] deliberative process."  *Id.* at 789.  Because exposing such consultations to "public view would inhibit frank discussion of policy matters and likely impair the quality of decisions," the court found that they "clearly" qualify as "inter-agency or intra-agency memorandums or letters" under Exemption 5.  *Id.* at 789-90; 5 U.S.C. § 552(b)(5).

The D.C. Circuit has reaffirmed that *Ryan* and its progeny remain good law on multiple occasions, including in the wake of the Supreme Court's decision in *Department of the Interior v. Klamath Water Users Protective Association*, 532 U.S. 1 (2001).  *See, e.g.*, *Nat'l Inst. of Military*

---

entries, is attached as Exhibit 1 to the Supplemental Hitter Declaration and is the version cited to throughout this brief.  *See id.*, Ex. 1 ("OMB Vaughn Index").

*Justice [NIMJ] v. Dep't of Def.*, 512 F.3d 677, 682 (D.C. Cir. 2008) (evaluating the reasoning and holding in *Klamath* and concluding that "we perceive no basis to jettison our binding Circuit precedent"); *see also* Mem. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Br.") at 14 n.4, ECF No. 25-1 (citing cases). American Oversight never contests that this Court remains bound by *Ryan*, along with all of the other consultant corollary cases from the D.C. Circuit that the agencies cited in their opening brief. *See* Mem. in Supp. of Pl.'s Cross-Mot. for Summ. J. and in Opp. to Defs.' and Def.-Intervenor's Mots. for Summ. J. ("Pl.'s Br.") at 13-15, ECF No. 30-1. And *Lucaj v. FBI*, 852 F.3d 541 (6th Cir. 2017), the out-of-circuit case that American Oversight cites in support of its reading of *Klamath*, cannot supplant this circuit's case law. If American Oversight is asking this Court to cast aside one (or more) of the D.C. Circuit's binding precedents, it should say so.

American Oversight also does not contest, or even engage with, the agencies' discussion of *Klamath*. *Compare* Defs.' Br. at 14 n.4, 19-20 & n.6, *with* Pl.'s Br. at 10, 11, 13-15. *Klamath* imposed a specific limit on the reach of the consultant corollary: communications with a non-agency are not subject to Exemption 5 if the non-agency is a "self-advocate[] at the expense of others seeking benefits inadequate to satisfy everyone." 532 U.S. at 12; *see also id.* at 12 n.4 (reinforcing that the Court's holding extended *only* to "communications to or from an interested party seeking a Government benefit at the expense of other applicants"). That holding is the Court's "clear guidance," not its discussion of the "typical" consultant corollary case. Pl.'s Br. at 11, 13. To the extent American Oversight's brief suggests otherwise, courts repeatedly have rejected similar attempts to over-read *Klamath* at the expense of D.C. Circuit precedent. In *Judicial Watch, Inc. v. Department of Transportation*, 950 F. Supp. 2d 213, 218 (D.D.C. 2013), for instance, Judge Lamberth held that communications with an interested party "adverse to others seeking" the same government benefit do not fall within the consultant corollary. But he rejected

further limitations on the consultant corollary, finding that such a result would entail "prun[ing] our circuit's rule further than the Supreme Court requires." *Id.*; *see also McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 337 (D.C. Cir. 2011) ("Lest there be any confusion, . . . the 'dispositive point' [in *Klamath was*]: 'that the apparent object of the Tribe's communications [was] a decision by an agency of the Government to support a claim by the Tribe that [was] necessarily adverse to the interests of competitors.'" (quoting *Klamath*, 532 U.S. at 14)); *Lardner v. DOJ*, No. CIV.A.03-0180(JDB), 2005 WL 758267, at \*15 (D.D.C. Mar. 31, 2005), (applying *Ryan* and explaining that "[f]airly read, the holding of *Klamath* is only that a communication from an *'interested party'* seeking a Government benefit *'at the expense of other applicants'* is not an intra-agency record" (emphasis in original)).

Stepping back, reading the D.C. Circuit's consultant corollary cases alongside *Klamath* "produces the following rule in [this] circuit: When communications between an agency and a non-agency aid the agency's decision-making process and the non-agency did not have an outside interest in obtaining a benefit that is at the expense of competitors, the communication *must* be considered an intra-agency communication for the purposes of FOIA Exemption 5." *Judicial Watch*, 950 F. Supp. 2d at 218-19 (emphasis added).  As set forth in the agencies' opening brief, the redacted emails at issue here fit squarely within this rule. *See* Defs.' Br. at 15-20.  Those emails were exchanged with "specific members of Congress and staff"[2] who contributed to the agencies' deliberations over how to enact health care reform.  *Id.* at 15 (citing agency declarations). American Oversight does not dispute that these communications were "integral" to a series of

---

[2] Although American Oversight is uncertain as to whom the agencies consulted, *see* Pl.'s Br. at 11 & n.4, the record is clear.  The records produced to American Oversight, along with the agencies' Vaughn indexes, identify the members of Congress and congressional staff that the agencies consulted in the redacted emails.  *See* OMB Vaughn Index; Decl. of Michael Bell ("Bell Decl."), Ex. 6 ("HHS Vaughn Index"), ECF No. 25-4.

decisions the agencies made regarding health care reform.  *Ryan*, 617 F.2d at 789; *see also* Pl.'s

Br. at 32 (accepting that redacted emails "were used to inform executive branch decisionmaking").

Nor does American Oversight contest that the relevant "members of Congress and staff . . . were

not 'self-advocates' seeking a particular government benefit '*at the expense of others.*'"[3]  Defs.'

Br. at 20 (emphasis in original) (quoting *Klamath*, 532 U.S. at 12).  In sum, American Oversight

has left unrebutted the two salient doctrinal elements that determine whether the consultant

corollary applies here.  The Court therefore should hold that the redacted emails are inter-agency

or intra-agency communications within the meaning of Exemption 5.

### 2. *American Oversight's Attempt to Reshape the D.C. Circuit's Consultant Corollary Is Unavailing.*

American Oversight endeavors to chart a course through this circuit's case law that would

avoid a straightforward application of the consultant corollary.  The arguments it makes in support

of this effort, however, are unavailing.

*First*, American Oversight contends that "the plain text of Exemption 5" precludes

application of the consultant corollary here.  Pl.'s Br. at 7-8.  But the actual thrust of the argument

is that the text forecloses the *existence* of the consultant corollary—a possibility that is ruled out

by the same D.C. Circuit case on which American Oversight relies.  *See Dow Jones*, 917 F.2d at

575 (holding that communications with non-agencies that "are part and parcel of *the agency's*

deliberative process . . . remain intra-agency documents," while communications that aid only the

"deliberations of a *non-agency*" do not).  In crafting this argument, American Oversight starts (as

the agencies' did in their opening brief) with Exemption 5's use of the terms "inter-agency or intra-

agency."  *Compare* Pl.'s Br. at 7, *with* Defs.' Br. at 13.  It then notes that Congress is not an

---

[3] Such a challenge would raise a series of questions—what *government benefit*, analogous to the water rights at issue in *Klamath*, 532 U.S. at 4-6, were these individuals seeking?  And at whose expense were they seeking it?

"agency" for purposes of FOIA, *see* 5 U.S.C. § 551(1)(A), and suggests that communications between Congress and an agency accordingly are never subject to Exemption 5. Pl.'s Br. at 8. But if the terms "inter-agency or intra-agency" require that both the author and recipient of a communication be "agencies," as defined by FOIA, then *all* of the D.C. Circuit's consultant corollary cases are wrong.[4] *See, e.g.*, *Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 129-30 (D.C. Cir. 2005) (deliberative communications between an agency and "the President and his staff, who are not subject to the FOIA," may still be protected under Exemption 5).

While that anomalous result is a sufficient reason to reject American Oversight's reading of the statute, there are strong textual reasons to reject it as well. The pertinent language in the statute is not simply "inter-agency or intra-agency"; it is "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5); *cf. DOJ v. Julian*, 486 U.S. 1, 11 (describing Exemption 5 as a "somewhat Delphic provision"). This additional language shapes how a court should interpret the use of "inter-agency or intra-agency," while still giving effect to that phrase. *See, e.g.*, *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 415 (2005) ("Statutory language has meaning only in context."). And as is clear from the language that follows "inter-agency or intra-agency," Exemption 5 textually incorporates its purpose: protecting privileged communications. In other words, the Court should interpret "inter-agency or intra-agency" in a manner that allows agencies to protect the kind of information that litigation privileges are meant to protect.

---

[4] To the extent American Oversight suggests that the consultant corollary cases should be parsed along some lines other than FOIA's definition of "agency," that argument simply reinforces that American Oversight's position is not driven by an application of the statute's text, but by a desire to re-write the D.C. Circuit's case law.

The D.C. Circuit's reading of Exemption 5 takes appropriate stock of the exemption's text-derived purpose.  *See Formaldehyde Inst. v. HHS*, 889 F.2d 1118, 1122 (D.C. Cir. 1989) ("[T]he pertinent element is the role, if any, that the document plays in the process of agency deliberations." (quoting *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1161-62 (D.C. Cir. 1987)). By contrast, as Justice Scalia has explained, the reading that American Oversight advances here is undesirable because "it excludes many situations where Exemption 5's purpose of protecting the Government's deliberative process is plainly applicable." *DOJ v. Julian*, 486 U.S. 1, 18 n.1 (1988) (Scalia, J., dissenting).[5]  The better reading of the statute, he argued, was to include in the definition of "intra-agency memorandum" a document that assisted an agency "in the performance of its own functions" and was sent by "a person acting in a governmentally conferred capacity other than on behalf of another agency."  *Id.* (citing the "information furnished by Senators" at issue in *Ryan* as an example of the correct way to interpret Exemption 5).  In this case, the members of Congress and staff involved in the redacted emails were acting in a governmentally conferred capacity and assisted the agencies in performing their functions related to health care reform.  The text of Exemption 5 therefore "clearly embraces" those emails as intra-agency.[6]  *Ryan*, 617 F.2d at 789.

*Second*, American Oversight challenges the application of the consultant corollary in this case based on a five-factor "test" that it fashions out of whole cloth.  *See* Pl.'s Br. at 10-11, 14.

---

[5] The majority in *Julian* did not reach, and thus did not contest, Justice Scalia's reading of Exemption 5.  486 U.S. at 11 n.9.

[6] Interpreting the enactment of Exemption 5 together with Congress's decision to exempt itself from the burdens of FOIA, *see* 5 U.S.C. §§ 551(1)(A), 552(f), also supports the conclusion that deliberative communications between Congress and the Executive Branch are "inter-agency" records for purposes of Exemption 5.  The structure of FOIA is inconsistent with a finding that when an entity that is entirely exempt from FOIA (Congress) communicates with an entity that may invoke the deliberative process privilege (an Executive Branch agency), the result is that both entities lose *all* protection over their deliberations.  The D.C. Circuit, however, has declined to adopt this reading of the statute.  *See Dow Jones*, 917 F.2d at 574-75.

But these "factors" are divorced from, and often inconsistent with, the actual requirements of the D.C. Circuit's cases.  And in any event, nearly all of them are present here.

The first of these factors is an alleged requirement that the agency "solicit[] the outside advice" of a non-agency.  Pl.'s Br. at 10.   But the D.C. Circuit's precedents do not "mandat[e] agency solicitation for a communication to be 'intra-agency.'"  *Judicial Watch*, 950 F. Supp. 2d at 219 n.4.  In *Judicial Watch, Inc. v. Department of Energy*, for instance, the court held that it was "of no moment" that the National Energy Policy Development Group, a non-agency, had "initiated the policy development process" at issue in the case, rather than an agency.  412 F.3d at 131 (emphasis added).  Similarly, the D.C. Circuit in *Formaldehyde* rejected "as too short-sighted" the position that "there can be no Exemption 5 coverage because the outside reviews [at issue] were not 'solicited' by [the agency]."  889 F.2d at 1124; *see also Judicial Watch*, 950 F. Supp. 2d at 220 (emphasizing the need to comply with D.C. Circuit cases, including *Formaldehyde* and *Public Citizen, Inc. v. DOJ*, 111 F.3d 168 (D.C. Cir. 1997), that do not "require agency solicitation").  *But see McKinley*, 647 F.3d at 338.

Moreover, many of the communications at issue here were *expressly* solicited by the agencies.  *See, e.g.*, Decl. of Jonathan Slemrod ("Slemrod Decl.") ¶¶ 13, 17, ECF No. 25-3; *cf.* Decl. of Kristin S. Skrzycki ("Skrzycki Decl.") ¶ 9, ECF No. 25-5 ("HHS accordingly engaged in discussions and sought feedback from Congress on legislative and administrative options for reform.").  And where there was not express solicitation, the sensitive analysis, recommendations, and draft legislation provided by Congress "reflect[ed] a mutual understanding between the agenc[ies] and [congressional personnel] . . . regarding how the agenc[ies]" would use the communications.  *Formaldehyde*, 889 F.2d at 1124; *see also* Slemrod Decl. ¶ 19 (describing expectation that communications would be kept confidential); Skrzycki Decl. ¶ 11 (same).

10

Accordingly, regardless of whether there was express agency solicitation, the consultant corollary would still apply here.

Finally, even if the congressional personnel who sent and received the redacted emails "also could be said to have 'solicited' [the agencies] for [their] assistance" in deliberating about the details of health care reform, "[t]he fact that both agency and non-agency may have mutually 'solicited' each other's assistance . . . does not obscure the fact that agency solicitation nevertheless occurred." *Judicial Watch*, 950 F. Supp. 2d at 219 n.4.  American Oversight tries to carve out "back-and-forth" emails from the scope of the consultant corollary, *see* Pl.'s Br. at 9, 11, but it fails to engage with the agencies' discussion of this issue in their opening brief.  *See* Defs.' Br. at 16.

*Public Citizen* provides the clearest example of why the D.C. Circuit does not treat back-and-forth communications differently than one-off documents provided by an outside consultant. There, the consultations at issue included communications between the Archivist and a former President, which had to take place "[b]efore deciding whether to allow access" to records the former President had designated as "restricted." *Public Citizen*, 111 F.3d at 170.  Both parties had a clear interest in the decision about access, and in fact the former President had the choice whether to "waive his restrictions" or challenge the Archivist's decisions in court.  *Id.*  Despite the back-and-forth nature of the communications between parties with distinct interests, the court rejected the plaintiff's argument that the consultant corollary was inapplicable.  It labeled a "false dichotom[y]" the plaintiff's contention that "[b]ecause there are other aspects to the relationship," the relationship "cannot be consultative for purposes of Exemption 5."  *Id.* at 171.  The court ultimately concluded that, like in this case, "the consultative relationship is not mutually exclusive with any of the other[]" relationships the plaintiff identified.  *Id.*; *compare* Pl.'s Br. at 13

11

(attempting to draw a line between cases where congressional communications are used "in an agency deliberative process" and cases where "senators' performance of their own constitutional functions" is also implicated).  In other words, even though the Executive Branch and Congress can (and do) communicate with each other in a manner that does not trigger the consultant corollary, that fact does not settle the question of whether the consultant corollary applies here. For the reasons outlined above, it does.

The second component of American Oversight's consultant corollary "test" is the novel requirement that an outsider must have "understood itself to be acting as a consultant to agency deliberations."  Pl.'s Br. at 10.  But American Oversight cites no authority that suggests, much less holds, that the subjective mindset of a non-agency is a requirement (or even a consideration) when applying the consultant corollary.[7]  The Court in *Public Citizen*, for example, did not find it necessary to ascertain whether former Presidents Reagan and Bush thought of themselves as "consultants" in holding that their communications with the Archives and the Department of Justice were subject to Exemption 5.  *See* 111 F.3d at 170.

To be sure, the D.C. Circuit's consultant corollary cases typically feature "some indicia of a consultant relationship between the outsider and the agency."  *NIMJ*, 512 F.3d at 686.  But such indicia plainly exist here.  The congressional personnel on whom the agencies relied included "veteran legislators" and "experienced legislative professionals," Decl. of Sarah C. Arbes ("Arbes Decl.") ¶ 9, ECF No. 25-6, who possessed relevant knowledge and expertise "[b]y virtue of their close proximity to the legislative process."  Slemrod Decl. ¶ 11; *compare NIMJ*, 512 F.3d at 679

---

[7] If such authority existed, American Oversight's only citation to the record on this point confirms it would apply to, at most, four email threads.  Pl.'s Br. at 11 (citing materials submitted in support of the House Committee on Ways and Means' Motion for Summary Judgment, which addresses just four email threads, *see* Mem. in Supp. of Summ. J. of the Comm. on Ways & Means at 1, ECF No. 27).

(quoting agency declaration that described the "previous experience" and "expertise" of the non-governmental lawyers at issue in the case, which supported treating them as consultants).  The expectation of confidentiality that accompanied communications with these congressional personnel reaffirms that the agencies treated these communications like the analysis and recommendations of a consultant.  *See* Slemrod Decl. ¶ 19; Skrzycki Decl. ¶ 11; Arbes Decl. ¶ 9.  As does the manner in which the agencies relied on the communications.  *See, e.g.*, Arbes Decl. ¶ 8.a. (explaining that "[t]he feedback that HHS received from Congress helped the agency identify and evaluate potential rulemakings and operations changes that might become necessary if a [health care] bill were to pass"); Slemrod Decl. ¶ 12 (OMB was "able to benefit from the advice of those with legislative expertise" in crafting Statements of Administration Policy).

The third and fourth factors collectively purport to require that non-agencies be "readily identifiable entities, essentially individuals or organizations available for hire" who "effectively function[] as agency employees."  Pl.'s Br. at 10-11.  The D.C. Circuit, however, has rejected attempts to narrow Exemption 5 to cover only paid consultants or more formal consultant relationships.  *NIMJ*, 512 F.3d at 686-87 (concluding that communications from consultants "would be [no] more 'intra-agency'" if "the individuals consulted [were] classified as 'committee' members or paid nominal stipends").

Moreover, whether a consultant is "analogous" to an agency employee in a particular case, *id.* at 687, turns on the nature of the information the consultant provides, not the abstract relationship between a consultant and an agency.  Senators are not effectively DOJ employees, *see Ryan*, 617 F.2d at 790-91; outside referees for a medical journal are not fairly thought of as employed by HHS, *see Formaldehyde*, 889 F.2d at 1120 ; and former presidents cannot be said to work for the Archives, *see Public Citizen*, 111 F.3d at 169.  The analogy to employment may make

sense for "a property appraiser, a toxic exposure expert, an English barrister," or any of the other consultant archetypes that American Oversight points to. *See* Pl.'s Br. at 12. But that is the point; all of these outsiders—the "typical" consultants, on the one hand, and the senators, journal referees, and former Presidents, on the other—have equally been held to fall within Exemption 5 when they communicated with Executive Branch agencies. That is because it is the role that an outsider plays in an agency's deliberative process, in each individual case, that determines whether to treat communications with that outsider as subject to Exemption 5. *See Formaldehyde*, 889 F.2d at 1123.

Finally, the fifth factor American Oversight suggests—that the consultant cannot have an interest of its own, *see* Pl.'s Br. at 11—is untenable in light of D.C. Circuit precedent. As American Oversight all but acknowledges, such a requirement is foreclosed by *Ryan*, where senators unquestionably had their own views and interests with respect to "their procedures for selecting and recommending potential [judicial] nominees." 617 F.2d at 784. American Oversight endeavors to avoid that conclusion by elevating Supreme Court dicta over binding circuit precedent, but as discussed above and in the agencies' opening brief, that effort fails. *See supra* at 4-7; Defs.' Br. at 19 n.6. The prospect of a "no independent interests" requirement is also foreclosed by *Public Citizen*. There, the court acknowledged that it is "clearly true that a former President's power to assert his right and privileges" in consultations about presidential records— a power conferred by the Presidential Records Act, 44 U.S.C. § 2204(e)—"constitutes an independent interest." 111 F.3d at 171. But the court nonetheless held that the communications at issue were subject to Exemption 5 and emphasized that "the *potential* for an adversary relationship is not enough to negate one of consultation." *Id.* (emphasis added). As discussed in greater depth below, *see infra* at 15-16, all American Oversight has done here is note the general

potential for adverseness between Congress and the Executive Branch. That structural observation, however, does "nothing to contradict the [agencies'] account of the deliberations[]" at issue here. *Public Citizen*, 111 F.3d at 171.

For all these reasons, American Oversight's proposed test—a five-factor corollary to the consultant corollary—should be rejected.

*Third*, American Oversight contends that treating the redacted emails as subject to Exemption 5 is inconsistent with the separation of powers. Pl.'s Br. at 20-22. This argument fails at the outset in light of *Ryan*. Like the communications relating to health care reform at issue here, the materials at issue in *Ryan*—responses to a questionnaire about the process for selecting judicial nominees—implicated a subject matter in which both Congress and the Executive Branch have a constitutional stake. *Compare* Defs.' Br. at 16-17 (outlining the "[t]he Executive Branch's constitutionally prescribed role in the process of enacting laws"), *with* U.S. Const. art. II, § 2 cl. 2 (providing for presidential appointments "by and with the Advice and Consent of the Senate"). If Senators providing information about judicial nominations to the Department of Justice raised no separation-of-powers concerns,[8] then neither do the redacted emails from this case.

More fundamentally though, American Oversight's separation-of-powers argument conflates the *structure* of government with the manner in which the political branches choose to operate *within* that structure. That Executive Branch agencies communicated confidentially with

---

[8] One particularly novel concern that American Oversight gestures at is an alleged "tension" between applying the consultant corollary and the Incompatibility Clause. *See* Pl.'s Br. at 21. No such tension exists because the touchstone of the consultant corollary is the role that materials from a non-agency play in the deliberative process, not the abstract relationship between a consultant and an agency. *See supra* at 13-14. And even if the abstract relationship between congressional personnel and the Executive Branch were the relevant frame of reference, *Ryan* still holds that communications like the redacted emails at issue here fall within Exemption 5. *See* 617 F.2d at 789-90.

15

congressional personnel about health care reform, an important policy priority, in no way means either branch ceded any constitutional authority.  American Oversight accuses the agencies of attempting to "waive the separation of powers out of convenience," Pl.'s Br. at 21, but it fails to identify *any* structural check that has been discarded—Congress simply did not forfeit any of its Article I powers with respect to health care reform, or any other issue, when several of its members and staff sent and received the redacted emails; nor did the Executive Branch, which also has a constitutional role in the enactment of legislation, surrender any of its powers under Article II.

Instead, congressional personnel worked with the Executive Branch in a manner contemplated by the Constitution.  The framers "were practical statesmen" who understood that "a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively." *Buckley v. Valeo*, 424 U.S. 1, 121 (1976); *see also In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 81 (D.D.C. 2009) ("When, as here, both the President and Congress . . . are working together toward a common foreign policy objective, the Judicial Branch should be extremely hesitant about intervening in a way that would unravel those efforts.").  Indeed, the Constitution envisions the branches participating in the exercise of powers with which they are not principally vested, including the Recommendations Clause, Const. art. II § 3, which provides that the President shall be involved in the process of creating legislation.  A "sealing off" in the context of the effort to enact health care reform would have harmed this necessary and longstanding policy-making process by, *inter alia*, "compromis[ing] the quality and accuracy of the advice OMB provide[d] to the President," Slemrod Decl. ¶ 24, and undermining "the candor, objectivity, and effectiveness of the communications" between HHS and Congress, Arbes Decl. ¶ 10.  Holding that the communications at issue in this case are subject to Exemption 5, by contrast, would further the

16

good governance interests that both the Constitution and the deliberative process privilege promote.

### 3. The Common Interest Doctrine Further Supports the Conclusion that the Redacted Emails Are "Inter-Agency or Intra-Communications" Under Exemption 5.

The D.C. Circuit's consultant corollary case law makes clear that the redacted emails are inter-agency or intra-agency communications for purposes of Exemption 5. But this Court can also reach that result by applying the common interest doctrine, which provides that the protections of the attorney-client and work product privileges—two of the other most frequently invoked privileges protected by Exemption 5—do not evaporate when parties that share a common legal interest communicate. *See In re Lindsey*, 158 F.3d 1263, 1282 (D.C. Cir. 1998). American Oversight's arguments to the contrary rest on the distinctions between the contours of the attorney-client and work product privileges, on the one hand, and the deliberative process privilege, on the other. But the common interest doctrine is not itself a privilege; it is a means of determining the *scope* of other privileges. *See* Defs.' Br. at 21; *see also Minebea Co. v. Papst*, 228 F.R.D. 13, 15 (D.D.C. 2005) (describing the doctrine as "an extension" of the underlying privilege). And as with the attorney-client and work product privileges, the animating purpose of the deliberative process privilege supports extending it to certain contexts where parties share a defined common interest.

The common interest doctrine addresses the confidentiality concerns that arise when parties who are otherwise outside the scope of a litigation privilege enter the picture. In such cases, where "multiple clients share a common interest about a legal matter," "[t]he need to protect the free flow of information from client to attorney logically exists." *Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015); *see also United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, No. Civ. 99-3298, 01-MS-50(MDL)(RCL), 2004 WL 2009413, at *4 (D.D.C. May 17, 2004) (explaining that the common interest doctrine "ensure[s] that attorneys feel free to fully and

completely prepare for trial by assuring that their legal preparations will not be accessible to an adversary"). As the agencies explained in their opening brief, in analysis that American Oversight does not contest, there is a comparable and substantial need for confidentiality when the Executive Branch and Congress engage in the kind of sensitive policy deliberations at issue here. *See* Defs.' Br. at 21-22; *see also Hunton & Williams v. DOJ*, 590 F.3d 272, 277-78 (4th Cir. 2010). The risk that government employees will hold their tongues, and thereby impair "the frank exchange of ideas and opinions," exists both when policy deliberations are internal to the Executive Branch and when such deliberations include allies in Congress. *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 462 (D.C. Cir. 2014) (quoting *Dudman Commc'ns. Corp. v. Dep't of Air Force,* 815 F.2d 1565, 1567 (D.C. Cir. 1987)); *see also* Slemrod Decl. ¶¶ 19-24; Skrzycki Decl. ¶ 20. Applying the common interest doctrine to the deliberative process privilege would prevent this harm from occurring and preserve the integrity of government decision-making processes—precisely what the privilege is meant to protect. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150-51 (1975).

The objections American Oversight raises to giving the common interest effect here are unsubstantiated in light of the clear manner in which the doctrine would further the important protections of the deliberative process privilege and the particular nature of the executive-congressional deliberations at issue in this case. First, the Executive Branch and congressional personnel who generated the redacted emails shared a specific, narrow interest: the repeal of the ACA and the enactment of the AHCA (or similar health care reform legislation). *See* Slemrod Decl. ¶ 7; *see also* Skrzycki Decl. ¶ 20 (explaining individuals on the emails "shared the common goal of enacting health care reform legislation"). Indeed, they shared more than just an interest in that outcome; they had a shared—and constitutionally prescribed—responsibility for the process. *See* Defs.' Br. at 16-17. Because both the Executive Branch and the relevant congressional

personnel had an actual stake in the outcome of the policymaking process for health care reform, this case is different from the more general circumstances in which parties share merely a "desire to see the same outcome." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012); *compare* Pl.'s Br. at 17 (noting that "[a] shared 'rooting' interest in achieving a particular outcome" is insufficient). American Oversight's fear that the common interest doctrine would extend to any circumstance where parties share only "common policy goals," Pl.'s Br. at 19 n.8, accordingly is unfounded.

Moreover, while the Executive Branch and the relevant congressional personnel may have disagreed at times about particular strategic decisions regarding health care reform, such disagreements are an intrinsic part of a *deliberative* process. As courts applying the common interest doctrine have emphasized, "parties need only have *a* common interest, not complete commonality of interests." *Diabetes Treatment Ctrs. of Am.*, 2004 WL 2009413, at *4 (citing *United States v. McPartlin*, 595 F.2d 1321, 1336 (7th Cir. 1979)). The months of effort in support of enacting the AHCA confirm that, at a minimum, the individuals who exchanged the redacted emails shared at least "a" common interest. To be sure, that interest differs from the particular legal interests at issue in cases where courts have applied the common interest doctrine to the attorney-client or work product privileges. But the interest that should be relevant for the common interest doctrine analysis is the interest protected by the *underlying privilege*. It makes sense to require a common legal interest, as distinct from a business or commercial interest, when the common interest doctrine is applied to "protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, 252 F.R.D. 163, 170 (S.D.N.Y. 2008) (quoting *United States v.*

*Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989)).  But where, as here, the underlying confidentiality interest pertains to policy deliberations, rather than legal communications, the interest necessary to trigger the common interest doctrine should reflect that fact.

Finally, the shared understanding between the relevant Executive Branch and congressional personnel that redacted emails were confidential policy deliberations confirms that there was a sufficient level of agreement to apply the common interest doctrine here.  *See* Slemrod Decl. ¶ 19; Skrzycki Decl. ¶ 11; Arbes Decl. ¶ 9; *see also Am. Mgmt. Servs., LLC v. Dep't of the Army*, 703 F.3d 724, 733 (4th Cir. 2013) (requiring a "meeting of the minds," but not "a written agreement").  In light of that understanding, and in light of the fact that the elements of the deliberative process privilege are otherwise satisfied here, *see infra* Section I.B., this Court should hold that the redacted emails are inter-agency or intra-agency communications, for purposes of Exemption 5, pursuant to the common interest doctrine.

### 4. American Oversight's Reading of Exemption 5 Would Expose the Kind of Sensitive Government Deliberations that the Deliberative Process Privilege Was Designed to Protect.

The narrow reading of Exemption 5 that American Oversight advances, and the disclosure of sensitive deliberative material that such a reading requires, would have significant, deleterious consequences on the government's ability to make and implement policy.  As set forth in the agencies' opening brief, along with three supporting declarations, requiring the disclosure of the redacted emails and all similar communications would have a chilling effect on agency deliberations with Congress.  *See* Defs.' Br. at 25-27; Slemrod Decl. ¶¶ 19-24; Skrzycki Decl. ¶ 20; Arbes Decl. ¶ 10.  While that chilling effect would have predictable, adverse consequences on the development of particular policies, such as health care reform, Arbes Decl. ¶ 10, the harm extends beyond the individual instances where Congress and the Executive Branch need to work together.  For instance, constricting channels of communication between OMB and Congress

would inhibit the President in relying on OMB as his agent in discussions with Congress (and therefore his constitutional ability to recommend measure for its consideration), as the fear of publicity would chill OMB's participation in such discussions, and OMB would not be as able to provide technical assistance to Congress as it crafts legislation that the President would ultimately have to decide whether to sign.  Slemrod Decl. ¶ 23.  More broadly, the ability to obtain and receive pertinent information from Congress rests on a mutual understanding of how that information will be treated when it is in the hands of an agency; requiring the disclosure of the redacted emails would undermine that mutual trust.[9]  *Id.* ¶¶ 22-23.

American Oversight does not contest *any* of these consequences, nor does it dispute that the deliberative process privilege is meant to prevent precisely these kinds of injuries to the process of crafting policy.  *See, e.g.*, *Nat'l Sec. Archive*, 752 F.3d at 462.  Given that "[t]he pertinent issue here is what harm, if any, the [redacted emails'] release would do to [the agencies'] deliberative process," *Formaldehyde*, 889 F.2d at 1123–24, the harms the agencies have identified provide more than adequate grounds for this Court to hold that the redacted emails are inter-agency or intra-agency communications for purposes of Exemption 5.

That holding would not trigger the line-drawing problem that American Oversight alleges in its brief.  It is a strawman to suggest that any communications with an outsider who "share[s] policy goals" with an agency could, under the agencies' reading of FOIA, fall within Exemption 5.  *See* Pl.'s Br. at 22.  In the agencies' interpretation of both the consultant corollary and the common interest doctrine, there are clear limiting principles that prevent such an extension of

---

[9] The fact that agencies have released certain communications with Congress in response to other FOIA requests does not diminish the weight of this concerns.  *Compare* Pl.'s Br. at 25, *with ACLU v. Dep't of Def.*, 628 F.3d 612, 625 (D.C. Cir. 2011) ("[W]e have repeatedly rejected the argument that the government's decision to disclose some information prevents the government from withholding other information.").

Exemption 5.  *See supra* at 4-7; *id.* at 18-20.  For instance, the examples American Oversight puts forward of outside groups—Exxon Mobil, the Sierra Club, and the Chamber of Commerce—would, in the mine run of cases, fall outside the consultant corollary because they have "an outside interest in obtaining a benefit that is at the expense of competitors."  *Judicial Watch*, 950 F. Supp. 2d at 218-19.  In fact, it is not hard to imagine that those particular interest groups would, at times, be seeking benefits at the expense of *each other*.  *See, e.g.*, *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, No. CV H-10-4969, 2017 WL 2331679, at *1 (S.D. Tex. Apr. 26, 2017) (recounting how plaintiffs that included the Sierra Club "brought suit under the citizen suit provision of the federal Clean Air Act . . . against Defendant[] ExxonMobil Corporation"), *appeal filed* Aug. 27, 2017.  Similarly, under the common interest doctrine, those outside interest groups generally would share only a "desire to see the same outcome," rather than a constitutionally prescribed role in the process (like the congressional personnel at issue here).  *In re Pac. Pictures*, 679 F.3d at 1129.

Plaintiff's argument that the agencies' position is at odds with FOIA's purpose is really an argument against applying Exemption 5 to agency communications that go outside the government—in other words, against the consultant corollary itself.  But that doctrine is controlling law in this circuit.  Holding that the redacted emails meet Exemption 5's threshold requirement would not send future courts down any slippery slopes.  Rather, it would protect core elements of the deliberative process privilege and maximize the chances that the two elected branches can work together on pressing policy challenges.

### B.  The Redacted Emails Are Protected by the Deliberative Process Privilege.

If the Court finds (as the agencies believe it should) that the redacted emails are inter-agency or intra-agency communications for purposes of Exemption 5, then the redacted material easily satisfies the two prongs of the deliberative process privilege inquiry—the material is both

"pre-decisional" and "deliberative." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). The agencies provided detailed justifications for this conclusion through their opening brief, the accompanying declarations, and the two Vaughn indexes. *See* Defs.' Br. at 23-25 (citing relevant supporting materials). The principal focus of American Oversight's opposition on this point, however, is not the adequacy of those materials, but is instead a re-litigation of the Exemption 5 threshold argument. Specifically, American Oversight contends that because the emails include "back-and-forth discussions" with Congress that are sometimes characterized as "exchanges," they cannot be part of the *agencies'* deliberative processes. Pl.'s Br. at 24, 25 n.10. That contention is incorrect.

The agencies addressed this argument in their opening brief, explaining that it is immaterial for purposes of the consultant corollary whether communications with a consultant that aid an agency's deliberative process *also* aid the deliberations of the entity being consulted. Defs.' Br. at 17-19. Those were the facts in *Formaldehyde*, where an agency had submitted a draft report to a medical journal for publication, and the D.C. Circuit held that the comments of two outside referees were protected from disclosure by Exemption 5. 889 F.2d at 1120. Applying the consultant corollary, the court concluded that the comments contributed to "the agency's decision whether and in what form to publish the Report," and found that disclosing the commentary risked "seriously hamper[ing]" the agency's ability to "conduct and publish scientific research for the public benefit." *Id.* But the court also recognized that the commentary played a role in *the journal's* deliberative process and quoted extensively from a declaration that explained why "the normal workings of review and publication of scientific articles would . . . be seriously compromised if comments of manuscript reviewers were to be released to the public." *Id.* at 1124-25. In other words, the fact that both an agency and a non-agency have an interest in the outcome

23

of a deliberation or the withholding of certain information does not prevent the application of Exemption 5.  *See also supra* at 11-12 (explaining why back-and-forth communications with a non-agency are not outside the scope of the consultant corollary).

American Oversight ignores this aspect of *Formaldehyde*, opting instead to focus on an unpublished out-of-district case that the agencies distinguished in their opening brief.  *See* Pl.'s Br. at 25 (citing *Elec. Frontier Found. [EFF] v. Office of Dir. of Nat'l Intelligence*, No. C 08-01023 JSW, 2009 WL 3061975 (N.D. Cal. Sept. 24, 2009), *aff'd in part, vacated in part, rev'd in part on other grounds*, 595 F.3d 949 (9th Cir. 2010)).  But as the language that American Oversights quotes from *EFF* suggests, the court in that case did not grapple with the possibility that communications between the Executive Branch and Congress could aid *both* branches' deliberative processes.  *See id.*

In any event, the *EFF* court's conclusion—that there was "no evidence that [the communications at issue] were used in an effort to aid *any* agency in its own deliberative process"—cannot be squared with the record here.  2009 WL 3061975, at *5 (emphasis added). The Slemrod, Skrzycki, and Arbes declarations all explain how the redacted emails were used to aid Executive Branch deliberative processes.  *See, e.g.*, Slemrod Decl. ¶ 10 (citing examples of how communications with congressional personnel, including "draft legislative language and analysis of proposals," were used by OMB "to provide the President with analysis and recommendations regarding the AHCA"); Arbes Decl. ¶ 8 (explaing how "the communications at issue in this case informed HHS' decision-making about potential administrative initiatives").  The record in this case—not American Oversight's assertion that the evidence here "is no more compelling than in *EFF*," Pl.'s Br. at 26—should guide the Court's application of the deliberative process privilege.

Turning to the two prongs of the deliberative process inquiry, American Oversight's arguments with respect to both are unavailing.  First, the redacted emails were "pre-decisional" to a series of agency decisions about health care reform, including the President's decision about whether to sign or veto particular legislation, OMB's decision to issue a Statement of Administration Policy on the AHCA, and interim decisions about legislative and communications strategy.  *See* Defs.' Br. at 23-25 (citing declarations and Vaughn indexes); *see also Pfeiffer v. CIA*, 721 F. Supp. 337, 340 (D.D.C. 1989) (citation omitted) (explaining that courts "must give considerable deference to the agency's explanation of its decisional process, due to the agency's expertise in determining what confidentiality is needed to prevent injury to the quality of agency decisions").  American Oversight does not contest that these are relevant agency decisions, or that the redacted emails preceded them.  *See* Pl.'s Br. at 26-27.  Instead, it levies the blanket charge that the agencies failed to establish the role the redacted emails played in these deliberations.  *Id.* at 26.  Again though, the record belies this claim.  The declarations and Vaughn indexes plainly situate the communications in the context of specific deliberative processes.  For instance, the Slemrod declaration specifies four categories of OMB decisions about health care reform at issue during the relevant period and identifies the communications that contributed to those decisions.  Slemrod Decl. ¶¶ 8, 10, 11, 13, 16, 18; *see also, e.g.*, OMB Vaughn Index No. 13 (explaining that an "analysis of draft health care legislative text provision-by-provision" contributed to a decision as to "which health care proposals to advocate for").  The agencies accordingly have met their burden in establishing that the redacted emails were pre-decisional.

Second, the redacted emails are also deliberative.  *See* Defs.' Br. at 23-25.  American Oversight's challenge to this prong of the analysis rests on the same argument discussed twice previously—that a "policy back-and-forth" is not deliberative when it is between congressional

personnel and the Executive Branch.  Pl.'s Br. at 27.  But both an agency employee and a congressional staffer can generate "draft legislative language" or an "analysis of [legislative] proposals" that contribute to the process of formulating advice to provide the President about health care legislation.  Slemrod Decl. ¶ 10; *see also Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 161 F. Supp. 3d 120, 128 (D.D.C.), *modified*, 185 F. Supp. 3d 26 (D.D.C. 2016) (draft documents protected by deliberative process privilege); *Citizens for Responsibility and Ethics in Wash. v. Nat'l Archives & Records Admin.*, 583 F. Supp. 2d 146, 162 (D.D.C. 2008) (assessments of policy proposals protected by the deliberative process privilege), *subsequent determination* 715 F. Supp. 2d 134 (D.D.C. 2010).  Although American Oversight focuses on how the materials from the redacted emails may have aided Congress, it ignores the variety of ways in which those materials also contributed to the agencies' own deliberations.  Because that aspect of the record has not meaningfully been contested, the Court should hold that the agencies have met their burden in demonstrating that the redacted emails were deliberative, and in turn, that the agencies are entitled to summary judgment with respect to the emails.

## II.   The Redacted Calendar Entries Are Subject to the Deliberative Process Privilege.

The agencies are also entitled to summary judgment with respect to three categories of calendar entries that remain at issue.

First, briefing materials prepared in advance of meetings or calls that HHS Secretary Price had with members of Congress are subject to the deliberative process privilege.  *See* Defs.' Br. at 27-28.  American Oversight does not contest that these materials generally are pre-decisional and deliberative.  It also does not dispute that the materials "reveal[] the information that agency staff believed to be important" in advance of each meeting or call.  *E.g.*, HHS Vaughn Index Bates No. HHS-July 2017-000002-000003; *see also Coastal States Gas Corp.*, 617 F.2d at 866 (deliberative process privilege protects "subjective documents which reflect the personal opinions of the writer

rather than the policy of the agency"). Instead, American Oversight challenges only HHS's decision to withhold proposed talking points from these briefing materials. Pl.'s Br. at 28-29. But in both of the two cases American Oversight quotes on this point, *see id.*, the agency did nothing more than label a document "[draft] talking points." *See Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 265 (D.D.C. 2004); *Elec. Privacy Info. Ctr. [EPIC] v. DOJ*, 511 F. Supp. 2d 56, 71 (D.D.C. 2007). Similarly, there was a real possibility in each of those cases that the talking points could be adopted "as official positions" of the agency, *EPIC*, 511 F. Supp. 2d at 71, or in "a communication with the public," *Judicial Watch*, 297 F. Supp. 2d at 265-66.

Here, by contrast, the Vaughn entries for these calendar entries included far more detail than just a label, providing (for instance) that the redacted material:

> consists of briefing material that agency staff selected to prepare the Secretary for a call with Representative Renacci; release of the redacted material would compromise the agency's deliberative process with respect to its legislative strategy by revealing the information that agency staff believed to be important and by identifying recommended talking points and potential issues to prepare the Secretary for discussions with Congressmen.

HHS Vaughn Index Bates No. HHS-July 2017-000002-000003. As reflected in this example entry, HHS clearly situated the briefing materials in its deliberative process. Moreover, there is minimal risk that Secretary Price adopted a public or agency-wide position in the course of a private phone call with a member of Congress. These calendar entries accordingly fall within the deliberative process privilege.

Second, OMB properly redacted select information from the title and body of a handful of calendar entries. American Oversight contends that a title, standing alone, does not express opinions or make recommendations, Pl.'s Br. at 29, but it ignores the cases cited by the agencies, which reaffirm that such material *can* reveal sensitive information about "what the agency [was] considering" in its deliberations. *Pub. Emps. for Envtl. Responsibility v. Office of Sci. & Tech.*

27

*Policy*, 881 F. Supp. 2d 8, 17 (D.D.C. 2012); *see also Mapother v. DOJ*, 3 F.3d 1533, 1537 (D.C. Cir. 1993) (citations omitted) (deliberative process privilege "serves to protect the deliberative process itself, not merely documents containing deliberative material").  Where, as here, the title or body of a calendar entry reveals details of agency deliberations, forcing disclosure of that information can indeed, contrary to American Oversight's suggestion, "chill[] future government employees from engaging in frank discussions," *Morley v. CIA*, 699 F. Supp. 2d 244, 256 (D.D.C. 2010) (emphasis omitted), *aff'd in part, vacated in part by* 466 Fed. App'x 1 (D.C. Cir. 2012), by discouraging them from holding meetings on particularly sensitive topics, or from describing those topics in any calendar entries.  These redactions accordingly are subject to the deliberative process privilege.

Finally, OMB's decision to redact meeting locations and the names of attendees from a small set of calendar entries was also proper under the deliberative process privilege.  OMB redacted the names of members of Congress from two calendar entries where the attendees were House members who had been "strategically selected" as part of the Administration's legislative strategy.  *See* OMB Vaughn Index Doc. Nos. 31, 32.  Although identifying the attendees of a meeting on legislative strategy generally would not reveal an agency's deliberative process, it is a different matter if who attends the meeting is itself a question of legislative strategy.  In those instances—like this case—revealing who was at the meeting reveals opinions within the agency about legislative strategy and thereby exposes "the deliberative process itself."  *Mapother*, 3 F.3d at 1537.  Similarly, revealing when, and under what circumstances, particular high-level figures in the Executive Branch chose to wade into deliberations over health care reform exposes the deliberative process of the President and/or his advisors.  As such, OMB's decision to also redact

information that would reveal the attendance of certain senior-most White House officials at health care reform meetings was proper. *See* OMB Vaughn Index Doc. Nos. 1A, 18, 31, 32.

## III. HHS Used Search Terms Reasonably Calculated to Locate Responsive Records  in Conducting Its Search.

The only remaining dispute between the parties with respect to the adequacy of the searches the agencies conducted pertains to the search terms that one of the agencies, HHS, selected.  As described in the agencies' opening brief and the Declaration of Michael Bell that accompanied it, HHS conducted an adequate search that initially located more than 40,000 pages of potentially responsive records.  Defs.' Br. at 7-9; Bell Decl. ¶¶ 12-18.  American Oversight, however, contends that the particular terms used to locate those records were inadequate as a matter of law. That claim is unfounded.

"When a plaintiff questions the adequacy of the search an agency made in order to satisfy its FOIA request, the factual question it raises is whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991).  HHS's search terms meet that test.  The agency used three terms to locate responsive records.  First, HHS searched for records with the phrase "health care reform," which was the *only* phrase American Oversight used to identify the subject matter of its FOIA request; second, HHS used the acronym "ACA," which was the most common way of referring to the law that was the target of health care reform efforts; and third, HHS used the acronym "AHCA," which was the most common way of referring to the health care reform legislation at issue during the time period relevant to the request.  Bell Decl. ¶¶ 16-17; *id.*, Ex. 1 (American Oversight's FOIA request).  Because HHS searched in the disjunctive, a document containing *any* of those three terms was identified as potentially responsive.  These terms accordingly were reasonably calculated to locate responsive records.

American Oversight posits in its brief (but not its initial FOIA request) that there are four particular terms that HHS was *required* as a matter of law to use to conduct an adequate search. Specifically, it argues that HHS should have used the full names of each of the two relevant health care bills ("Affordable Care Act" and "American Health Care Act"), a political term for referring to the ACA ("Obamacare"), and a shorthand phrase for referring to health care reform efforts— "repeal and replace"—that it alleges was commonly used "over the past several months."  Pl's Br. at 5; *compare* Bell Decl. ¶¶ 9, 12 (explaining that HHS began its search by April 5, 2017—more than six months ago).

As an initial matter, American Oversight is not entitled to "dictate the search terms to be used as the benchmark for determining whether an agency's search is reasonable." *Physicians for Human Rights v. Dep't of Def.*, 675 F. Supp. 2d 149, 163–64 (D.D.C. 2009) (quoting *Nielsen v. U.S. Bureau of Land Mgmt.*, 252 F.R.D. 499, 514 (D. Minn. 2008)).  That is particularly true when a requester seeks to impose its desired terms after the fact, *i.e.*, when the FOIA request itself "d[id] not set forth a discrete list of search terms." *Id.*  Because FOIA requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise," courts are particularly reluctant "to micro manage the executive branch" in its response to FOIA requests.  *Johnson v. Exec. Office for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002).  Instead, HHS's burden here is "to show that its search efforts were reasonable and logically organized to uncover relevant documents; it need not knock down every search design advanced by every requester." *DiBacco v. U.S. Army*, 795 F.3d 178, 191–92 (D.C. Cir. 2015).  HHS's explanation for the three broad terms it used plainly meets that standard.

In any event, the failure to use the specific terms American Oversight proposes does not undermine the conclusion that HHS "made a good faith effort to conduct a search for the requested

records, using methods which can be reasonably expected to produce the information requested."
*Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  First, American Oversight's analysis

considers each of the terms the agency used in isolation; it at no point argues that the *combination*

of the three terms was, together, inadequate.  For instance, HHS could not have been obligated to

use "repeal and replace" as a search term, given that its search already covered a) the law that was

to be repealed (the ACA) and b) the law that was to be the replacement (the AHCA), not to mention

the term American Oversight used to refer to the overall effort ("health care reform").  The emails

American Oversight points to in paragraph 16 of the Creighton Declaration confirm this.[10]  *See,*

*e.g.*, HHS-July 2017-002093-94 (letter expressing opposition to "repealing the ACA"); HHS-July

2017-002191-94 (letter discussing an "ACA" "repeal bill, the American Health Care Act

(AHCA)").

Second, the evidence American Oversight marshals for using its requested terms generally

is from public statements for political consumption (as compared with the statements one would

reasonably expect to find in emails to Congress or calendar entries), statements made long after

the agencies' searches, or some combination of the two.  For instance, American Oversight relies

on six transcripts where Secretary Price used the word "Obamacare" in media appearances (not

emails), and three of them were from June 25, 2017 or later—more than two months after HHS's

search.  *See* Creighton Decl. ¶ 23.  And in two of the three TV appearances from the time period

relevant to this case, Secretary Price actually said "ACA," one of the search terms HHS used, in

---

[10] It appears that a number of the HHS records that American Oversight identifies as being in
Exhibit 10 are not in fact included in that exhibit, *compare* Decl. of Sara Creighton ("Creighton
Decl.") ¶¶ 13-16, ECF No. 30-3, *with id.*, Ex. 10, though American Oversight did indicate that
all of the records from this case are available on its website, Creighton Decl. ¶ 12.  For the
Court's convenience, Defendants attach hereto copies of any records discussed in this brief that
were not contained in American Oversight's filing.  *See* Suppl. Decl. of Michael Bell ("Bell
Suppl. Decl."), Ex. 1.

the same breath as "Obamacare."  *See* Creighton Decl., Ex. 11 at 3 of 5 (introducing a discussion of Congressional Budget Office with the phrase: "when they looked at Obamacare originally, the ACA originally"); *id.*, Ex. 13 at 5 of 17 (referring to individuals "leaving Obamacare, leaving the ACA in droves").

Moreover, the only two records American Oversight points to for the proposition that HHS agency employees refer to the ACA as "Obamacare" involve forwarded press statements or releases.  *See* Creighton Decl. ¶ 13 (citing HHS-July 2017-002097, *see* Bell Suppl. Decl., Ex. 1, which forwarded a "statement that went to press" that includes the word "Obamacare," and HHS-July 2017-002185-86, *see* Bell Suppl. Decl., Ex. 1, which also forwards a press statement with the word "Obamacare" (though the statement also mentions "healthcare reform")).  The same is true of the records American Oversight points to that were authored by congressional staff.  *See* Creighton Decl. ¶ 14 (citing HHS-June 2017-001463, *see* Bell Suppl. Decl., Ex. 1, which appears to be a collection statements for the press in an email on which an agency staff member was bcc'd, and HHS-July 2017-002165-66, *see* Bell Suppl. Decl., Ex. 1, which is a forwarded press release from a senator's office ).  American Oversight has offered nothing to suggest that HHS was required to search for terms likely to have been used in press releases, nor has it contested that "ACA" and "AHCA" were the terms "frequently used in the day-to-day operations of the Department."  Bell Decl. ¶ 16.  Relatedly, its citation to an out-of-district case where an agency failed to use *the acronym* for an entity, rather than the entity's full title, actually supports the choice HHS made here to search for acronyms—*i.e.*, language that the agency actually used on an everyday basis.  *See* Pl.'s Br. at 5-6 (citing *Fox News Network, LLC v. Dep't of the Treasury*, 678 F. Supp. 2d 162, 166 (S.D.N.Y. 2009)); *see also Climate Investigations Ctr. v. Dep't of Energy*, No. 16-CV-124 (APM), 2017 WL 4004417, at *4 (D.D.C. Sept. 11, 2017) (holding that an agency

"was not obligated to use additional or alternative search terms when searching" for responsive records)).

At bottom, "there is no basis to doubt that [HHS] 'properly exercised [its] discretion in crafting [a] list[ ] of search terms that [it] believed to be reasonably tailored to uncover documents responsive to the FOIA request.'" *Am. Fed'n of Gov't Emps., Local 812 v. Broad. Bd. of Governors*, 711 F.Supp.2d 139, 151 n. 11 (D.D.C. 2010) (quoting *Physicians for Human Rights*, 675 F. Supp. 2d at 164). HHS "has met its burden; second-guessing what other terms the agency could have used would be inappropriate." *Climate Investigations Ctr.*, 2017 WL 4004417, at *4. HHS accordingly is entitled to summary judgment with respect to the adequacy of its search.

## IV.    *In Camera* Review is Unnecessary.

In light of the showing the agencies have made in support of their motion for summary judgment, the Court should decline American Oversight's request that the Court conduct *in camera* review. *See* Pl.'s Br. at 30-31. "If the affidavits" produced by the agencies "provide specific information sufficient to place the documents [at issue] within the [relevant] exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents." *Hayden v. NSA/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979). Here, the five affidavits the agencies produced—three of which dealt specifically with the redacted emails—along with the two Vaughn Indexes, provide sufficiently detailed information about why the agencies withheld certain material from American Oversight. Moreover, American Oversight has not suggested any bad faith on the part of the agencies. Accordingly, "*in camera* review is neither necessary nor appropriate." *Id.*

**V.      Discovery with Respect to the Agencies Is Inappropriate.**

The Court should not break with the normal practice of resolving FOIA cases "on motions for summary judgment." *Gilliam v. DOJ*, 128 F. Supp. 3d 134, 138 (D.D.C. 2015). American Oversight has requested such a deviation from the normal course if the Court denies its cross-motion for summary judgment because it believes that it is "entitled to discovery into a range of topics" before the Court can award summary judgment to the agencies. Pl.'s Br. at 44; *see also* Pl.'s Rule 56(d) Decl., ECF No. 30-6. But American Oversight has fallen far short of the showing that would be necessary for such unusual relief.

At the outset, American Oversight faces a high bar because "[d]iscovery in FOIA is rare and should be denied where an agency's declarations are reasonably detailed, submitted in good faith and the court is satisfied that no factual dispute remains." *Baker & Hostetler, LLP v. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006); *see also, e.g.*, *Military Audit Project v. Casey*, 656 F.2d 724, 751-52 (D.C. Cir. 1981); *Thomas v. HHS*, 587 F. Supp. 2d 114, 115 n.2 (D.D.C. 2008); *Canning v. DOJ*, Civil Action No. 11-cv-1295 (GK), 2013 WL 1333422, at *1 (D.D.C. Apr. 2, 2013); *Asarco, Inc. v. EPA*, Civil Action No. 08-cv-1332 (EGS/JMF), 2009 WL 1138830, at *1 (D.D.C. Apr. 28, 2009) (citing "the consistent holding in case after case that discovery is not favored in . . . [FOIA] cases and only allowed under rare circumstances."). For the reasons outlined in this brief and the agencies' opening brief, American Oversight has failed to clear this high bar.

Moreover, under Rule 56(d), American Oversight must "submit an affidavit which states with sufficient particularity why additional discovery is necessary." *United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 26 (D.C. Cir. 2014) (quoting *Convertino v. DOJ*, 684 F.3d 93, 99 (D.C. Cir. 2012)). This affidavit must satisfy three criteria: "(1) [I]t must outline the particular facts [plaintiff] intends to discover and describe why those facts are

34

necessary to the litigation . . . ; (2) it must explain why [the plaintiff] could not produce the facts in opposition to the motion for summary judgment . . . ; and (3) it must show the information is in fact discoverable." *Id.* (quoting *Convertino*, 684 F.3d at 99-100) (citations omitted). American Oversight's 56(d) affidavit fails at the first factor.  It is devoid of *any* explanation as to why the facts it seeks "are necessary to the litigation." *Id.*; *comnpare* 56(d) Decl. ¶ 3.  Instead, it seeks some facts that are already plainly covered by the record (without any hint of agency bad faith), *e.g.*, 56(d) Decl. ¶¶ 3.g, h (information relating to "agency policies or decisions that the communications at issue preceded" and "[t]he role of the communications in the [agencies'] deliberative process"); and others that simply are not at issue, *e.g.*, *id.* ¶ 3.b. ("authority of members of Congress and congressional employees to take on outside consultant work").  Rather than venturing into discovery, the Court can, and should, resolve this case at summary judgment by granting the agencies' motion.

## CONCLUSION

For all the foregoing reasons, as well as those set out in Defendants' opening brief, Defendants respectfully requests that this Court grant their motion for summary judgment and deny Plaintiff's cross-motion for summary judgment.

Dated:   November 3, 2017

Respectfully Submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Michael H. Baer*
MICHAEL H. BAER
Trial Attorney (New York Bar No. 5384300)
U.S. Department of Justice,

Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C. 20530
Telephone: (202) 305-8573
Facsimile:  (202) 616-8460
E-mail:      Michael.H.Baer@usdoj.gov

*Counsel for Defendants*