# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN OVERSIGHT, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) Case No. 17-cv-827 (EGS) |
| | ) |
| U.S. DEPARTMENT OF | ) |
| HEALTH AND HUMAN SERVICES et al., | ) |
| | ) |
| *Defendants.* | ) |
| | ) |
| COMMITTEE ON WAYS AND MEANS OF | ) |
| THE U.S. HOUSE OF REPRESENTATIVES, | ) |
| | ) |
| *Defendant-Intervenor.* | ) |
| | ) |

## REPLY IN SUPPORT OF PLAINTIFF'S
## CROSS-MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.    The Court Should Reject HHS and OMB's Effort to Fundamentally Expand the Scope
      of Exemption 5............................................................................................................ 2

      A.    *Klamath* and the Text of Exemption 5 Preclude HHS and OMB's Approach. ...... 2

            1.    The Claim that the Communications Here Were "Inter-Agency or
                  Intra-Agency" Cannot Be Reconciled with *Klamath*'s Approach to
                  Exemption 5........................................................................................... 2

            2.    HHS and OMB's Approach Fails to Give "Independent Vitality" to
                  Exemption 5's Threshold Requirement that the Communications Be
                  "Inter-Agency or Intra-Agency.".......................................................... 5

      B.    HHS and OMB's View of the "Consultant Corollary" Goes Far Beyond
            Existing D.C. Circuit Precedent.......................................................................... 8

            1.    The Post-*Klamath* Cases Include Important Limitations
                  Not Met Here. .......................................................................................... 9

            2.    Even the Pre-*Klamath* Cases Would Not have Extended     the
                  "Consultant Corollary" to the Facts of this Case. .................................. 12

      C.    HHS and OMB Have Effectively Conceded that the Common Interest
            Doctrine Does Not Apply Here............................................................................ 14

II.   The Agencies Have Not Met Their Burden of Establishing that the Deliberative
      Process Privilege Applies to Their Communications with Congress. ............................. 17

III.  The Court Should Reject the Committee's Invitation to Radically Expand the
      Application of Congressional Records. ............................................................................ 18

IV.   The Policy Arguments Raised by the Defendant Agencies and the Committee
      Should Be Addressed to Congress, Not the Court............................................................ 22

      A.    HHS and OMB's Position Would Require this Court to Legislate a New
            Exemption Under FOIA to Protect Inter-Branch Communications
            Regarding Potential Legislation.......................................................................... 23

      B.    The Committee's Position Would Require this Court to Legislate a New
            Exclusion to Remove the Contested Records from the Scope of FOIA. .............. 24

## TABLE OF AUTHORITIES

**CASES**

*ACLU v. CIA,*
   105 F. Supp. 3d 35 (D.D.C. 2015) ........................................................................ 19

*ACLU v. CIA,*
   823 F.3d 655 (D.C. Cir. 2016) ........................................................................ 19, 20

*Andrus v. Glover Constr. Co.*,
   446 U.S. 608 (1980) ................................................................................................ 25

*Corley v. U.S.*,
   556 U.S. 303 (2009) .................................................................................................. 6

*CREW v. DHS,*
   514 F. Supp. 2d 36 (D.D.C. 2007) ......................................................................... 7

*Ctr. for Int'l Environ. Law v. USTR*,
   237 F. Supp. 2d 17 (D.D.C. 2002) ......................................................................... 7

*DOI v. Klamath Water Users Protective Ass'n,*
   532 U.S. 1  (2001) .......................................................................................... passim

*Dow Jones,  & Co. v. DOJ,*
   917 F.2d 571 (D.C. Cir. 1990) .............................................................................. 24

*Faragher v. City of Boca Raton,*
   524 U.S. 775 (1998) ............................................................................................... 24

*Formaldehyde Inst. v. HHS,*
   889 F.2d 1118 (D.C. Cir. 1989) ........................................................................ 7, 13

*Goland v. CIA,*
   607 F.2d 339 (D.C. Cir. 1978) .............................................................................. 20

*Hillman v. Maretta,*
   133 S. Ct. 1943 (2013) ........................................................................................... 25

*Holy Spirit Ass'n v. CIA,*
   636 F.2d 838 (D.C. Cir. 1980) .............................................................................. 19

*Hoover v. DOI,*
   611 F.2d 1132 (5th Cir. 1980) ................................................................................ 7

*Judicial Watch v. DOE,*
   412 F.3d 125 (D.C. Cir. 2005) ......................................................................... 10, 11

*Judicial Watch v. DOT*,
   950 F. Supp. 2d 213 (D.D.C. 2013) ...................................................................... 12

*Lead Indus. Ass'n v. OSHA*,
  610 F.2d 70 (2d Cir. 1979) ................................................................. 7

*McKinley v. Bd. of Governors of Fed. Reserve Sys.*,
  647 F.3d 331 (D.C. Cir. 2011) ........................................................... 10

*Miller v. DOJ*,
  562 F. Supp. 2d 83 (D.D.C. 2008) ....................................................... 7

*Milner v. Dep't of the Navy*,
  562 U.S. 562 (2011) ........................................................................... 24

*Nat'l Inst. for Military Justice v. DOD*,
  512 F.3d 677 (D.C. Cir. 2008) ................................................... passim

*NLRB v. Robbins Tire & Rubber Co.*,
  437 U.S. 214 (1978) ........................................................................... 23

*NLRB v. Sears, Roebuck & Co.*,
  421 U.S. 132 (1975) ........................................................................... 17

*Public Citizen, Inc. v. DOJ*,
  111 F.3d 168 (D.C. Cir. 1997) ..................................................... 7, 14

*Ryan v. DOJ*,
  617 F.2d 781 (D.C. Cir. 1980) ..................................................... 7, 12

*Sakamoto v. EPA*,
  443 F. Supp. 2d 1182 (N.D. Cal. 2006) ............................................. 7

*Stewart v. DOI*,
  554 F.3d 1236 (10th Cir. 2009) .......................................................... 6

*United We Stand America, Inc. v. IRS*,
  359 F.3d 595 (D.C. Cir. 2004) .......................................................... 20

*Vaughn v. Rosen*,
  523 F.2d 1136 (D.C. Cir. 1975) ........................................................ 18

*Wu v. Nat'l Endowment for the Humanities*,
  460 F.2d 1030 (5th Cir. 1972) ............................................................ 7

**STATUTES**

5 U.S.C. § 551(1)(A) ............................................................................. 23

5 U.S.C. § 552(b)(5) .......................................................................... 1, 23

5 U.S.C. § 552(c)(1)–(3) ........................................................................ 25

5 U.S.C. § 552(d) ................................................................................... 24

Electronic Freedom of Information Act Amendments of 1996,

Pub. L. 104-231; 110 Stat. 3048 .................................................................................. 24

FOIA Improvement Act of 2016,
   Pub. L. 114-185 .......................................................................................................... 24

Intelligence Authorization Act of 2002,
   Pub. L. 107-306, 116 Stat. 2383 .............................................................................. 24

OPEN Government Act of 2007,
   Pub. L. 110-175, 121 Stat. 2524 .............................................................................. 24

Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency" from disclosure under the Freedom of Information Act ("FOIA"). *See* 5 U.S.C. § 552(b)(5). The primary Supreme Court case interpreting Exemption 5's scope emphasizes the independent importance of the threshold textual requirement that the communications be "inter-agency or intra-agency." *See DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 11–12 (2001) ("*Klamath*"). Rather than grapple with this textual prerequisite, the defendant agencies—the Department of Health & Human Services (HHS) and the Office of Management & Budget (OMB)—instead argue that failing to extend the coverage of Exemption 5 to its back-and-forth communications with Congress regarding potential health care legislation would, in their view, "undermine" the aims of the deliberative process privilege. But this approach—reasoning backward from the policy goals underlying the privilege—cannot be reconciled with either the text of Exemption 5 or the Supreme Court's interpretation of it. Nor does the agencies' reliance on the "consultant corollary" resolve this threshold issue, because the circumstances here differ materially from those in which the D.C. Circuit has recognized that an "outside consultant" might be deemed part of an agency for purposes of Exemption 5.

The House Committee on Ways & Means ("the Committee") contends that this Court should find that four contested email chains are congressional records not subject to FOIA, arguing that a footer unilaterally inserted by an individual staffer placed all related correspondence, including records created by the agency in the course of their performance of core Executive Branch functions, under the control of Congress, notwithstanding the fact that the agencies did not agree or acquiesce to such control and instead used and disposed of the records as the agencies saw fit. D.C. Circuit precedent does not compel this anomalous result.

I.      **The Court Should Reject HHS and OMB's Effort to Fundamentally Expand the Scope of Exemption 5.**

    A.      ***Klamath* and the Text of Exemption 5 Preclude HHS and OMB's Approach.**

        1.      *The Claim that the Communications Here Were "Inter-Agency or Intra-Agency" Cannot Be Reconciled with* Klamath*'s Approach to Exemption 5.*

Over the course of more than sixty pages of briefing, nowhere do HHS and OMB meaningfully grapple with Exemption 5's text, i.e., its requirement that communications be "inter-agency" or "intra-agency." Indeed, it is difficult even to discern which of those two necessary conditions the agencies believe the challenged communications satisfy, presumably because neither term really fits the communications at issue.

Rather than engage with the textual prerequisite that the communications be "inter-agency or intra-agency," the agencies' reasoning is premised almost entirely on an expansive (and outcome-driven) reading of the second part of Exemption 5: namely, that the records purportedly satisfy the deliberative process privilege. Echoing the arguments that the government advanced in *Klamath*, the agencies argue that the Court "should interpret 'inter-agency or intra-agency' in a manner that allows agencies to protect the kind of information that litigation privileges are meant to protect." *See, e.g.*, Mem. of Points and Authorities in Opposition to Pl.'s Mot. for Summary Judgment ("Defs.' Opp'n") at 8, ECF No. 34; *see also id.* at 3 ("[T]he uncontested harm that disclosing the redacted emails would cause to government deliberations and policy-making should guide the Court's resolution of the Exemption 5 threshold issue . . .").

Of course, that is precisely the sort of reasoning that the Supreme Court expressly rejected in *Klamath* when it faulted the government's argument for "skip[ping] a necessary step, for it ignores the first condition of Exemption 5, that the communication be 'intra-agency or inter-agency.'" *Klamath*, 532 U.S. at 12. The *Klamath* Court was fully cognizant of the potential

impact of its ruling on communications between the Department of the Interior and the Native American tribes with which it had a fiduciary relationship. *See id.* at 11 (noting that there is not "any doubt about the plausibility of the Government's assertion that the candor of tribal communications with the Bureau would be eroded without the protections of the deliberative process privilege recognized under Exemption 5" and stating that the government "is surely right in saying that confidentiality in communications with tribes is conducive to a proper discharge of its trust obligation"). Nonetheless, the Court concluded that there was "no textual justification" for draining the threshold requirement that the communications be "inter-agency or intra-agency" of "independent vitality." *Id.* at 12.

In an effort to avoid this plain holding, HHS and OMB advance a cramped view of *Klamath*, contending that this Court should read *Klamath* to only foreclose the use of the "consultant corollary" in situations where the non-agency entity is a "self-advocate[] at the expense of others seeking benefits inadequate to satisfy everyone." Defs.' Opp'n at 5 (citing *Klamath*, 532 U.S. at 12). But seizing on one distinguishing factor that the *Klamath* Court identified to avoid unnecessarily overturning the "consultant corollary" line of cases does not suffice to rebut the central thrust of the Supreme Court's reasoning in that case: namely, that the requirement that the communications at issue be "inter-agency or intra-agency" is an independent and textually-mandated condition that must be present in order to apply Exemption 5, and that any effort to extend Exemption 5 to communications that include parties outside the Executive Branch must explain how such communications nevertheless meet this mandatory textual prerequisite. The *Klamath* Court (skeptically) acknowledged that "consultants *may* be enough like the agency's own personnel to justify calling their communications 'intra-agency'" in the "typical" case where the outside entities are not communicating "with the government in

their own interest or on behalf of any person or group." 532 U.S. at 12 (emphasis added).[1] Here, however, the congressional participants simply are not "enough like the agency's own personnel to justify calling their communications 'intra-agency.'"

Moreover, even if *Klamath* were as limited as the agencies suggest, it would still instruct against application of the consultant corollary here. The members of Congress and staff with whom the agencies communicated were undoubtedly "self-advocates at the expense of others seeking benefits inadequate to satisfy everyone." *Id.* Individual members of Congress each have their own personal interests when it comes to passing potential legislation. Each has political interests in how legislation will affect their political ambitions and be received by the voters of their district. Each represents the varying interests of their respective constituents, and different permutations of potential legislation may have different impacts on those constituents depending on the composition of the district. For example, a representative from a state that had expanded Medicaid under the ACA would have dramatically different interests than a representative from a state that had not, regardless of party. And because federal funding is a finite resource, an approach that benefits one representative's state or district often disadvantages other states or districts. The same is true of the individual staffers who communicated with the agencies: each had individualized interests in securing support from the Executive Branch that would best assist their principal. In short, each congressional participant in these communications had unique interests that were likely at odds with the interests of other participants. Finally, it is Defendants' burden to establish, with facts, that each individual congressional participant in these emails

---

[1] Notwithstanding *Klamath*'s skepticism, Plaintiff does not, and need not, suggest that this Court find that "the text [of Exemption 5] forecloses the *existence* of the consultant corollary." Def.'s Opp'n at 7. As discussed below, and as recognized by the D.C. Circuit's post-*Klamath* cases, in certain limited circumstances it may be reasonable to deem a "typical" consultant to be, in effect, part of the agency for purposes of Exemption 5's threshold condition.

independently satisfied the requirements of the consultant corollary, even under their stretched view of that doctrine. As they have offered only generic assertions that run counter to logic and lived experience, they have not met this burden. Accordingly, even under the defendant agencies' constrained reading of *Klamath*, it would be inappropriate to extend the "consultant corollary" to the communications here.

> **2.   HHS and OMB's Approach Fails to Give "Independent Vitality" to Exemption 5's Threshold Requirement that the Communications Be "Inter-Agency or Intra-Agency."**

HHS and OMB's view that the Court should interpret "inter-agency or intra-agency" through the lens of the policy purposes underlying the deliberative process privilege fails to give "independent vitality" to Exemption 5's threshold requirement. In the agencies' view, the purported "harm" caused by disclosing the communications should control the application of Exemption 5, regardless of whether they are "inter-agency or intra-agency." Both the agencies' expansive view of the "consultant corollary" and their proposed extension of the common interest doctrine suffer this same fundamental flaw: they render Exemption 5's threshold requirement that the communications be "inter-agency or intra-agency" effectively meaningless.

This flaw distinguishes the agencies' position here from the precedent on which they rely. Cases that apply the consultant corollary in "typical" circumstances may "stretch the meaning of 'intra-agency,'" but at least "they still plausibly interpret 'intra-agency': when an agency hires consultants to perform at task, it's not unreasonable to say they have become part of the agency for purposes of that project." *Nat'l Inst. for Military Justice v. DOD*, 512 F.3d 677, 688–89 (D.C. Cir. 2008) ("*NIMJ*") (Tatel, J., dissenting). That is because, in a typical case, the outsider has been formally solicited by the agency for advice and has entered into a consultant relationship with the agency, frequently for compensation, to perform a specific task in the same manner that

an agency employee would normally perform the same task. In those circumstances, it may not be unreasonable to view the outside consultant as effectively part of the agency for that task.

But to construe Exemption 5 "to cover *everyone* an agency asks for advice," rather than limiting it to those who plausibly stand in the shoes of agency employees, would "stretch Exemption 5 beyond its breaking point." *Id.* at 689 (emphasis original). "Intra-agency" is not "a purely conclusory term, just a label to be placed on any document the Government would find it valuable to keep confidential." *Klamath*, 532 U.S. at 12. But that is the consequence of the agencies' approach here: the defendant agencies seek to cover any and all individuals in Congress they communicated with on health care, regardless of their own interests, and the agencies' reasoning could easily reach other external interlocutors, including trade groups, unions, think tanks, political parties, and advocacy organizations.[2]

Consistent with the Supreme Court's reasoning in *Klamath*, then, the Court's obligation is to consider how to reconcile case law regarding the "consultant corollary" with the text of Exemption 5 in a manner that affords "independent vitality" to the threshold condition that the communications be "inter-agency or intra-agency." *Id.* at 12. What would it look like to give the meaning of "intra-agency" "independent vitality" in the context of the consultant corollary? It means limiting the application of the corollary to those outside consultants who could reasonably be understood to be, effectively, part of the agency; that is, to those consultants who can reasonably be viewed as standing in the shoes of agency personnel; as acting "akin to an agency employee," *Stewart v. DOI*, 554 F.3d 1236, 1245 (10th Cir. 2009); as functioning "just as an

_____

[2] Such a result also violates the fundamental principle of statutory interpretation that Congress intended each word to have meaning and interpretations that render statutory language surplusage should be rejected. *See Corley v. U.S.*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (citation omitted)).

employee would be expected to do," *Klamath*, 532 U.S. at 11; as "providing neutral advice" solely for the benefit of the agency's decisionmaking, *see Ctr. for Int'l Environ. Law v. USTR*, 237 F. Supp. 2d 17, 27 (D.D.C. 2002). That is, to those who by virtue of the nature of their consultancy arrangement are, in effect, in privity with the agency, such that it is reasonable to view communications between them and agency personnel as "intra-agency" communications.

Many of the "typical" consultant corollary cases could be said to meet this standard: the hired expert on property values or toxic exposure, *see, e.g.*, *Hoover v. DOI*, 611 F.2d 1132, 1138 (5th Cir. 1980); *Lead Indus. Ass'n v. OSHA*, 610 F.2d 70, 83 (2d Cir. 1979); the lawyer or auditor retained to advise an agency, *see Miller v. DOJ*, 562 F. Supp. 2d 83, 113 (D.D.C. 2008); *Sakamoto v. EPA*, 443 F. Supp. 2d 1182, 1191 (N.D. Cal. 2006); the independent contractor hired to advise the agency, *see CREW v. DHS*, 514 F. Supp. 2d 36, 44 (D.D.C. 2007); and the volunteer consultants on military law or Chinese history, *see NIMJ*, 512 F.3d at 681; *Wu v. Nat'l Endowment for the Humanities*, 460 F.2d 1030, 1032 (5th Cir. 1972); *see also* Plaintiff's Cross-Motion for Summary Judgment ("Pl.'s Br.") at 12 n.6, ECF No. 30-1.

There might even be arguments that this standard could extend to reach the D.C. Circuit's pre-*Klamath* cases: the former presidents playing a statutorily defined consultative role regarding decisions with respect to which they still exercise a certain degree of public authority, *see Public Citizen, Inc. v. DOJ*, 111 F.3d 168 (D.C. Cir. 1997); the academic peer reviewers engaged in a collaborative, scholarly enterprise to ensure publications meet rigorous scientific standards, *Formaldehyde Inst. v. HHS*, 889 F.2d 1118 (D.C. Cir. 1989); possibly, even (though probably not) individual senators whose views were solicited by questionnaire for information expressly intended to inform a particular Attorney General decisionmaking process separate from the senators' own legislative responsibilities, *Ryan v. DOJ*, 617 F.2d 781 (D.C. Cir. 1980).

But there are no colorable arguments that the members of Congress and staff involved in the communications at issue here can be reasonably viewed as part of HHS and OMB. They cannot plausibly be said to be operating just as an agency employee would, providing advice and recommendations to senior agency officials on matters of agency policy. Instead, the individuals here were advancing the diverse interests of each member of Congress and their constituents as well as the adverse institutional interests of Congress in connection with an effort to perform the legislative branch's core constitutional function, i.e., passing legislation. As a result of these differences, the members of Congress and congressional staff simply do not have the sort of consultancy arrangement with HHS and OMB that warrants treating them as though they were in privity with the agencies for purposes of Exemption 5's threshold requirement. Consequently, extending the consultant corollary to reach these communications would fail to give "independent vitality" to Exemption 5's text and thus fails the test set forth in *Klamath*.

**B.     HHS and OMB's View of the "Consultant Corollary" Goes Far Beyond Existing D.C. Circuit Precedent.**

HHS and OMB also contend that binding D.C. Circuit precedent compels this Court to conclude that the communications here are exempt. This claim is doubly false. First, this Court is not bound by broad dicta contained in cases that precede, and conflict with, the Supreme Court's decision in *Klamath*. And second, HHS and OMB ask this Court to extend the "consultant corollary" to circumstances that go far beyond those where the D.C. Circuit has accepted it.

To begin with, HHS and OMB's argument is premised on the misleading claim that the D.C. Circuit has held that *Ryan* and its other pre-*Klamath* cases remain good law. *See* Defs.' Opp'n at 4–5 (claiming that "[t]he D.C. Circuit has reaffirmed that *Ryan* and its progeny remain

good law" after *Klamath*).[3] But the D.C. Circuit expressly reserved that question in *NIMJ*, 512 F.3d 677. There, the majority opinion noted that "the extent to which either *Ryan* or *Public Citizen* may have extended Exemption 5 beyond its permissible facts" is "an issue we need not and do not decide here," because the facts in *NIMJ* were consistent with the "typical" outside consultant cases. *Id.* at 683–85; *see also id.* at 688–89 (Tatel, J., dissenting) ("The problem with [*Ryan*, *Formaldehyde Institute*, and *Public Citizen*] . . . is that the Supreme Court rejected exactly this type of reasoning [in *Klamath*].").

Second, as demonstrated below, applying the "consultant corollary" to the circumstances here would go far beyond any applicable D.C. Circuit precedent. To be sure, the D.C. Circuit has applied the "consultant corollary" post-*Klamath* in circumstances consistent with the "typical" case envisioned by the Supreme Court, and this Court is bound by those holdings. The circumstances here, however, differ materially from those "typical" cases. So instead, HHS and OMB rely heavily on pre-*Klamath* cases, asking this Court to rely on broad dicta to expand those cases beyond their facts. And even *Ryan* and its progeny reflect a more limited vision of the "consultant corollary" than the position taken by the agencies here.

### 1. The Post-Klamath Cases Include Important Limitations Not Met Here.

HHS and OMB claim that the facts here are comparable to recent D.C. Circuit cases applying the "consultant corollary." *See* Defs.' Opp'n at 7–17. But every post-*Klamath* "consultant corollary" case falls well within the confines of the "typical" cases identified by the Supreme Court, and have important features that distinguish them from the facts here.

For instance, in *NIMJ*, the court found communications between DOD and experts on

---

[3] Defendants incorrectly claim that Plaintiff never contested that this Court remains bound by *Ryan*. *See* Defs.' Opp'n at 5. *But see* Pl.'s Br. at 13–14 (saying *Ryan* "went too far" and questioning whether *Ryan* "even remains good law").

military legal affairs discussing the promulgation of new regulations regarding military commissions were protected under Exemption 5, 512 F.3d at 680, relying on a number of factors consistent with the "typical" consultant cases, but not present here: *First*, DOD expressly and formally "sought the opinions and recommendations" of the experts. *Id.* at 679; *see also id.* at 686 (the "consultant relationship" was "evidenced by the fact that the agency [sought] out the individual consultants and affirmatively solicit[ed] their advice in aid of agency business"). *Second,* DOD had an "understanding [with the experts] that they w[ould] consult and advise on a continuing basis." *Id.* at 679. *Third*, the experts DOD consulted with "had no individual interests to promote." *Id.* at 683. Thus there were "indicia of a consultant relationship," *id.* at 686, and it was reasonable to view the military experts as part of DOD for purposes of Exemption 5.

Likewise, in *McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 337 (D.C. Cir. 2011), the D.C. Circuit concluded that communications from the Federal Reserve Bank of New York to the Board of Governors of the Federal Reserve System in connection with the approval of a loan to Bear Stearns were protected under Exemption 5. In reaching this conclusion the D.C. Circuit again relied on factors consistent with the "typical" consultant cases but not present here: *First,* the FRBNY is an "operating arm" of the Board and did not "'represent an interest of its own, or the interest of any other client, when it advise[d] the [Board]' on the Bear Stearns loan." *Id.* at 337. *Second*, the interests of FRBNY and the interests of the Board did not "diverge"; rather, the statute requires both to separately determine that the loan "promotes the maintenance of a sound and orderly financial system." *Id.* For these reasons it was reasonable for the court to view FRBNY as part of the Board for purposes of Exemption 5.

Similarly, in *Judicial Watch v. DOE*, 412 F.3d 125, 129–30 (D.C. Cir. 2005), the D.C. Circuit concluded that agencies could withhold communications with an advisory group

established by the President to developing national energy policy and staffed entirely by detailed

federal employees, notwithstanding that the advisory group was not, itself, an agency. The D.C.

Circuit based this conclusion on the simple fact that the deliberations at issue were wholly

internal to the Executive Branch, again a factor not present here: the detailed federal employees

were "Executive Branch officials who play important roles in the formulation of policy"

analogous to White House staff, and the fact that those officials were not part of an "agency" did

not preclude application of Exemption 5. *Id.* at 130 ("We are aware of no reason to believe—

indeed, we think it inconceivable—the Congress intended Exemption 5 to protect the decision-

making processes of the Executive Branch when the decision is to be made by 'agency' officials

subject to oversight by the President and not when the decision is to be made by the President

himself and those same agency officials are acting in aid of his decision-making processes."). It

was therefore entirely reasonable to view the advisory board staffed by federal employees as

effectively part of the agencies for purposes of the relevant Executive Branch deliberations.

Unlike these cases, here the communications were the ordinary back-and-forth

interactions and negotiations one would expect between two co-equal branches regarding the

enactment of potential legislation. There is no plausible way to view the congressional

participants as part of HHS and OMB for purposes of Exemption 5. HHS and OMB offer no

evidence that they "solicited" "advice" from the members of Congress and congressional staff

regarding agency decisionmaking, nor of any "understanding" of a consultancy arrangement.

The members of Congress and congressional staff represent different constituencies and have

independent and adverse interests. The facts here do not reflect the "indicia of a consultant

relationship" between HHS and OMB and each of their congressional interlocutors. Because the

"nature of the relationship" between the agencies and Congress was not akin to that of a retained

11

outside contractor to the agency that *hired* it, the "consultant corollary" is not applicable.[4]

### 2. Even the Pre-Klamath Cases Would Not Have Extended the "Consultant Corollary" to the Facts of this Case.

Given these limitations, it is not surprising that the agencies rely heavily on language drawn from pre-*Klamath* cases. As explained above, however, there is good reason to question whether the reasoning in these cases can be reconciled with the Supreme Court's approach to interpreting Exemption 5 in *Klamath*. But even if these cases survive *Klamath*, the pre-*Klamath* cases are nonetheless cabined in ways that exclude HHS and OMB's communications regarding potential health care reform legislation with members of Congress and congressional staff here.

*Ryan*, 617 F.2d 781, involved circumstances that the Supreme Court said "arguably extend beyond what we have characterized as the typical examples [of outside consultants]," *see Klamath*, 532 U.S. at 12 n.4, but nonetheless those circumstances included a number of features indicative of a consultancy relationship, *all of which* are absent here. In *Ryan*, the agency directly and formally "solicited" advice for the express purpose of informing an agency policymaking process by sending a questionnaire, and the senators' responses were wholly separate from their performance of their constitutional functions.[5] And because the responses were not part of their

---

[4] For the same reasons, the persuasive authority of the decision of this court in *Judicial Watch v. DOT*, 950 F. Supp. 2d 213 (D.D.C. 2013), does not support extending Exemption 5 to cover the facts here. In that case, DOT and a state transportation agency entered into a formal contract agreement to develop environmental impact reports for a high-speed rail project. *Id.* at 214. The court concluded that communications between the two entities pursuant to this agreement could be protected under Exemption 5, emphasizing that any distinct interests the state agency may have had were "too remote from its communications with [DOT] and from the decision [DOT] was making." *Id.* at 220. That case therefore falls squarely within the "typical" consultant corollary line of cases. Here, by contrast, rather than an attenuation of any conflict of interest, there are direct and immediate differences of interest in the very thing the communications relate to, i.e., Congress's effort to pass health care reform legislation. *See infra* at 4–5.

[5] Nor is it correct to suggest that the senators were performing their constitutional advice-and-consent role by providing the Attorney General factual information regarding the procedures they use to evaluate potential candidates for nomination, as Defendants do. Defs.' Opp'n at 15.

performance of their constitutional duties, there was at least some attenuation of their adverse interests with the Executive Branch. *See also* Pl.'s Br. at 13–14.

By contrast, the task at hand here is Congress's own efforts to pass health care reform legislation. There can be no question that, in doing so, the members of Congress and their staff were representing their own "opposite and rival interests," as well as those of their institution and constituents, rather than providing disinterested expert advice "akin" to that an agency employee would provide. Nor do the interactions bear the normal indicia of a consultancy relationship, such as a direct solicitation to consult on a specific task to assist agency decisionmaking.

*Formaldehyde Institute v. HHS*, 889 F.2d 1118 (D.C. Cir. 1989), likewise involves facts materially different from the communications at issue here. The communications there involved academic peer reviewers engaged in a collaborative, scholarly enterprise to ensure published scientific work met rigorous scientific standards. Although the comments were not directly solicited by the agency, the court emphasized that receipt of peer review comments is an expected result of submission of a scholarly work for publication,[6] and the receipt and confidential treatment of such comments were part of an arrangement between the agency and the publications that reflected a "mutual understanding." *Id*. at 1124. And the peer review information (1) directly informed the agency's decisionmaking process on publication; (2) was the result of a congressionally-mandated process; and (3) reflected scientific coordination where the actors all had a convergent interest in producing the most rigorous scientific work possible.[7]

---

[6] Thus, the agencies' reliance on *Formaldehyde Institute* for the notion that an agency need not have solicited the advice from a third-party, *see* Defs.' Opp'n at 10, is misplaced.

[7] For this reason, *Formaldehyde Institute* does not support the agencies' assertion that communications can be considered part of the intra-agency deliberative process even if they *also* aid in the deliberations of the outside entity, *see* Defs.' Opp'n at 23, because it did not present a situation where the two entities' deliberative processes furthered distinct and divergent interests.

Finally, *Public Citizen v. DOJ*, 111 F.3d 168 (D.C. Cir. 1997), can be readily distinguished from the facts here. *Public Citizen* turned on two features wholly absent here: the former presidents' ongoing authority with respect to questions of executive privilege and the consultative processes established by Congress in the Presidential Records Act (PRA). *See* Pl.'s Br. at 14–15. And unlike the input of former presidents to executive privilege determinations under the PRA, the records at issues here contain the ordinary back-and-forth interactions and negotiations one would expect between two co-equal branches regarding the enactment of potential legislation and cannot plausibly be described as records created for the purpose of aiding the agency's deliberative process. *See* 111 F.3d at 170 ("records of communications between an agency and outside consultants qualify as 'intra-agency' for purposes of Exemption 5 if they have been 'created for the purpose of aiding the *agency's* deliberative process'") (citation omitted)). Here, of course, the ultimate goal was the enactment of legislation by Congress.

### C.     HHS and OMB Have Effectively Conceded that the Common Interest Doctrine Does Not Apply Here.

In their opposition, the defendant agencies concede that they are asking this Court to radically expand the common interest doctrine by extending it to an entirely new privilege—the deliberative process privilege. *See, e.g.*, Defs.' Opp'n. at 19 ("To be sure, [the interest at issue here] differs from the particular legal interests at issue in cases where courts have applied the common interest doctrine to the attorney-client or work product privileges."). There is simply no precedent for expanding the doctrine in this way. The common interest doctrine applies to conversations between *attorneys* (not parties) conveying information that is already privileged, where the parties share a common legal interest and are pursuing a joint legal effort; it is entirely inapplicable to the deliberative process privilege and shared policy goals. *See* Pl.'s Br. at 16–20.

Moreover, even if the common interest doctrine did apply to the deliberative process

privilege, it should not be extended to the communications at issue here. As they do with the consultant corollary, the agencies start from the mistaken premise that the records are subject to the deliberative process privilege and assert that it is so important to protect any such privileged records that it matters not whether those records in fact satisfy the threshold requirement that they be "inter-agency" or "intra-agency." *See* Defs.' Opp'n at 18 ("The objections American Oversight raises to giving the common interest effect here are unsubstantiated in light of the clear manner in which the doctrine would further the important protections of the deliberative process privilege and the particular nature of the executive-congressional deliberations at issue in this case."). The Court should reject this dramatic expansion of common interest doctrine.

Even setting aside the fact that the doctrine simply does not apply here, the members of Congress and congressional staff who participated in the communications with HHS and OMB did not share sufficiently identical interests to implicate the common interest doctrine. They represent different constituencies than the agencies and have different personal and institutional interests, powers, and obligations. By definition HHS and OMB did not share the same interest as all of their interlocutors because each interlocutor had divergent interests regarding the shape of potential health care reform legislation. And, as a fundamental feature of our constitutional scheme, they are intended to pursue "opposite and rival interests." *See* Pl.'s Br. at 20–22.

HHS and OMB argue that their interests were sufficiently aligned with Congress's interests because they shared a "specific, narrow interest: the repeal of the ACA and the enactment of the AHCA (or similar health care reform legislation)." Defs.' Opp'n at 18.[8] This is

---

[8] The suggestion that HHS and OMB were aligned with Congress in their desire to repeal the ACA and enact a replacement undermines the agencies' argument that these communications were predecisional to the Executive Branch's decision whether to sign or veto any legislation that ultimately resulted from the process. *See* Defs.' Br. at 23, 26; Defs.' Opp'n at 25.

not "specific" or "narrow" but rather states their supposedly shared interests at an incredibly high level of generality. There are countless permutations of potential health care reform legislation. Not every member of Congress and staffer with whom the agencies communicated necessarily shared the same goals or sought to replace the ACA in the same way. As explained above, each participant had independent interests based on what is most politically expedient for them and what policy is in the best interests of their constituents. *See infra* at 4–5.

The existence of these divergent interests can be seen in the unredacted portions of the records produced by the agencies in this case, for example:

- HHS-July 2017-000004 (calendar entry for meeting between HHS and the Doctors Caucus, with topics to include "how the Docs Caucus can be helpful in messaging the ACA replacement").

- HHS-July 2017-002023-25 (emails between HHS and Stuart Burns, Chief of Staff to Rep. Brian Babin, regarding "ideas" about the House Healthcare bill).

- OMB-American Oversight-000678-79 (email chain between OMB, the White House, and Paul Ryan's Chief of Staff regarding the announcement that a Republican Congressman had come out in opposition to the health care bill).

*See* Creighton Decl. Exs. 9 (OMB Excerpts), 10 (HHS Excerpts), ECF No. 30-3. And any casual observer of the political process over the last year should be well aware that there are stark divergences of views and interests between the Executive Branch and Congress—and among members of Congress—regarding how to pass health care reform legislation and in what form.

Because neither the "consultant corollary" nor the common interest doctrine supports treating these records like "inter-agency or intra-agency" communications, Exemption 5 does not cover these communications.[9]

---

[9] The agencies' attempt to withhold talking points from calendar entries without establishing that those talking points have not been officially adopted or otherwise publicly disclosed by the agencies is flawed for the same reason. The agencies assert that "there is minimal risk that Secretary Price adopted a public or agency-wide position in the course of a private phone call

**II.     The Agencies Have Not Met Their Burden of Establishing that the Deliberative Process Privilege Applies to Their Communications with Congress.**

For all of the reasons stated above, the defendant agencies' position that members of Congress were acting as outside consultants to the Trump administration's efforts to pass health care reform legislation—or shared a "common interest" in that outcome—is untenable. However, even if the agencies were correct on that point—thereby satisfying Exemption 5's threshold requirement—the agencies would still bear the burden of proving that the communications with members of Congress are entitled to protection under the deliberative process privilege. The evidence they have put forth in this case fails to meet that burden.

It is not enough that the agencies may have provided information, opinions, or advice to be used by Congress in *its* legislative strategy; rather, to be covered by the agencies' deliberative process privilege, Congress must have been acting as a consultant to the agencies' own decisionmaking process. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–51 (1975) (the purpose of the deliberative process privilege "is to prevent injury to the quality of *agency* decisions") (emphasis added); *see also* Pl.'s Br. at 24–26. Thus, assuming the threshold requirement had been met, if the documents contain input by Congress into the agencies' deliberative process—or are express solicitations by the agency to receive Congress's input— that might suffice to satisfy the burden. If, on the other hand, the documents reflect *output* from the agencies to Congress containing the agencies' positions on an issue—such as what legislative strategy the Executive Branch intends to use to assist in passing legislation; which members of

---

with a member of Congress." Defs.' Opp'n at 27. But a "member of Congress" is not part of the Executive Branch and is, therefore, a member of the public for FOIA purposes. The agencies' position on this issue is based on the same mistaken premise that underscores their redactions to the substantive communications; namely, that discussions with Congress constitute "intra-agency" disclosures. In any event, an adoption need not be public to convert a predecisional document into an agency position.

Congress or outside groups to engage as allies in the efforts to pass legislation; what position the Executive Branch was taking on particular legislative language, etc.—that would reflect decisions already made by the Executive Branch, and would not qualify for protection under the deliberative process privilege. In the latter scenario, it could not be said that the documents "make[] recommendations or express[] opinions on legal or policy matters" *to the agency decisionmakers*. *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975). For similar reasons, any time one of the defendant agencies was offering "technical assistance" to Congress on the pending legislation, that exchange, by definition, cannot be said to be a part of the *agency's* decisionmaking process. *See, e.g.*, OMB *Vaughn* Index Doc. Nos. 25, 27, ECF No. 34-1.

Yet the agencies' declarations fail to meet the burden of establishing that the redactions withhold non-factual *inputs* to agency decisions, rather than simple facts about congressional positions or proposals or *outputs* communicating agency positions to Congress's efforts to pass legislation. At a minimum, this Court should conduct *in camera* review of the documents (or at least a representative sample thereof) to determine whether they in fact convey deliberative *inputs* to the internal deliberative processes of the defendant agencies.

III.   **The Court Should Reject the Committee's Invitation to Radically Expand the Application of Congressional Records.**

The Committee, for its part, continues to argue that the unilateral invocation of certain magic words, through some alchemy, somehow transmutes records in the possession of federal agencies that are routinely used by those agencies for the performance of agency functions into records under the sole control of the Committee. As a result, the Committee urges this Court to hold for the first time that an individual staffer can unilaterally assert congressional control over the use and disposition of records generated and used by an Executive Branch agency in the ordinary conduct of its legitimate agency functions, and thereby preclude disclosure of those

records relating to the agency's performance of its own legitimate functions under FOIA.

Contrary to the Committee's confident assertions, D.C. Circuit precedent on congressional records does not compel such an anomalous result. The facts here are materially different than any case where the D.C. Circuit accepted a claim that records in the possession of an agency were nonetheless congressional records not subject to FOIA. Unlike those cases, here the Executive Branch does not agree that the records are under congressional control; to the contrary, the agencies instead used and disposed of the records as they saw fit. *See* Pl.'s Br. at 38–42. Unlike those cases, the records at issue here involve HHS and OMB's performance of core Executive Branch functions, and are not related to congressional oversight inquiries. *See id.* at 40–42. Unlike those cases, here there is no committee letter specific to these interactions reflecting a particularized judgment by Congress regarding these particular records and asserting congressional control over the records or providing them only for limited purposes. *See id.* at 34–36, 38–40. And, for at least a subset of the emails at issue, there was no contemporaneous indication of Congress's intent to control the records. *See id.* at 33–34.[10] Rather than address these differences, the Committee asks the Court to turn a blind eye to them and blithely apply broad language taken out of context from cases with different facts. Of course, the simple reason

---

[10] The Committee claims that it need not have expressed a contemporaneous intent to control the records. *See* Reply Mem. in Support of Mot. for Summary Judgment of the Committee on Ways and Means ("Comm.'s Opp'n") at 6 (citing *Holy Spirit Ass'n v. CIA*, 636 F.2d 838, 842 (D.C. Cir. 1980); *ACLU v. CIA*, 105 F. Supp. 3d 35, 47 (D.D.C. 2015)). But those cases simply state that Congress need not convey its intent simultaneously with the actual transmission of the document; instead, it can be sufficient for Congress to state its intent *in advance of* transmission. *See ACLU v. CIA*, 823 F.3d 655, 665 (D.C. Cir. 2016) (chairman's letter regarding investigation was sufficient to establish committee's intent to retain control over a final report later transmitted to an agency). In no case has a court permitted Congress to assert its control *post-hoc*, *after* the transmission of the records, when the agency has already accepted the record, integrated it into its system of records, and used it in the conduct of official agency business. Thus, any emails that preceded the addition of the Committee's footer cannot be considered congressional records. Each email is an independent communication and must be assessed separately.

why the D.C. Circuit's language regarding congressional intent does not expressly address these facts is that the cases before it did not present them.

The D.C. Circuit has held that records in an agency's possession were "congressional records" on only three occasions, each time on facts materially different than those here:

- *First*, in *Goland v. CIA*, 607 F.2d 339 (D.C. Cir. 1978), the court concluded that a transcript of a hearing held in executive session before the House Committee on Expenditures in the Executive Departments was a congressional record because the transcript was marked "Secret" and was made available to the agency only for limited purposes. *Id.* at 347–48.[11]

- *Second*, in *United We Stand America, Inc. v. IRS*, 359 F.3d 595 (D.C. Cir. 2004), the court concluded that an oversight letter from the Joint Committee on Taxation to the IRS investigating the IRS's selection of tax-exempt organizations for audit, as well as any parts of the IRS's response that revealed the contents of the letter, were congressional records based on a committee letter clearly stating the Committee's intent for them to be treated as such. *Id.* at 597, 600.[12]

- *And third*, in *ACLU v. CIA*, 823 F.3d 655 (D.C. Cir. 2016), the court concluded that a report prepared by the Senate Select Committee on Intelligence laying out the results of its oversight investigation into the CIA's detention and interrogation program was a congressional record based on an earlier letter from the Chair of the committee memorializing a set of "special arrangements" the committee had negotiated with the Director of the CIA which clearly indicated that any work product from the investigation would remain a congressional record. *Id.* at 659–60, 667–68.

---

[11] The Committee asserts that the hearing transcript at issue in *Goland* "may have related to Congress's consideration of potential legislation, rather than 'oversight.'" Comm.'s Opp'n at 15 n.10. While this might be so, the transcript was described as containing "discussions of the basic elements of intelligence methodology" and "detailed discussions of the CIA's structure and disposition of functions." 607 F.2d at 347. Thus, the committee was plainly conducting oversight into the operation of our country's national security apparatus, and the questions asked at the hearing would disclose its oversight inquiries. The mere fact that that information might inform legislation does not change the fact that the hearing was inherently oversight in nature. That is a far cry from this case, where Congress was working together with the agencies to pass a bill, negotiating and communicating back-and-forth about the potential legislation. Nor does *Goland* address, as the Committee suggests, *see* Comm. Opp'n at 10, the authority of individual staffers to assert congressional control of agency-held records over the Executive Branch's objection.

[12] The Committee relies on *United We Stand* for the proposition that the actions of individual staffers can reveal Congress's intent. *See* Comm.'s Opp'n at 11. But in that case, although the letter itself was sent by the committee's chief of staff, the evidence before the court showed that it was a formal communication on behalf of the committee. *United We Stand*, 359 F.3d at 597.

The circumstances surrounding the four email chains contested here ("the Contested Records"[13]) are far different. The Committee's arguments would radically expand the scope of potential congressional records far beyond existing precedent. To begin with, in every past "congressional records" case, the Executive Branch itself accepted and advanced the position that the records at issue were under congressional control. The suggestion here that Congress, much less individual staffers, can bind the Executive Branch's use and disposition not only of communications from Congress, but also records generated within the agencies themselves in the absence of any agreement or acquiescence by the agency, raises serious constitutional questions that the Court should construe the statute to avoid. Surely neither the Judicial Branch nor the Legislative Branch would recognize an analogous, unilateral claim of control over records provided to them by the Executive Branch, at least absent some preceding agreement.

This problem is exacerbated by the fact that the Committee's claim here would extend the concept of congressional records to reach agency-generated records routinely used by the agencies in the course of their official agency functions. Unlike the congressional oversight information at issue in the cases where the D.C. Circuit found records in the possession of an agency to nonetheless be congressional records, *see* Pl.'s Br. at 40–42, here the Committee proposes that the Court find agency records related directly to the agencies' performance of their own and Executive Branch functions to be under congressional control. Indeed, HHS and OMB's own *Vaughn* indexes reveal the way the Contested Records were used by the agencies: the OMB record was described as having been used "in crafting Executive Branch legislative strategy and ultimately advising the President on whether he should sign or veto the bill," *see*

---

[13] The Committee refers to the Contested Records as the "Legended Documents." This moniker elides the fact that of the 25 messages contained in the four email chains, only 6 messages have the boilerplate footer affixed to them.

OMB *Vaughn* Index Doc. No. 42, and the HHS records were described as being part of "the agency's deliberative process in considering and adjusting technical assistance that HHS could provide [to Congress]," HHS *Vaughn* Index, Bates Nos. HHS-July 2017-0001621-30.

More generally, these records arise as part of the Executive Branch's engagement and negotiation with Congress related to the enactment of legislation, where the agencies were performing the Executive Branch's constitutionally-assigned functions. As such, the Committee's proposed approach would put significant categories of core agency functions outside the reach of FOIA. This is a far cry from the limited circumstances where the D.C. Circuit has found it warranted to treat records in an agency's possession as under congressional control—all of those cases involved Congress's oversight responsibilities, an exclusive congressional function, rather than areas where Congress shares powers and responsibilities with the Executive Branch, such as the enactment of legislation. And, importantly, unlike the records here, the records in those cases simply would not have existed, much less been in the possession of the agency, but for Congress's oversight inquiries.[14] Given the role played by the Contested Records in HHS and OMB's legitimate conduct of their own agency business, they are agency records subject to FOIA.

## IV.   The Policy Arguments Raised by the Defendant Agencies and the Committee Should Be Addressed to Congress, Not the Court.

The central thrust of the arguments raised by both the defendant agencies and the Committee is, at base, a policy argument that public disclosure of the types of records at issue here would have deleterious consequences (at least in the eyes of the Defendants and Defendant-Intervenor). To be sure, the question of where, precisely, to draw the line between protection of

---

[14] This distinction reveals why the Committee's attempt to elide its oversight and legislative activities falls flat. *See* Comm.'s Opp'n at 13–15.

interactions between Congress and federal agencies, on the one hand, and the important

democratic values of transparency and accountability, on the other, may involve complex

questions of policy and require a careful exercise of judgment. The problem for HHS and OMB

and the Committee, however, is that Congress has already made this policy determination in

favor of disclosure by drawing the lines where it did in the Freedom of Information Act.

The parties' suggestions that the Court legislate new FOIA exemptions and exclusions

from the bench also conflict with the animating purpose of FOIA: to promote transparency and

accountability in government. "[D]isclosure, not secrecy, is the dominant objective of the Act."

*Klamath*, 532 U.S. at 8. Sweeping broad swaths of government communications out of the public

eye in the absence of any foundation in the statute's text would undermine the Act's core

purpose to ensure "an informed citizenry," vital to democracy. *Klamath*, 532 U.S. at 16; *see also*

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978) ("The basic purpose of FOIA is

to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check

against corruption and to hold the governors accountable to the governed.").

### A.     HHS and OMB's Position Would Require this Court to Legislate a New Exemption Under FOIA to Protect Inter-Branch Communications Regarding Potential Legislation.

HHS and OMB effectively invite this Court to legislate a new exemption under FOIA to

cover inter-branch discussions and negotiations regarding potential legislation. The Court should

decline this invitation.

Congress already addressed whether Exemption 5 should cover inter-branch

communications regarding potential legislation when it expressly limited the reach of

Exemption 5 to "inter-agency and intra-agency memorandums and letters" and expressly

excluded Congress from the definition of an "agency." 5 U.S.C. §§ 552(b)(5), 551(1)(A). When

enacting FOIA, Congress was aware that it was balancing the public interest in disclosure with the potential impacts of such transparency on government operations. Congress decided to favor disclosure and provide for exemptions in only nine clear, specific, and narrowly-drawn exemptions included in the statute. By their express terms, none of those exemptions covers the communications at issue here. The Supreme Court has emphasized that the FOIA statute favors disclosure and consequently that any exemptions are to be narrowly construed. *See Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011). Indeed, in enacting FOIA, Congress specifically contemplated the place of Congress in the FOIA scheme and included language expressly providing that 5 U.S.C. § 552 "is not authority to withhold information from Congress," 5 U.S.C. § 552(d), but did not include any exemption for inter-branch communications.

Moreover, Congress has repeatedly amended FOIA, including after the D.C. Circuit explicitly held that inter-branch communications are not covered by Exemption 5 in *Dow Jones, & Co. v. DOJ*, 917 F.2d 571, 574 (D.C. Cir. 1990)*. See* Electronic Freedom of Information Act Amendments of 1996, Pub. L. 104-231; 110 Stat. 3048; Intelligence Authorization Act of 2002, Pub. L. 107-306, 116 Stat. 2383; OPEN Government Act of 2007, Pub. L. 110-175, 121 Stat. 2524; FOIA Improvement Act of 2016, Pub. L. 114-185. Yet in none of those post-*Dow Jones* amendments did Congress revise FOIA to include language protecting inter-branch communications. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 792 (1998). This Court should not contravene the limited exemptions Congress has provided in FOIA.

**B.     The Committee's Position Would Require this Court to Legislate a New Exclusion to Remove the Contested Records from the Scope of FOIA.**

The Committee similarly invites this Court to legislate a new exclusion to remove from the scope of FOIA records in the possession of federal agencies obtained in the legitimate conduct of the agency's official business, and routinely used for the agency's performance of its

own functions. The Court should likewise reject this invitation.

Congress has already considered when records used by agencies in the legitimate conduct of their official business should be excluded from the scope of FOIA. Congress included in the statute three specific categories of records used by agencies in the conduct of their official business that are not subject to the requirements of FOIA. *See* 5 U.S.C. § 552(c)(1)–(3). Despite including three express exclusions from the coverage of FOIA, Congress did not include any exclusion that would cover inter-branch communications that are used by agencies in the conduct of their official business. Consistent with one of the best-known canons of statutory construction, when Congress expressly includes an enumerated list of items, it is fair to conclude that other, non-enumerated items were intentionally excluded from the list—*expressio unius est exclusio alterius. See Hillman v. Maretta*, 133 S. Ct. 1943, 1953 (2013) ("We have explained that '[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.'" (citing *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980))).

Moreover, once again, notwithstanding numerous amendments to FOIA, *see supra* at 24, Congress has never added language to exclude inter-branch communications from FOIA's scope. This Court should not create a new exclusion, without any textual basis, covering records used by agencies in the ordinary conduct of their official business simply because congressional employees happened to be parties to the communications contained in those records.

## CONCLUSION

For these reasons and those in American Oversight's initial memorandum, this Court should deny the motions for summary judgment filed by Defendants and Defendant-Intervenor and should grant the cross-motion for summary judgment filed by American Oversight.

Dated: November 10, 2017                    Respectfully submitted,

                                            */s/ Sara Kaiser Creighton*
                                            Sara Kaiser Creighton
                                            D.C. Bar No. 1002367
                                            Austin R. Evers
                                            D.C. Bar No. 1006999
                                            John E. Bies
                                            D.C. Bar No. 483730
                                            AMERICAN OVERSIGHT
                                            1030 15th Street NW, B255
                                            Washington, DC 20005
                                            (202) 869-5246
                                            sara.creighton@americanoversight.org
                                            austin.evers@americanoversight.org
                                            john.bies@americanoversight.org
                                            *Counsel for Plaintiff*