**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN OVERSIGHT, <br><br> *Plaintiff*, <br><br> v. <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> and <br><br> OFFICE OF MANAGEMENT AND BUDGET <br><br> *Defendants*. | Case No. 17-cv-00827 (EGS) |

<u>**DEFENDANTS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT OF THE COMMITTEE ON WAYS AND MEANS OF THE U.S. HOUSE OF REPRESENTATIVES**</u>

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND AND PROCEDURAL POSTURE ..................................................... 1

LEGAL STANDARD ........................................................................................................ 6

ARGUMENT ...................................................................................................................... 6

I.      Whether a Record Is an Agency Record Turns on the Intent to Retain Control
        Over the Record and the Agency's Ability to Use the Record as it Sees Fit......................6

II.     The Four Email Threads Are Agency Records...................................................................9

CONCLUSION ................................................................................................................. 14

# TABLE OF AUTHORITIES

## Cases

*ACLU v. CIA*,
  105 F. Supp. 3d 35 (D.D.C. 2015),
  *aff'd,* 823 F.3d 655 (D.C. Cir. 2016) ...................................................................... 8

*ACLU v. CIA*,
  823 F.3d 655 (D.C. Cir. 2016) ....................................................................... 6, 10

*Am. Oversight v. HHS*,
  101 F.4th 909 (D.C. Cir. 2024) ........................................................................... 5

*Brayton v. Off. of U.S. Trade Rep.*,
  641 F.3d 521 (D.C. Cir. 2011) ............................................................................. 6

*Burka v. HHS*,
  87 F.3d 508 (D.C. Cir. 1996) ............................................................................... 7

*Cause of Action v. NARA*,
  753 F.3d 210 (D.C. Cir. 2014) ........................................................................ 7, 8

*DOJ v. Tax Analysts*,
  492 U.S. 136 (1989) ............................................................................................. 6

*Gilliam v. DOJ*,
  128 F. Supp. 3d 134 (D.D.C. 2015) ..................................................................... 6

*Goland v. CIA*,
  607 F.2d 339 (D.C. Cir. 1978) ...................................................................... 8, 10

*\*Judicial Watch, Inc. v. U.S. Secret Serv.*,
  726 F.3d 208 (D.C. Cir. 2013) ................................................................... *passim*

*Kissinger v. Reporters Committee for Freedom of the Press*,
  445 U.S. 136 (1980) ...................................................................................... 9, 14

*Paisley v. CIA*,
  712 F.2d 686 (D.C. Cir. 1983),
  *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984) ................... *passim*

*United We Stand Am., Inc. v. IRS*,
  359 F.3d 595 (D.C. Cir. 2004) ............................................................................. 8

## Statutes

5 U.S.C. § 551 ................................................................................................... 7

5 U.S.C. § 552 ............................................................................................... 6, 7

**Rules**

Fed. R. Civ. P. 56 ............................................................................................. 6

**INTRODUCTION**

In this long-running Freedom of Information Act (FOIA) case, intervenor the Committee on Ways and Means of the U.S. House of Representatives seeks to unilaterally designate back-and-forth email communications between Executive Branch agencies and Congress as congressional records not subject to FOIA, based solely on a boilerplate legend that congressional staff unilaterally affixed to certain of their messages in the email chains. Those legends not only claimed to retain congressional control over Congress' messages but over the agencies' messages as well. The Committee has shown no agreement by the agencies to these expansive terms, and, in fact, the agencies used the records for their own Executive Branch purposes and processed them as agency records in this case. Nor are these kinds of back-and-forth, two-way email conversations between the branches at all like the type of inherently "congressional" record that courts have considered to be congressional records, such as a congressional transcript or congressional report. The email communications at issue here are agency records subject to FOIA, not congressional records. Accordingly, the Court should deny the Committee's motion.

**BACKGROUND AND PROCEDURAL POSTURE**

In 2017, Plaintiff American Oversight submitted FOIA requests to the U.S. Department of Health and Human Services (HHS) and the Office of Management and Budget (OMB) seeking communications between those agencies and Congress about health care reform. *See* Bell Decl., Ex. 1, ECF No. 25-4; Hitter Decl., Ex. 2, ECF No. 25-2. At the time, HHS and OMB were engaged in deliberations with Congress about health care reform efforts, including principally the American Health Care Act of 2017 (AHCA).

The agencies processed responsive records as agency records, withholding information pursuant to one or more of FOIA's exemptions. *See generally* Bell Decl., ECF No. 25-4 (HHS

1

*Vaughn* index); Suppl. Hitter Decl., ECF No. 34-1 (supplemental OMB *Vaughn* index). Plaintiff challenged certain withholdings under Exemption 5, arguing, among other things, that email communications between Executive Branch agencies and Congress did not meet Exemption 5's inter- or intra-agency threshold requirement, since Congress is not an agency. *See generally* Mem. Supp. Pls.' MSJ, ECF No. 30-1.

The Committee intervened in the case as a defendant and filed a motion for summary judgment with respect to four email threads that each contained at least one email from a Committee staff member bearing a legend claiming that the whole email chain—and any related documents—were congressional records not subject to FOIA, rather than agency records. *See generally* Committee Mot. Int., ECF No. 19; Committee 1st MSJ, ECF No. 27. The legend does not appear in each email in the chain, Defs.' Counter-SUMF ¶ 33, and the email chains contain emails created by individuals at OMB or HHS, Defs.' Counter-SUMF ¶ 32. Three of the email threads are from HHS's production (HHS--Sept 2017--01621 to 01623, HHS--Sept 2017--01624 to 01627, and HHS--Sept 2017--01628 to 01635), and are similar versions of the same email chain. Fromm Decl., Exs. B-D, ECF No. 96-2. The email chain is between an individual at the Committee, an individual at HHS, and others, and the topic of discussion is state health care statutes. One of the emails attaches a document "Final List of BMPs_17_03_24_2.docx." That document is a list of state health care plans and has been produced in full at HHS--Sept 2017--01631 to 1635.

The fourth email thread is from OMB's production (OMB-American Oversight-000988 to 001029), is between an individual at OMB and an individual at the Committee about health care reform options, and has three attachments. Ex. A to Fromm Decl., ECF No. 96-2. The first attachment, "ABetterWay-HealthCare-PolicyPaper.pdf," was produced in full at bates OMB-

American Oversight-000989 to 1025. The second attachment was withheld in full, including its

title, at OMB-American Oversight-001026, and was described in OMB's *Vaughn* index as

"contain[ing] analysis of proposed legislation that was part of OMB's pre-decisional

deliberations regarding potential legislative strategy and whether to advise the President to

ultimately sign or veto the legislation." Suppl. Hitter Decl., Ex. 1 at p. 12 (Suppl. OMB *Vaughn*

Index), ECF No. 34-1. The third attachment, "List of Health Care Policies for OMB to

consider.docx," was withheld in full at OMB-American Oversight-001027 to 1029, and was

described in OMB's *Vaughn* index as "contain[ing] policy proposals for OMB review as part of

its pre-decisional deliberations regarding potential legislative strategy and whether to advise the

President to ultimately sign or veto the legislation." Suppl. OMB *Vaughn* Index at p. 12.

The legend is identical in all four email chains and reads:

> This document and any related documents, notes, draft and final legislation, recommendations, reports, or other materials generated by the Members or staff of the Committee on Ways and Means are records of the Committee, remain subject to the Committee's control, and are entrusted to your agency only for use in handling this matter. Any such documents created or compiled by an agency in connection with any response to this Committee document or any related Committee communications, including but not limited to any replies to the Committee, are also records of the Committee and remain subject to the Committee's control. Accordingly, the aforementioned documents are not "agency records" for purposes of the Freedom of Information Act or other law.

Committee SUMF ¶¶ 4, 9, 10, ECF No. 96-1. The legend appears in the top (most recent) email

of the email chain starting at OMB-American Oversight-000988, Ex. A to Fromm Decl.; in the

second-to-the-top email of the email chain starting at HHS--Sept 2017--01621, Ex. B to Fromm

Decl.; and in several places in the email chains starting at HHS--Sept 2017--01624 and HHS--

Sept 2017--01628, Exs. C and D to Fromm Decl.

OMB and HHS used these records, as they did many of the other records responsive to

the FOIA request, for Executive Branch purposes. *See, e.g.*, Slemrod Decl. ¶ 10, ECF 25-3

3

("OMB relied on the informal channel of email communications to enable its officials and staff to receive information from Congress that was used to advise the President about health care reform."); Slemrod Decl. ¶ 13 ("In the case of the AHCA, OMB solicited information from Congressional personnel regarding the status of the AHCA throughout the drafting and debate process, with an understanding that some of that information would ultimately become a part of a SAP [the agency's formal method of expressing a position on legislation]."); Arbes Decl. ¶ 18, ECF No. 25-6 ("[T]he communications at issue in this case informed HHS' decision-making about potential administrative initiatives" such as "identif[ing] and evaluat[ing] potential rulemakings and operational changes that might become necessary if a bill were to pass" and "help[ing] HHS prioritize the potential implementation issues presented by draft legislation"); *see also, e.g.*, Suppl. OMB *Vaughn* Index at p. 12 (describing OMB-American Oversight-000988 as "for use in crafting Executive Branch legislative strategy and ultimately advising the President on whether he should sign or veto the bill"); Suppl. OMB *Vaughn* Index at p. 12 (describing OMB-American Oversight-001026 to 1029 as containing analysis "that was part of OMB's pre-decisional deliberations regarding potential legislative strategy and whether to advise the President to ultimately sign or veto the legislation" and containing policy proposals used in OMB's "pre-decisional deliberations regarding potential legislative strategy and whether to advise the President to ultimately sign or veto the legislation"); Bell Decl., Ex. 6 at p. 85 (HHS *Vaughn* Index), ECF No. 25-4 (noting that release of the HHS-Sept 2017-01621 to1630 would "compromise [HHS's] deliberative process in considering and adjusting technical assistance that HHS could provide"); Defs.' Counter-SUMF ¶¶ 34-37. In keeping with these uses, the agencies and the Committee mutually understood that their communications would be confidential. *See, e.g.*, Slemrod Decl. ¶ 19 ("When working with their Congressional counterparts on the

4

development of health care reform, OMB had an expectation that those communications would be kept confidential."); Skrzycki Decl. ¶ 11, ECF No. 25-5 ("As a result, I expected that communications between HHS and Congress would be kept confidential.").

Magistrate Judge Robinson entered two Reports and Recommendations on the parties' cross-motions for summary judgment. R & R, ECF No. 48, R & R, ECF No. 49. She found, *inter alia*, that the four email threads were congressional records. R & R at 10-12, ECF No. 49. Ultimately, this Court upheld a number of the agencies' assertions of Exemption 5 and did not reach the Committee's argument that the four email threads were congressional records. Mem. Op. 3, ECF No. 81; *see also* Order, ECF No. 80. On appeal, the D.C. Circuit reversed as to the application of Exemption 5 to the challenged records. *Am. Oversight v. HHS*, 101 F.4th 909 (D.C. Cir. 2024).

Subsequent to the D.C. Circuit's decision, OMB and HHS largely re-processed and re-released the documents, lifting prior redactions under Exemption 5 consistent with the D.C. Circuit's opinion. *Cf.* Joint Status Report, ECF No. 92. The Committee indicated that it planned to renew its arguments that the four email threads—which it refers to as the "legended documents," Mem. Supp. Committee 2d MSJ 1 n.1, ECF No. 96—were not agency records subject to FOIA, and, accordingly, OMB and HHS agreed not to re-release those specific documents while the issue is litigated. Joint Status Report. The Committee has now renewed its motion for summary judgment, Committee 2d MSJ.[1]

---

[1] In addition to the four email threads, the parties have stipulated that the Court's decision on the Committee's motion will also apply to a fifth document that was discovered during HHS's recent re-processing and that is substantially similar to the HHS emails at issue here. Joint Stipulation, ECF No. 97.

**LEGAL STANDARD**

A reviewing court evaluates an agency's response to a FOIA request *de novo*. 5 U.S.C.

§ 552(a)(4)(B). "Most FOIA cases are appropriately resolved on motions for summary

judgment." *Gilliam v. DOJ*, 128 F. Supp. 3d 134, 138 (D.D.C. 2015) (citing *Brayton v. Off. of*

*U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011)). Summary judgment is warranted "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**ARGUMENT**

**I.  Whether a Record Is an Agency Record Turns on the Intent to Retain Control Over the Record and the Agency's Ability to Use the Record as it Sees Fit.**

FOIA requires federal agencies to "make agency records available to the public upon

reasonable request." *ACLU v. CIA*, 823 F.3d 655, 658 (D.C. Cir. 2016). While FOIA does not

define "agency records," court decisions have shed some light on the term. The Supreme Court

has identified two requirements for agency records: (1) "an agency must 'either create or obtain'

the requested materials," and (2) the agency must be "in control of the requested materials at the

time the FOIA request is made," meaning "that the materials have come into the agency's

possession in the legitimate conduct of its official duties." *DOJ v. Tax Analysts*, 492 U.S. 136,

144-45 (1989). Here, there is no dispute that HHS and OMB had either created or obtained the

legended documents—indeed they were collected from HHS and OMB's email systems, and

comprise email chains between individuals at the Committee and at HHS and OMB. The focus

therefore is on the second requirement—agency control.

The D.C. Circuit has identified four factors used in determining if the agency controlled a

record such that it is an "agency record." These are:

> [1] the intent of the document's creator to retain or relinquish control over the records;
> [2] the ability of the agency to use and dispose of the record as it sees fit;

6

[3] the extent to which agency personnel have read or relied upon the document; and [4] the degree to which the document was integrated into the agency's record system or files.

*Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 218 (D.C. Cir. 2013) (citing

*Burka v. HHS*, 87 F.3d 508, 515 (D.C. Cir. 1996) and other cases). However, where an

agency either obtained a document from Congress, or prepared a document in response to

a request from Congress, the D.C. Circuit has used a modified test. *Id.* at 221. Congress is

not an "agency" for purposes of FOIA, *see* 5 U.S.C. §§ 551(1)(A), 552(f), and as the D.C.

Circuit has explained, there are "special policy considerations [that] counsel in favor of

according due deference to Congress's affirmatively expressed intent to control its own

documents." *Paisley v. CIA*, 712 F.2d 686, 693 n.30 (D.C. Cir. 1983), *vacated in part on

other grounds*, 724 F.2d 201 (D.C. Cir. 1984).

In this scenario, "the first two factors"—*i.e.*, the intent of the document's creator

and the ability of the agency to use the record as it sees fit—"effectively [become]

dispositive." *Judicial Watch*, 726 F.3d at 221; *see also id.* ("[t]his focus [given that

Congress is not subject to FOIA] renders the first *two* factors of the standard test

effectively dispositive." (emphasis added)). The D.C. Circuit thus made explicit that the

inquiry does not stop at Congress's intent to retain control over the records, but instead

includes how the agency is able to use the records. *See also Cause of Action v. NARA*,

753 F.3d 210, 215 (D.C. Cir. 2014) (noting the *Judicial Watch* factors of "intent to

control the documents and their future use"). In analyzing these factors, the court

"examine[s] how the agency would treat the records in its normal course of operations, in the absence of pending FOIA-related litigation." *Judicial Watch*, 726 F.3d at 219.[2]

Accordingly, the Committee is not correct that Congress can unilaterally determine the status of a record by claiming an intent to retain control over it, because this approach would ignore the second factor: the agency's ability to use the record as it sees fit. *See* Committee MSJ 10 ("Congress's manifestation of its intent to control the document and keep it confidential is dispositive"). All of the cases cited by the Committee involved agency *agreement* that the records at issue were not agency records. *See Goland v. CIA*, 607 F.2d 339, 343 (D.C. Cir. 1978) ("[T]he CIA reiterated its position that the Transcript was a 'legislative document under the control of the House of Representatives' . . . and to which FOIA did not apply"); *Cause of Action*, 753 F.3d at 213 ("The Archives . . . . maintained that because the Commission was established in the legislative branch, Commission records held by the Archives were not agency records subject to FOIA."); *Paisley*, 712 F.2d at 695 (referring to letters expressing "the agencies' belief that the documents now at issue are congressional in nature" (emphasis omitted)); *ACLU v. CIA*, 105 F. Supp. 3d 35, 42 (D.D.C. 2015) ("[The defendant-agencies] argue that the Report remains a congressional record notwithstanding its transmittal to the Executive Branch and thus falls outside the scope of FOIA."), *aff'd* 823 F.3d 655 (D.C. Cir. 2016); *Judicial Watch*, 726 F.3d at 214 ("The Service denied the request . . . reiterating its position that WAVES and ACR records are not 'agency records' subject to FOIA, but rather are 'Presidential records'

---

[2] The two-factor test described in *Judicial Watch* and the four-factor test described in *Burka* are similar. Indeed, the second *Judicial Watch* factor (the ability of the agency to use and dispose of the record as it sees fit) naturally relates to the third and fourth *Burka* factors, which are "the extent to which agency personnel have read or relied upon the document" and "the degree to which the document was integrated into the agency's record system or files." *Judicial Watch*, 726 F.3d at 218. Particularly where the agency does not agree with a congressional claim of control, these factors will overlap.

subject to the PRA."); *United We Stand Am., Inc. v. IRS*, 359 F.3d 595, 598 (D.C. Cir. 2004) ("[T]he agency refused to disclose the response sent to the Joint Committee, claiming that it qualified as a congressional document not subject to FOIA."). Several of these cases also pre-date the D.C. Circuit's analysis in *Judicial Watch*, and thus *Judicial Watch* should be read to already incorporate their teachings; or turn on entirely separate tests, *see Cause of Action*, 753 F.3d at 215 ("[W]e do not think it makes sense to apply the analysis from *Judicial Watch II* and the cases discussed in that opinion to the National Archives.").[3] Because they all involved agreement, these cases simply stand for the uncontroversial proposition that where Congress indicates an intent to control the record, and the agency agrees and treats the record as subject to congressional control, that is good evidence the records are not agency records under FOIA. As discussed below, there is no such agreement here.

## II. The Four Email Threads Are Agency Records.

Here, applying the two factors from *Judicial Watch* compels the conclusion that the four email threads are agency records.

With respect to first *Judicial Watch* factor—the intent of the record's creator to retain control over the record—the Committee asserts an intent to retain control over not just emails created by Congress, but over emails created by the agencies, as well. Several of the emails contained in the four email threads were sent by and thus created by individuals at OMB and HHS. *See, e.g.*, HHS--Sept 2017--01626, Ex. C to Fromm Decl. (emails from Sarah Arbes at HHS); Defs.' Counter-SUMF ¶ 33. Unlike the typical case where an agency comes into

---

[3] In *Paisley*, the court considered the Supreme Court's analysis in *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 157 (1980). There, to analyze "the control exercised by the State Department" the Supreme Court considered that "'[the records] never entered the State Department's files, and they were not used by the Department for any purpose.'" 712 F.2d at 693 (quoting *Kissinger*, 445 U.S. at 157). Thus, *Paisley* supports the view that how the agency "used" a document is relevant to whether the agency controls the document.

possession of an inherently "congressional" record that was created by Congress at the outset, such as the congressionally-created transcript of House proceedings at issue in *Goland*, or the congressional report drafted by the Senate Select Committee on Intelligence, which "was indisputably part of [the Senate committee's] work product," at issue in *ACLU*, 823 F.3d at 666, back-and-forth emails between the Executive Branch and Congress are two-way conversations between Congress and the Executive Branch, where Congress creates some emails and the agency creates others, and the emails in a chain are an iterative part of the same conversation. It is hard to see how Congress can "retain" control over a mutual, back-and-forth conversation that it never had exclusive control over to begin with. Nor can the agencies here be described as holding Congress's portions of the email chains as a "trustee" for Congress, as the CIA was for the congressional transcript in *Goland.* 607 F.2d at 347, or as acting as an "overseer of the Executive Branch." *Paisley*, 712 F.2d at 693 n.30.

The Committee's attempt to unilaterally assert control over agency-created material has ramifications for the separation of powers. If, for example, the FBI were conducting an investigation into congressional corruption, a similar "congressional records" legend applied to materials produced by Congress to the FBI could, according to the Committee's theory, bring those and related documents, including the FBI's own work product, within Congress's exclusive control. This result cannot be right. Similarly, if an agency conducts an internal audit of its prior budget, Congress cannot wrest control of that audit from the agency simply by requesting a copy and declaring all documents produced in response to the request "congressional records." The Committee might argue that they are only seeking to control the four email threads for purposes of disclosure under FOIA, but the legend—and the Committee's theory of the case—is not so limited. Indeed, it claims that "any documents created or compiled by an agency in connection

with any response to the Committee document or any related Committee communications, including but not limited to any replies to the Committee, are also records of the Committee and remain subject to the Committee's control."

In *Judicial Watch*, the D.C. Circuit recognized the need to consider separation of powers issues and used "the canon of constitutional avoidance" to avoid an interpretation that would raise such issues. *Judicial Watch*, 726 F.3d at 231. Moreover, given that Congress enacted FOIA, any constitutional uncertainties should be construed against Congress. *Id.* at 224 ("whatever encroachment upon congressional authority we might engender by applying FOIA to congressional communications, it was Congress that passed the Act and Congress that can amend it").

Finally, the Committee's attempt to demonstrate congressional intent-to-control further falls afoul of the D.C. Circuit prohibition on "general and sweeping" assertions of congressional intent to exercise control over documents in an agency's possession. *Paisley*, 712 F.2d at 695. In *Paisley*, the court held that letters exchanged between the CIA and the Senate Select Committee on Intelligence failed "to provide sufficient proof" that Congress intended to transfer the documents at issue to the FBI and the CIA for only limited purposes. *Id.* The court explained that, although the letters indicated a "desire to prevent release" of documents generated by the Committee without the Committee's approval, the letters were "too general and sweeping" and contained "no discussion of any particular documents or of any particular criteria by which to evaluate and limit the breadth of this interdiction." *Id.* As such, the court concluded that there was not enough evidence of congressional intent to deem the documents congressional records.

The boilerplate legend the Committee used here is not specifically addressed to the content of the four email threads. Instead, it takes a blunderbuss approach, purporting to cover:

11

"[a]ny such documents created or compiled by an agency in connection with any response to this Committee document or any related Committee communications, including but not limited to any replies to the Committee," where "[a]ny such documents" appears to refer to "[t]his document and any related documents, notes, draft and final legislation, recommendations, reports, or other materials." Committee SUMF ¶¶ 4, 9, 10. Where assertions of congressional control have been found to remove a document from an agency's control (again, with the agency's agreement), it has often been as part of a specific system for handling one particular type of record. *See, e.g.*, *Judicial Watch*, 726 F.3d at 218-19 (the agency had entered into an MOU described the "two limited purposes" for which it could use records from the White House Access Control System, and "the MOU provides that the [agency] will transfer the records to the White House within 60 days of the visit, and then purge them from its system").

It is true that the legend is applied to individual documents, but it is the same boilerplate legend. By affixing the same boilerplate legend to each message, there is nothing to suggest that Congress applied any criteria for reserving control that is particularized to the content of the document. By this standard, Congress's reservation of control would truly be limitless. There is not a principled difference between the letters the court found insufficient in *Paisley*, on the one hand, and a rote application of a "congressional records" legend to a congressional committee's correspondence with the Executive Branch, on the other.[4]

And while the Committee asserts that "[t]he legend was not automatically generated," because Committee staffers "manually pasted the legend into emails," Committee MSJ 5, it is not the automated generated nature of the legend that is fatal. Rather, it is the generalized and

---

[4] The Committee does not contend that any legend was placed in either of the two withheld-in-full attachments, nor does the legend or the Committee's briefing explain the nature of those documents or why Congressional control would be appropriate.

sweeping scope that is problematic. The Committee's assurance that in this case it did not apply the legend in an automated fashion provides scant comfort given that the Committee's argument would apply to any similar, generalized legend that was automatically applied to any other type of record.

The second *Judicial Watch* factor, the ability of the agency to use and dispose of a record as it sees fit, further reflects that, along with the first factor, the Executive Branch and Congress both have equities in inter-branch communications. Unlike the cases the Committee relies on, the Committee points to no agreement by OMB or HHS to the terms of the legend regarding its use of the email.

And OMB and HHS both used the four email threads for their own purposes,[5] contrary to the legend's instruction that the documents "are entrusted to your agency only for use in handling this matter," *e.g.*, Committee SUMF ¶¶ 4, 9, 10. *See, e.g.*, Slemrod Decl. ¶ 10 ("information from Congress" "was used to advise the President about health care reform"); Slemrod Decl. ¶ 13 (OMB sought information from Congress regarding the AHCA "with an understanding that some of that information would ultimately become a part of a SAP [the agency's formal method of expressing a position on legislation]"); Arbes Decl. ¶ 8 ("[T]he communications at issue in this case informed HHS' decision-making about potential administrative initiatives" such as "identif[ing] and evaluat[ing] potential rulemakings and operational changes that might become necessary if a bill were to pass" and "help[ing] HHS prioritize the potential implementation issues presented by draft legislation"); Defs.' Counter-

---

[5] If the four-factor *Burka* test applied, these facts would likewise show that agency personnel read and relied on the four email chains to a significant extent, supporting that the email chains are agency records under the third factor.

SUMF ¶¶ 34-37. *See Kissinger*, 445 U.S. at 157 (noting that records were not agency records where "they were not used by the [agency] for any purpose").

Indeed, the records exist on agency servers, as demonstrated by the fact that OMB and HHS identified them in their searches in response to Plaintiff's FOIA request, and the agency's schedules regarding record management apply to these documents.[6] Nor, other than this litigation, does it appear that the Committee has made any efforts to restrict access to or use of the email chains. While the agencies and the Committee both believed that the emails would be treated confidentially, that is not the same as one branch of government agreeing to constrain its internal use of the emails in any way, or agreeing that the emails are not agency records subject to FOIA. Both agencies in fact have taken the position in this case that the emails are agency records subject to FOIA and processed them accordingly.

## CONCLUSION

For the foregoing reasons, the Committee's motion should be denied.

Dated:   November 15, 2024                     Respectfully Submitted,

                                               BRIAN M. BOYNTON
                                               Principal Deputy Assistant Attorney General

                                               MARCIA BERMAN
                                               Assistant Branch Director

                                               */s/ Rebecca Kopplin*
                                               Rebecca Kopplin
                                               Trial Attorney
                                               (California Bar No. 313970)
                                               United States Department of Justice
                                               Civil Division, Federal Programs Branch
                                               1100 L Street NW
                                               Washington, D.C. 20005

---

[6] And thus, if the four-factor *Burka* test applied, the fourth factor would also favor the conclusion that the email chains are agency records.

Email: Rebecca.M.Kopplin@usdoj.gov

*Counsel for Defendants*