**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| AMERICAN OVERSIGHT, INC., |
|          Plaintiff, |
| v. |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., |
|          Defendants. |

Civ. Action No. 17-827(EGS/DAR)

<u>**MEMORANDUM OPINION**</u>

This case arises out of a Freedom of Information Act ("FOIA") suit brought by Plaintiff American Oversight, Inc. ("American Oversight") against Defendants U.S. Department of Health and Human Services ("HHS") and Office of Management and Budget ("OMB") (collectively, the "Agencies") in which American Oversight seeks documents related healthcare reform legislation in 2017. *See* Compl., ECF No. 1.[1] Some of the documents relevant to this FOIA request include the Agencies' communications with the U.S. House of Representatives Committee on Ways and Means, ("Intervenor" or "Committee"), which has intervened in this case to object to the production of those documents. *See* Intervenors' Mot. to Intervene, ECF No. 19.

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF header page number, not the page number of the filed document.

American Oversight and the Agencies previously filed cross motions for summary judgment, primarily disputing whether Exception Five to FOIA production applied. *Am. Oversight, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. CV 17-827(EGS/DAR), 2022 WL 1719001, at *1 (D.D.C. May 27, 2022), *rev'd and remanded sub nom. Am. Oversight v. United States Dep't of Health & Hum. Servs.*, 101 F.4th 909 (D.C. Cir. 2024). The Court granted in part the Agencies' motion, *see id.*; and the U.S. Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") reversed the decision and ordered the Agencies to produce the documents at issue, *see Am. Oversight v. United States Dep't of Health & Hum. Servs.*, 101 F.4th 909 (D.C. Cir. 2024). In the Court's prior Memorandum Opinion, it did not reach the Committee's argument that certain communications between the Agencies and Congress were not subject to FOIA because they were congressionally controlled. *Am. Oversight*, 2022 WL 1719001, at *1 (finding the Committee's Motion moot). Now that the Agencies have been ordered to produce the previously disputed documents, the Committee has renewed its request for summary judgment in its favor with respect to the asserted congressional documents. *See* Intervenor's Mot. for Summ. J. ("Intervenor Mot."), ECF No. 96. American Oversight filed its cross Motion for Summary Judgment arguing that the documents are subject to disclosure, *see* Pl.'s Mem. of Points & Authorities in Support of Pl.'s

Cross-Mot. for Summ. J. & in Opp'n to Def.-Intervenor's Mot. for Summ. J. ("Pl.'s Mot. & Opp'n"), ECF No. 101;[2] and the Agencies also filed an Opposition to the Committee's Motion for Summary Judgment. *See* Def.'s Resp. to Intervenor's Mot. for Summ. J. ("Agency Resp."), ECF No. 102. Briefing on these renewed motions is now complete and they are ripe for the Court's review.

Upon careful consideration of the Motions, Oppositions thereto, Replies, the entire record, and for the reasons stated below, Intervenor's Motion is **DENIED** and American Oversight's Motion is **GRANTED**.

## I. Background

### A. Factual Background

#### 1. Underlying FOIA Case

This case arises out of two FOIA requests that American Oversight submitted to HHS and OMB in 2017 seeking communications between the Agencies and Congress related to health care reform legislation, the American Health Care Act ("ACHA"). *See* Pl.'s Mot. & Opp'n, ECF No. 101 at 7-8; Intervenor Mot., ECF No. 96 at 7-8; Agency Resp., ECF No. 102 at 5.

---

[2] American Oversight's Opposition to Intervenor's Motion for Summary Judgment and Cross-Motion for Summary Judgment at Docket Number 100-1 is identical to its Motion and Opposition at Docket Number 101. The Court will refer to Docket Number 100-1 for ease of reference. Similarly, the Court will refer to Docket Number 105 for the Committee's Opposition and Reply, which is the same as its filing at Docket Number 106.

American Oversight submitted identical requests to HHS and OMB on March 15, 2017 and March 21, 2017, respectively, seeking the following documents:

> (1)   All communications, meeting notices, meeting agendas, informational material, draft legislation, talking points, or other materials exchanged between OMB and any members of Congress or congressional staff relating to health care reform.

> (2)   All calendar entries for the Director, any political or SES appointees in the Director's office, and the Acting Head of Legislative Affairs, or anyone maintaining calendars on behalf of these individuals, relating to health care reform. For calendar entries created in Outlook or similar programs, the documents should be produced in "memo" form to include all invitees, any notes, and all attachments.

Intervenor Mot., ECF No. 96 at 7-8 (citing Compl. Exs. A-B, ECF No. 1-1, 1-2).

When neither OMB nor HHS responded to American Oversight's requests, it filed suit on May 4, 2017. *See* Compl., ECF No. 1. The Court ordered the Agencies to review and process responsive records on a rolling basis. *See* Minute Order (May 10, 2017). According to the parties' representations, the Court ordered HHS to review and process approximately 11,000 pages of records and for OMB to review and process approximately 2,348 pages of records. *See* Intervenor Mot., ECF No. 96 at 8-9. Ultimately, the Agencies produced 658 records from OMB and 5,384 pages of records from HHS, which comprised approximately 295 records,

including those with attachments. Pl.'s Mot. & Opp'n, ECF No.
101 at 8. These documents "were heavily redacted under [FOIA]
Exemption 5." *Id.* (citing Creighton Decl., ECF No. 30-2, Exs. 3-
8).

### 2. Communications with Congress

Included among the documents that the Agencies produced to
American Oversight were four partially redacted email chains
between either HHS or OMB and staffers on the Committee on Ways
and Means.[3] *See* Intervenor Mot., ECF No. 96 at 9; Pl.'s Mot. &
Opp'n, ECF No. 101 at 8-10. One of the documents was from OMB,
*see* Intervenor Mot., ECF No. 96 at 9 (citing Fromm Decl. Ex. A,
OMB-American Oversight-000988 to 0010292); and the other three
documents were from HHS, *see id.* (citing Fromm Decl. Exs. B-D,
HHS—Sept 2017—01621 to 01623; HHS—Sept 2017—01624 to 01627; HHS—
Sept 2017—01628 to 01635).[4]

---

[3] The parties do not dispute the basic facts regarding these
exchanges such as who sent what email, where the individuals who
sent the emails worked and in what capacity, when the Legend was
attached, and when other documents were attached. *See generally*
Pl.'s Statement of Material Facts as to Which there is No
Genuine Issue in Support of Mot. for Summ. J. & Counter-
Statement of Material Fact ("Pl.'s CSMF"), ECF No. 100-4; Def.'s
Counter-Statement of Material Facts Not in Dispute ("Defs.'
CSMF"), ECF No. 102-1.
[4] On October 18, 2024, the parties filed a joint stipulation
informing the Court that while the Agencies were reprocessing
documents for production following the D.C. Circuit's ruling,
they found another record that was similar to the other HHS
email chains but included one additional email. *See* Joint
Stipulation, ECF No. 97. The parties stipulated that "the
Court's forthcoming decision on the Committee's motion for

The first document ("Document 1") is an email chain between
Emily Murry ("Ms. Murry"), a Committee staffer, and Joseph
Grogan ("Mr. Grogan"), then-Associate Director of Health
Programs at OMB. *See* Ex. A to Fromm Decl., ECF No. 62-2 at 5-47
(depicting OMB-American oversight 000988 to 001029). Mr. Gorgan
initiated this email conversation to Ms. Murry by writing in the
first email "Emily, could we speak today? I have a policy issue
I need to run by you." *See* Intervenor Mot., ECF No. 96 at 9;
Pl.'s Mot. & Opp'n, ECF No. 101 at 9. There are four emails
included as part of this chain. Pl.'s Mot. & Opp'n, ECF No. 101
at 9. In the fourth email, Ms. Murry wrote "[h]ere are three
documents to help fill the 'white space.' I am happy to set up a
call with the experts on my team to go through specific items /
provide more information." *Id.* (citing Ex. A to Fromm Decl., ECF
No. 62-2 at 5-47). Ms. Murry attached a "Legend" to that fourth
email as well as the documents that were referenced. *See* Ex. A
to Fromm Decl., ECF No. 62-2 at 5-47. The Legend said:

> This document and any related documents,
> notes, draft and final legislation,
> recommendations, reports, or other materials
> generated by the Members or staff of the
> Committee on Ways and Means are records of the
> Committee, remain subject to the Committee's
> control, and are entrusted to your agency only
> for use in handling this matter. Any such
> documents created or compiled by an agency in
> connection with any response to this Committee

---

summary judgment and Plaintiff's cross-motion for summary
judgment will apply to the new document." *Id.* at 2.

> document or any related Committee
> communications, including but not limited to
> any replies to the Committee, are also records
> of the Committee and remain subject to the
> Committee's control. Accordingly, the
> aforementioned documents are not "agency
> records" for purposes of the Freedom of
> Information Act or other law.

Intervenor Mot., ECF No. 96 at 10 (citing Statement of Facts

("SOF"), ECF No. 96-1 ¶ 4). According to Intervenors, "[t]he

Legend was not automatically generated." *Id.* (citing Fromm.

Decl., ECF No. 96-2 ¶ 10). "Rather, the Committee has authorized

staffers to include the footer when deemed appropriate, and they

manually pasted the Legend into emails to do so." *Id.* American

Oversight points out that "the Committee has proffered no

details on that authorization (such as who specifically issued

it, when, and with what guidance or instructions) nor how it was

applied to the Contested Records." Pl.'s Mot. & Opp'n, ECF No.

101 at 10.

The second document ("Document 2") consists of seven email

communications between Sarah Arbes ("Ms. Arbes"), a then-

employee of HHS, Stephanie Parks ("Ms. Parks"), a then-Committee

staffer, and Adam Buckalew ("Mr. Buckalew"), unidentified

affiliation, that cc'd Ms. Murry and Paul Edattel (unidentified

affiliation). *See* Ex. B to Fromm Decl., ECF No. 62-2 at 48-51

(depicting HHS—Sept 2017—01621 to 01623). The conversation began

on March 24, 2017 and lasted through April 1, 2017. *See id.*

"These emails discussed state and federal health care plans."
Pl.'s Mot. & Opp'n, ECF No. 101 at 9 (citing Ex. B to Fromm
Decl., ECF No. 62-2 at 48-51). Ms. Parks sent two of the emails,
one on March 30, 2017 and the other on April 1, 2017. *See* Ex. B
to Fromm Decl., ECF No. 62-2 at 48-51. She attached the Legend
to both emails. *See id.*

The third document ("Document 3") is the same as Document
2, "with the addition of two email communications from Adam
Buckalew and Ms. Arbes replying to Mr. Buckalew." Pl.'s Mot. &
Opp'n, ECF No. 101 at 9; *see also* Ex. C to Fromm Decl., ECF No.
62-2 at 52-56 (depicting HHS—Sept 2017—01624 to 01627). There
are no additional Legends on this document besides the two
included on Document 2.

The fourth document ("Document 4") is also the same as
Document 2, but it lacks the final two emails between Ms. Arbes
and Ms. Parkes. Ex. B to Fromm Decl., ECF No. 62-2 at 57-65
(depicting HHS—Sept 2017—01628 to 01635). There is only one
Legend included on this document. *See id.* This record includes
an unredacted attachment with state-by-state data. *See id.*

According to the Agencies, "OMB and HHS used these records,
as they did many of the other records responsive to the FOIA
request, for Executive Branch purposes." Agency Resp., ECF No.
102 at 7. Specifically, OMB "relied on the informal channel of
email communications to enable its officials and staff to

receive information from Congress that was used to advise the President about health care reform." *Id.* (quoting Slemrod Dec., ECF No. 25-3 ¶ 10). With respect to the ACHA, "OMB solicited information from Congressional personnel regarding the status of the ACHA throughout the drafting and debate process, with an understanding that some of the information would ultimately become a part of a [Statement of Administration Policy ("SAP")]", which is the OMB's means to express its final position on legislation. *Id.* (quoting Slemrod Decl., ECF No. 25-3 ¶ 13. As for HHS, "the communications . . . informed HHS' decision-making about potential administrative initiatives" including "identify[ing] and evaluat[ing] potential rulemakings and operational changes that might become necessary if a bill were to pass[.]" *Id.* (quoting Arbes Decl., ECF No. 25-6 ¶ 18) (alterations in original). Moreover, the communications "helped HHS prioritize the potential implementation issues presented by draft legislation." *Id.* (quoting Arbes Decl., ECF No. 25-6 ¶ 18) (alterations in original). The Agencies have described the records at issue as contributing to their deliberations about "whether to advise the President to ultimately sign or veto the legislation." *Id.* (quoting Supp'l OMB *Vaughn* Index at p. 12).

After the Agencies produced these documents to American Oversight, the Committee filed a Motion to Intervene on September 15, 2017 so that it could argue that the documents are

congressional records and not subject to FOIA. *See* Intervenor's
Mot. to Intervene, ECF No. 19. The Court granted the Committee's
request to intervene. *See* Minute Order (Sept. 26, 2017).

### B. Procedural Background

The Agencies and Intervenor filed separate Motions for
Summary Judgment on September 26, 2017. *See* Def.'s MSJ, ECF No.
25-1; Intervenor's MSJ, ECF No. 27. American Oversight filed a
Cross-Motion for Summary Judgment and Opposition to both Motions
on October 16, 2017. *See* Pl.'s XMSJ, ECF No. 30. Pursuant to
Local Civil Rule 72.2, this Court referred the cross motions to
a Magistrate Judge for a Report and Recommendation, and the case
was randomly assigned to Magistrate Judge Deborah A. Robinson.
*See* Minute Order (Mar. 8, 2018).[5] Magistrate Judge Robinson
issued a Report and Recommendation in which she recommended that
the Court grant in part and deny in part the Agencies' Motion
for Summary Judgment, grant the Committee's Motion for Summary
Judgment, and deny American Oversight's Cross-Motion for Summary
Judgment. *See* R. & R., ECF No. 49.[6] In relevant part, the

---

[5] The referral to Magistrate Judge Robinson was terminated on
January 16, 2019.
[6] Magistrate Judge Robinson issued another Report and
Recommendation, *see* R. & R., ECF No. 48, with respect to
American Oversight's Motion for Judgment on the Pleadings, and
she addressed other disputes in her Report and Recommendation on
the cross-motions for summary judgment. The Court only mentions
the portions of this procedural background relevant to the
instant dispute.

Magistrate Judge recommended that the Court conclude that the documents at issue here are congressional records and therefore not subject to FOIA disclosure requirements. *See id.* at 9-14. American Oversight and the Agencies raised several objections to the Report and Recommendation, to which the Committee responded. *See Am. Oversight*, 2022 WL 1719001, at *4 (discussing and citing objections and responses). On May 22, 2022, the Court issued a Memorandum Opinion and Order which, *inter alia*, adopted in part and rejected in part the Magistrate Judge's Report and Recommendation. *See id.* at *20. Among other rulings, the Court adopted the Magistrate Judge's recommendation to grant the Agencies' Motion for Summary Judgment "as to the adequacy of its search and the validity of Exemption 5 for the records at issue" and denied as moot the Magistrate Judge's recommendation to grant the Committee's Motion for Summary Judgment. *Id.*

American Oversight appealed to the D.C. Circuit. *See* Notice of Appeal, ECF No. 86. On May 17, 2024, the D.C. Circuit issued an opinion in which it reversed the Court's conclusion that Exemption 5 applied to communications between the Agencies and Committee and that HHS's search for documents was inadequate. *See Am. Oversight*, 101 F.4th at 923. The D.C. Circuit noted that the Court had denied the Committee's Motion for Summary Judgment with respect to the documents at issue here as moot when it ruled that Exemption 5 applied and shielded those documents from

11

disclosure. *See id.* at 919 n.3. Of this issue, the D.C. Circuit said "[w]e express no view on the merits of any such challenge." The D.C. Circuit remanded the case back to this Court for further proceedings. *See id.* at 925.

On remand, the parties sought, and the Court granted, a briefing schedule on renewed motions for summary judgment. *See* Mot. for Briefing Schedule, ECF No. 94; Minute Order (Sept. 6, 2024). The Committee filed its renewed Motion for Summary Judgment on October 1, 2024. *See* Intervenor Mot., ECF No. 96. American Oversight filed its Cross-Motion for Summary Judgment and Opposition to Intervenor's Motion for Summary Judgment on November 15, 2024. *See* Pl.'s Mot. & Opp'n, ECF No. 100-1; Pl.'s Mot. & Opp'n, ECF No. 101. The Agencies filed their Opposition to Intervenor's Motion for Summary Judgment on the same day. *See* Agency Resp., ECF No. 102. The Committee filed its Opposition to American Oversight's Cross-Motion for Summary Judgment and Reply in Support of its Motion for Summary Judgment on December 13, 2024. *See* Intervenor's Reply Mem. in Supp. of Mot. for Summ. J. & Opp'n to Pl.'s Cross-Mot. for Summ. J. ("Intervenor Opp'n & Reply")., ECF No. 105; Intervenor's Reply Mem. in Supp. of Mot. for Summ. J. & Opp'n to Pl.'s Cross-Mot. for Summ. J. ("Intervenor Opp'n & Reply")., ECF No. 106. American Oversight filed its Reply on January 10, 2025. *See* Pl.'s Reply Mem. in Supp. of Pl.'s Cross-Mot. for Summ. J. ("Pl.'s Reply), ECF No.

107. Briefing is complete and the renewed issue is now ripe for the Court to consider.

## II.  Legal Standard

### A. Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment motions must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(c)(1). This burden "may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

In evaluating a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255 (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). Summary judgment turns on "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party"–and thus a "genuine" dispute over a material fact exists–then summary judgment is not available. *Id.* at 248.

For purposes of summary judgment, materiality is determined by the substantive law of the action. *Id.* Accordingly, the substantive law identifies "which facts are critical and which facts are irrelevant," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* Similarly, the applicable substantive evidentiary standards of the action guide "whether a given factual dispute requires submission to a jury." *Id.* at 255. The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

### B. FOIA

FOIA is based on the recognition that an informed citizenry is "vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). It was enacted to "pierce the veil of

administrative secrecy and to open agency action to the light of public scrutiny," and it favors "full agency disclosure." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 360–61 (1976) (quoting *Rose v. Dep't of the Air Force*, 495 F.2d 261, 263 (2d Cir. 1974)). FOIA cases are usually resolved on motions for summary judgment. *Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011). The agency has the burden of justifying its response to the FOIA request it received, and the court reviews its response *de novo*. 5 U.S.C. § 552(a)(4)(B).

## III. Analysis

The pending dispute in this case is whether five sets of email communications and attachments are "agency" records and therefore subject to disclosure under FOIA, or "congressional" records and accordingly shielded from the public. American Oversight, the Agencies, and the Committee take varying views on what test should apply to make such a determination, how the test should apply, and the outcome of the test. In addition to arguing that their view is the correct approach, all parties argue that respect for the separation of powers requires their requested result. With the backdrop of this essential principle, as well as keeping in mind the purpose of FOIA to provide for public access to information about the government, the Court addresses the merits of the issue.

## A. Applicable Test

### 1. Precedent

"To qualify as an 'agency record' subject to FOIA disclosure rules, 'the agency must 'either create or obtain' the requested materials,' and 'the agency must be in control of [them] at the time the FOIA request is made." *Burka v. Dep't of Health & Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996) (quoting *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144 (1989) (quoting *Forsham v. Harris*, 445 U.S. 169, 182 (1980))); *see also Am. Civ. Liberties Union v. Central Intelligence Agency* ("*ACLU*"), 823 F.3d 655, 662 (D.C. Cir. 2016). Here, the first part of the test, whether the Agencies created or lawfully obtained the requested material, is clearly satisfied and undisputed. *See* Pl.'s Mot. & Opp'n, ECF No. 100-1 at 14-15; Intervenor's Combined reply to Pl.'s Counter-Statement of Disputed Facts & Counter-Statement of Material Facts ("Intervenor's CSMF"), ECF No. 105-1 at 4. The second prong is, however, highly disputed.

The D.C. Circuit typically employs a four-factor test to determine whether the agency is in control of the relevant documents at the time of the FOIA request. *See Burka*, 87 F.3d at 515.[7] These four factors are "'(1) the intent of the document's

_____

[7] In 1988, the D.C. Circuit applied this four-factor test in *Tax Analysts* that had previously been articulated by the Eleventh

creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or file."' *Id.* (quoting *Tax Analysts*, 845 F.2d at 1069).

The D.C. Circuit has also held, however, that a truncated test applies in some cases in which "special policy considerations . . . counsel in favor of according due deference" to a governmental entity not subject to FOIA. *See ACLU*, 823 F.3d at 662 (quoting *Judicial Watch, Inc. v. U.S. Secret Service* ("*Judicial Watch*"), 726 F.3d 208, 221 (D.C. Cir. 2013)). In such a situation, whether a document is an "agency record" subject to FOIA '"turns on whether Congress manifested a clear intent to control the document."' *Id.* at 662-63 (quoting *Judicial Watch*, 726 F.3d at 221 (quoting *United We Stand Am., Inc. v. I.R.S.* ("*United We Stand*"), 359 F.3d 595, 596 (D.C. Cir. 2004))). This modified analysis '"renders the first two factors of the standard test effectively dispositive."' *Id.* (quoting *United We Stand*, 359 F.3d at 596).

---

Circuit. *See Tax Analysts*, 845 F.2d at 1069 (citing *Lindsey v. Bureau of Prisons,* 736 F.2d 1462, 1465 (11th Cir. 1984)). The Supreme Court affirmed the D.C. Circuit. *See U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989).

The D.C. Circuit has rooted this exception to the ordinary test in a string of cases dating back to the 1970s: *United We Stand*, 359 F.3d 595, 600 (D.C. Cir. 2004)*; Paisley v. C.I.A.*, 712 F.2d 686 (D.C. Cir. 1983), *opinion vacated in part*, 724 F.2d 201 (D.C. Cir. 1984); *Holy Spirit Ass'n for the Unification of World Christianity v. C.I.A.* ("*Holy Spirit*"), 636 F.2d 838, 842 (D.C. Cir. 1980), *vacated in part sub nom. C.I.A. v. Holy Spirit Ass'n of the Unification of World Christianity*, 455 U.S. 997 (1982); and *Goland v. CIA*, 607 F.2d 339, 346 (D.C. Cir. 1978). *United We Stand* is the only of these cases to occur after the *Burka* four-factor test was announced. *See United We Stand*, 359 F.3d at 599 ("Until now we have had no occasion to consider the applicability of the four-factor analysis in the congressional context."). *Paisley* and *Holy Spirit* used a test that the D.C. Circuit had pronounced in *Goland* which stated "[w]hether a congressionally generated document has become an agency record . . . depends on whether under all the facts of the case the document has passed from the control of Congress and become property subject to the free disposition of the agency with which the document resides." *Goland*, 607 F.2d at 347. *Paisley* and *Holy Spirit* interpreted the *Goland* test to consider "(1) the circumstances attending the document's creation, and (2) the conditions under which it was transferred to the agency." *Paisley*, 712 F.2d at 692 (citing *Holy Spirit,* 636 F.2d at 841).

18

Even though the D.C. Circuit has applied a modified test in circumstances in which Congress is involved, it has often concluded that the records at issue were "agency" records and therefore subject to FOIA. *Compare Goland*, 607 F.2d at 347-48 (not subject to FOIA), *with Paisley*, 712 F.2d at 695-96 (subject to FOIA); *and Holy Spirit*, 636 F.2d at 842-43 (subject to FOIA); *see also United We Stand*, 359 F.3d at 599-604 (subject to FOIA in part). As the D.C. Circuit has recognized, it is common for agencies to communicate with Congress about a range of policymaking matters; recognizing a broad exception whenever Congress is involved in these communications would undermine FOIA's preference for disclosure. *See Paisley*, 712 F.2d at 696 (describing how "[m]any agencies . . . must work frequently and closely with congressional committees on matters of budget and policy or on individual cases" and that a broad interpretation of congressional control could "undermin[e] the spirit of broad disclosure that animates [FOIA]"). With this background, the Court will now address the parties' arguments as to what test applies.

### 2. Parties' Arguments

The parties disagree about which test should apply and how the Court should consider the factors in the tests. The Committee argues that because Congress is involved, the Court must apply the modified test. *See* Intervenor's Mot., ECF No. 96

at 15-16. In so doing, however, the Committee asks the Court to modify the test even further to view only the first factor as relevant and dispositive, without any consideration of how the agency viewed or used the document as being relevant to this analysis. *See id.* at 16 ("Congress's manifestation of its intent to control the document and keep it confidential is dispositive, meaning the view of an agency that possesses a Congressional document does not factor into this case.").

American Oversight asserts that the "special policy considerations" warranting the modified test do not exist here and that the Court should apply the traditional four-factor test. *See* Pl.'s Mot. & Opp'n, ECF No. 100-1 at 16-26. According to American Oversight, the special factors are lacking because the documents were not created as part of Congress's oversight function and the Agencies dispute that Congress controlled the documents. *See id.* Specifically, American Oversight argues that "the logic underpinning [] deference" given in the modified test "simply does not exist when Congress's oversight responsibility is not implicated, like in this case, because the negotiations between Congress involved both legislative and executive functions." *Id.* at 18. American Oversight does not cite to authority where other courts have recognized these factors as determining which test should apply, *see id.;* but maintains that it still prevails under the modified standard.

The Agencies agree that the modified two-factor test applies, but they disagree with the Committee as to its description of the test. *See* Agency Resp., ECF No. 102 at 11-13. Specifically, they assert that the Committee's interpretation of this test omits the second factor which is relevant here: the agency's ability to use the documents as it saw fit. *See id.*

The Court will apply the two-factor test. Although American Oversight raises compelling arguments as to why this case is distinct from other cases in which the two-factor test has been applied, it seems likely that special considerations still arguably exist even when Congress is involved in its lawmaking function and even if the Agencies disagree about who controls the records. *See Judicial Watch*, 726 F.3d at 221 (citing *United We Stand*, 359 F.3d at 599); *Paisley*, 712 F.2d at 693 n.30 (noting the need to "safeguard Congress' long-recognized prerogative to maintain the confidentiality of its own records as well as its vital function as overseer of the Executive Branch"); *ACLU*, 823 F.3d at 662-663.[8] The Court does not need to resolve this issue, however, because it concludes that American Oversight and the Agencies prevail under either test.

---

[8] As the Committee argues, Congress also has constitutional interests in its legislative functions. *See* Intervenor's Opp'n & Reply, ECF No. 105 at 15.

Accordingly, the Court will presume, without deciding, that the two-factor test applies.

### B. Application of the Two-Factor Test

Under the modified test, the Court must determine whether '"Congress manifested a clear intent to control the document."' *ACLU*, 823 F.3d at 346-47 (quoting *Judicial Watch*, 726 F.3d at 221). This analysis "renders the first two factors of the standard test effectively dispositive."' *Id.* (quoting *Judicial Watch*, 726 F.3d at 221 (quoting *United We Stand*, 359 F.3d at 596)). Accordingly, the Court will consider both of the "first two factors of the standard test" to determine whether Congress manifested such a clear intent.

#### 1. Factor One: The Creator's Intent to Control

The Committee argues that it clearly intended to maintain control of the documents at issue because the 'Legend' was attached to at least one of the emails sent by committee staffers to the Agencies. *See* Intervenor Mot., ECF No. 96 at 21-27. It relies exclusively on the contents of the Legend as unquestionable evidence that the Committee clearly intended to control the records and therefore it must prevail on its Motion for Summary Judgment. *See id.* American Oversight and the Agencies dispute this. American Oversight raises several arguments as to why Congress did not clearly manifest its intent to retain control over these documents, specifically: (1) the

22

Committee staffers' insertion of the Legend was inadequate to manifest Congress's intent for this purpose; (2) the Legend did not and could not control documents that were exchanged prior to its insertion; (3) the documents should be considered as their individual components and not one overarching chain; (4) the Legend was not specific or adequate enough to be a manifestation of congressional intent to control the documents to it was affixed. *See* Pl.'s Mot. & Opp'n, ECF No. 100-1 at 24-36. The Agencies raise several similar arguments. *See* Agencies' Resp., ECF No. 102 at 13-18.

The Court concludes that the Committee has failed to show that it clearly manifested its intent to control the records at issue. As explained below, the circumstances here do not show that Congress manifested its intent to control the records, but instead that Committee staffers affixed a generally applicable disclaimer to email communications with the Agencies in the course of discussing proposed legislation about health care reform. This non-specific assertion does not reflect the considered judgment that has previously been held to manifest Congress's clear intent. In reaching this conclusion, the Court reaffirms the importance of due respect for a coordinate branch of government. The issue here, however, is whether Congress indeed manifested such an intent, and the Court concludes that it has not.

Because the Court holds that the Committee fails to show it manifested its intent to control the documents even with the Legend affixed, it need not reach the disputes as to whether the individual emails should be considered as a whole record and whether the Committee staffers' insertion of the Legend applies to emails that predate it in the same conversation.

### i. Records Not Produced in Oversight

Although the Court presumes that Congress's oversight function, or lack thereof, does not determine which test applies, it is still important to consider the context of the communications at issue. The Committee denies that the records were produced apart from Congress's oversight function. It states that "communications between Congress and the Executive Branch regarding health care reform constitute 'oversight' as that term is properly understood, and that there is no clear delineation between 'oversight' activities and other types of 'legislative' activities." Intervenor's CSMF, ECF No. 105-1 at 6 (citing Intervenor's Opp'n & Reply, ECF No. 105 at 14-17).[9] But

---

[9] In its Opposition/Reply, the Committee points to House Rules which authorize committees to "review and study on a continuing basis matters to assist the house in its analysis, appraisal, and evaluation of" legislation. Intervenor's Opp'n & Reply, ECF No. 105 at 17 (internal quotations omitted). Therefore, according to the Committee, the FOIA requests here seek documents that "squarely implicate Congress's Article I authority—which includes legislative and oversight components." *Id.*

the Court need not determine if or where the line is drawn between oversight and legislative functions to assess the context here.[10] What is relevant for purposes of determining Congress's assertion of clear intent is that there is no evidence of any specific oversight investigation or other function occurring. Put otherwise, the Committee may well have been engaging in its regular activities that included assessing information from the Agencies that informed its oversight function, but there is no other manifestation of this oversight function such as a letter or hearing in which the *Committee* set parameters for the information exchanged with the Agencies.

This absence alone does not necessarily mean that Congress could not have manifested a clear intent otherwise. It is, however, instructive when comparing this case to other cases in which the D.C. Circuit has assessed such a manifestation. The D.C. Circuit cases that developed the modified test and considered whether records were "agency" or "congressional" for FOIA purposes were in the context of Congress conducting oversight through hearings or other investigations. *See Goland*, 607 F.2d at 343 ("stenographic transcript of Hearings held before the House Committee on Expenditures in the Executive

---

[10] For this reason, whether the Committee was engaged in oversight activities is not a material dispute that renders summary judgment unavailable.

Departments"); *Holy Spirit*, 636 F.2d at 840-41 (correspondence
and memoranda generated by one of four committees that was
investigating Korean-American relations from 1976-1978);
*Paisley*, 712 F.2d at 689-90 (Senate Select Committee on
Intelligence investigation into the death of former CIA agent
John A. Paisley); *United We Stand*, 359 F.3d at 597 (internal
citations omitted) (Joint Committee on Taxation investigation
into "whether the IRS"s selection of tax-exempt organizations .
. . for audit has been politically motivated"); *ACLU*, 823 F.3d
at 659 (Senate Select Committee on Intelligence "oversight
review of the CIA's highly controversial, but then-defunct,
detention and interrogation program").[11]

Accordingly, the fact that the Committee here did not
engage in a formal oversight investigation of the Agencies

---

[11] Many of the records at issue in these D.C. Circuit cases were
also deemed "secret" or "confidential." *See Goland*, 607 F.2d at
343 ("the Hearing Transcript had been classified "Secret" by
Congress"); *Paisley*, 712 F.2d at 689 (some documents were
classified as "Secret" by the Senate Select Committee on
Intelligence); *United We Stand*, 359 F.3d at 601 (Joint Committee
on Taxation's Chief of Staff was under the impression that the
Committee's investigative requests to the IRS would be
confidential); *ACLU*, 823 F.3d at 658, 661 (discussing procedures
for confidentiality in reviewing CIA documents and asking the
Executive to retain the full classified report produced from the
Senate Select Committee on Intelligence's investigation); *but
see Holy Spirit*, 636 F.2d at 841 ("In contrast, the
circumstances surrounding Congress' creation of the documents
requested by the Church do not demonstrate any intent that they
be kept secret.").

contrasts, for example, to the Senate Select Commtittee on Intelligence's investigation into the CIA's post-911 "detention and interrogation program", *see ACLU*, 823 F.3d at 659; or the death of a former CIA agent, *see Paisley*, 712 F.2d at 689-90; or the Joint Committee on Taxation's investigation into purported politically motivated audits of tax exempt entities, *see United We Stand*, 359 F.3d at 597. Though, as noted, not dispositive, this context is relevant to assessing the Committee's actions and communications.

### ii.    Staffers' Assertions

There is no dispute here that the only mode of the Committee allegedly asserting its intent to control the emails and attachments was the Legend included in certain emails. *See* Pl.'s Mot. & Opp'n, ECF No. 100-1 at 25; *see also* Intervenor's Opp'n & Reply, ECF No. 105 at 34 (conceding there was no formal communication). American Oversight argues that the Legends inserted on certain emails "do not reflect a decision by Congress, or someone authorized to act on behalf of Congress, to assert control over the emails to which the footers are appended." Pl.'s Mot. & Opp'n, ECF No. 100-1 at 24. It contrasts what occurred here, a decision by one staffer to attach a footer to an email, with other D.C. Circuit cases in which the committee, or a staffer who had the authority to speak on behalf of the committee, articulated an intent to control certain

documents. *See id.* As American Oversight points out, all the relevant D.C. Circuit cases entailed either the Committee's leadership or a high-level staffer on the Committee such as the Chief of Staff making such an assertion. *See id.* at 24-25; *see also ACLU*, 823 F.3d at 664-65 (letter sent from SSCI Chair and Vice Chair); *United We Stand*, 359 F.3d at 597 (communication from Chair, Vice-Chair, and Ranking Members of Joint Committee on Taxation); *Goland*, 607 F.2d at 347-48 (committee oversight hearing held in executive session at which transcript was marked secret). In summary, American Oversight argues that the "law does not permit individual staffers to assert control over records on behalf of Congress" and that "the Committee has pointed to no congressional or Committee rule conferring this authority" here. *See* Pl.'s Mot. & Opp'n, ECF No. 100-1 at 24-25.

In response, the Committee argues that that the D.C. Circuit has held that Congress need not assert its intent to control documents in a specific way, Congress often takes actions through its staffers, there is no D.C. Circuit precedent that prohibits congressional staff from asserting Congress's intent to control documents, here the staff had authority from the Committee's General Counsel and Parliamentarian to assert such authority, and that the Committee need not use a "formal communication" to assert its intent. *See* Intervenor's Opp'n & Reply, ECF No. 105 at 31-34.

To the extent that the Committee argues that the context of
an assertion of congressional intent has no bearing on whether
such intent is clearly made for FOIA purposes, this argument is
rejected. The Committee mistakes the deference that exists once
Congress manifests an intent to control with an analysis of
whether Congress manifested such an intent. Moreover, the
authority that the Committee cites must be read in context. *See
id.* at 31 (citing *Holy Spirit*, 636 F.2d at 842). The Committee
cites *Holy Spirit* for the proposition that the D.C. Circuit
"explicitly declined to direct 'Congress to act in a particular
way in order to preserve its FOIA exemption for transferred
documents.'" *Id.*[12]   The D.C. Circuit made this remark, however,
while reaffirming that Congress's intent to control disputed
documents must be clearly made. *See Holy Spirit*, 636 F.2d at
842. Put otherwise, the Court does not need to categorically
decide that non-leadership staff can *never* manifest Congress's
intent, but that the facts of how such an assertion occur are

---

[12] The Committee also relies on *Goland* for the proposition that
the identity of the staffer who stamped "confidential" on a
hearing transcript was not relevant to the court's analysis. *See*
Intervenor's Opp'n & Reply, ECF No. 105 at 32. This is a
selective representation. In *Goland*, the D.C. Circuit reviewed
how the committee had met in executive session to take the
relevant testimony in secret and thereafter the transcript of
that testimony as secret. *See Goland*, 607 F.2d at 347. It was
not confronted with a situation where the only action taken to
assert congressional control was by a staffer on behalf of a
committee. *See also* Pl.'s Reply, ECF No. 107 at 17.

relevant to whether such a manifestation clearly occurred. *See also* Intervenor's Opp'n & Reply, ECF No. 105 at 32-33 (explaining how congressional committees often act through their staff); *but see* Pl.'s Reply, ECF No. 107 at 18 (citing *United We Stand*, 359 F.3d at 605) (alterations in original) (discussing how "in the only case the Committee points to where the Legend was appended by someone other than an elected official, Comm. Reply Br. at 28, the 'confidentiality directive appears in a letter written by the Joint Committee's chief of staff as part of an investigation authorized by the chairman, vice-chairman, and ranking members of the Joint Committee,' a fact that was 'emphasize[d]' by the Court '[i]n finding sufficient 'indicia of congressional intent.''").

Here, the Committee neglects to provide any additional details about how the staffers purportedly manifested Congress's intent and chooses to rest only on its general arguments that such information is "irrelevant." Intervenor's Opp'n & Reply, ECF No. 105 at 31-34 (arguing that conformance with "procedural niceties" is not required). The Court disagrees. Accepting the Committee's representations that staffers were authorized[13] to

---

[13] In its Opposition and Reply, the Committee asserts that the staffers were authorized to do so by the Committee's General Counsel and Parliamentarian, citing the Fromm Declaration ¶ 10; but the details about who authorized staff to insert the Legend when deemed appropriate were not included in this declaration nor in the Committee's statement of facts. *See generally*

affix the Legend when they deemed appropriate, American Oversight points out numerous questions that remain unanswered such as the scope of the authorization to use the Legend, whether all staffers or only certain staffers had such authority, whether staffers were provided any guidance on when to assert the authority, and whether the staffers' invocation of the authority was subject to any review. *See* Pl.'s Mot. & Opp'n, ECF No. 100-1 at 25. Without any further information from the Committee, all that the summary judgment facts show is that Committee staffers with undefined authority to do so "cop[ied] and paste[d]", *see* Fromm Decl., ECF No. 96-2 ¶ 10; the Legend into emails sent back and forth to Agency staff about possible healthcare reform. There are no facts showing that the Committee made a specific determination that these communications should be subject to congressional control. This falls far short of the clear manifestation of intent that is required to prevent disclosure under FOIA.

### iii.    Specificity of the Assertion

Finally, and considered together with the details of the staffers copying and pasting the Legend when they deemed appropriate, the generic and far-reaching contents of the Legend

---

Intervenor's Mot., ECF No. 96; Intervenor's Opp'n & Reply, ECF No. 105.

further show that Congress did not clearly manifest an intent to control the records at issue.

As noted, the Committee relies exclusively on the Legend as showing its clear intent to control the records at issue. *See generally* Intervenor's Mot., ECF No. 96; Intervenor's Opp'n & Reply, ECF No. 105. The Committee does not assert, however, that the Legend was somehow specifically tailored to the records at issue. *See* Intervenor's Opp'n & Reply, ECF No. 105 at 26-27. Indeed, the Committee has said that staffers were authorized to affix the generic Legend whenever they deemed appropriate. *See* Intervenor's Mot., ECF No. 96 at 10. It maintains that the Legend is specific enough because it was appended to the email exchanges themselves, including words like "this" and "related" documents, *see id.*; and attempts to distinguish this from the general expressions that the D.C. Circuit has deemed insufficient, *see id.* (discussing *Paisley*, 712 F.2d at 694; *United We Stand*, 359 F.3d at 601).

There is no doubt that the Legend was drafted to be wide-reaching and encompass a broad number of records that could be related to the exchange to which the Legend is inserted. *See* Intervenor's Opp'n & Reply, ECF No. 105 at 25 (listing five different ways in which the individual emails could fall within the documents sought to be controlled by the Legend); *see also id.* at 7 (showing that the Legend purported to apply to any

"documents, notes, draft and final legislation, recommendations, reports, or other materials generated by the Members or staff of the Committee on Ways and Means" and "[a]ny such documents created or compiled by an agency in connection with any response to this Committee document or any related Committee communication"). In context, this undermines the notion that Congress manifested a clear intent to control the specific records at issue. *See* Fromm Decl., ECF No. 96-2 at 2; *see also* Agencies' Resp., ECF No. 102 at 16 ("By affixing the same boilerplate Legend to each message, there is nothing to suggest that Congress applied any criteria for reserving control that is particularized to the content of the document."); *United We Stand*, 359 F.3d at 602 (citing *Paisley*, 712 F.2d at 694) (explaining how Congress must give "contemporaneous and specific instructions" to assert or maintain control).

As the Agencies point out, if congressional staffers could simply insert this footer into any email correspondence based on unspecified criteria and unclear, if any, review of such a decision, the window of exclusion from FOIA significantly widens, beyond a point that the D.C. Circuit's careful analyses have previously allowed. Due deference for a coordinate branch of government does not require such an approach. On the contrary, respect for the separation of powers and the purpose of the Act mandate its rejection.

For all these reasons, the Committee has failed to show that the first factor warrants concluding that it clearly manifested its intent to control the disputed records.

### 2. Factor Two: The Agencies' Ability to Use and Dispose of the Records

The Agencies describe in detail how they sought and used the information from the Committee for their decision-making about the proposed health care reform legislation and even to compile a recommendation to the President as to whether he should sign or veto the bill if it passed Congress. *See* Agencies' Resp., ECF No. 102 at 17; *see also* Pl.'s Mot. & Opp'n, ECF No. 100-1 at 37. Based on the facts that the Committee does not dispute, but claims are irrelevant, the Agencies clearly used the documents as they saw fit. *See generally* Intervenor's Mot., ECF No. 96; Intervenor's Opp'n & Reply, ECF No. 105.[14]

---

[14] In its responses to American Oversight's Counter-Statement of Material Fact, the Committee denies that "[t]he documents at issue were obtained from Congress for use in HHS and OMB's own decision-making processes", but reiterates its view that this is not a material fact and does not address this in any of its briefs. *See* Intervenor's Resp. to Counter-Statement of Material Facts, ECF No. 105-1 at 5. The Committee also stated that it lacked sufficient knowledge as to whether "Agency personnel read and relied on the information provided in the Contested Records in crafting their legislative strategy and advising the President." *Id.*; *see also* Intervenor's Resp. to Def.'s Counter-Statement of Material Facts, ECF No. 105-2 at 4-5 (lacking knowledge as to whether the Agencies used the documents for "Executive Branch purposes such as advising the President about healthcare reform" and "generating a SAP").

Moreover, neither OMB nor HHS agreed to the terms of the Legend while exchanging emails with the committee staffers. *See id.*

Instead, the Committee maintains that the Agencies' actions and understanding are irrelevant to the Court's analysis. *See* Intervenor's Opp'n & Reply, ECF No. 105 at 13; Agencies' Resp., ECF No. 102 at 12 (explaining how the Committee's interpretation would "ignore the second factor"). This means, according to the Committee, that the Court need not consider the second factor at all. *See* Intervenor's Opp'n & Reply, ECF No. 105 at 13. The Committee bases this argument in the legal requirement that an agency have exclusive control over documents for them to be subject to FOIA, which it cannot do if Congress expresses an intent to obtain or retain control of the same documents. *See id.* Therefore, according to the Agency, the first and second factors are mutually exclusive, and the Court need not consider how the Agency used the documents if Congress manifested clear intent to control the documents. *See id.*

This argument fails for two main reasons. First, as described above, the Court concludes that the first factor does not weigh in the Committee's favor. Second, the Committee's argument ignores the fact that how the Agencies used the documents may be indicative of whether Congress manifested a clear intent to control them. Therefore, while the questions of whether the Agencies or Congress exercised control over the

35

documents may be "mutually exclusive," this does not render an inquiry into how the Agencies used the documents redundant. The Committee's explanation of its argument proves this point. When arguing the two factors are "mutually exclusive", the Committee asserts that "if the agency has 'exclusive control' of the document, which it must have to trigger a FOIA obligation, Congress necessarily has not manifested a clear intent to control that document." *Id.* (citations omitted). On this logic, the Agencies' use of the documents is indicative of whether Congress or the Agencies manifested control and is plainly relevant to the Court's analysis. *See also See* Pl.'s Reply, ECF No. 107 at 10 ("This is logical, because the agency's actions are evidence of whether Congress's manifestation of intent was *clear*.").

Third, the Committee's argument cannot be squared with precedent. As the Committee concedes, the D.C. Circuit has clearly and repeatedly said that "[t]his focus renders the first *two* factors of the standard test effectively dispositive." *Judicial Watch*, 726 F.3d at 221 (emphasis added); *see also Cause of Action v. Nat'l Archives & Records Admin.*, 753 F.3d 210, 214 (D.C. Cir. 2014); *ACLU*, 823 F.3d at 663; *United We Stand,* 359 F.3d at 596. Indeed, in cases that have applied the modified, two-factor test, the reviewing court has acknowledged how the agency used the documents, or viewed any restrictions on its

ability to use the documents, as part of its analysis. *See United We Stand,* 359 F.3d at 601-02 (considering provisions of the agency's manual); *Judicial Watch*, 726 F.3d at 223 (referencing the D.C. Circuit's analysis of the second factor in its review of the four-factor test, Part III.A.2, in its conclusion that the non-FOIA entity had manifested a clear intent to control the disputed records). Moreover, as the Agencies point out, these prior cases "involved agency *agreement* that the records at issue were not agency records." Agency Resp., ECF No. 102 at 12 (emphasis in original) (citations omitted). Here, the Agencies maintain that the records were not congressional, and that there were no restrictions on their ability to use the records. That the Agencies disagree as to whether Congress clearly controlled the documents may not be relevant to which test applies, but it speaks to whether Congress clearly manifested an intent to control.

Moreover, in the cases that pre-date the four or two factor analysis, and are the foundation for the D.C. Circuit applying the modified test, courts similarly considered how the agency used the documents. *See Goland*, 607 F.3d at 347 ("Whether a congressionally generated document has become an agency record, rather, depends on whether under all the facts of the case the document has passed from the control of Congress and become property subject to the free disposition of the agency with

which the document resides."); *id.* (considering how the agency "retains a copy of the Transcript for internal reference purposes only, to be used in conjunction with legislation concerning the Agency and its operations"); *Holy Spirit*, 636 F.2d. at 842 (comparing records at issue, the contents of which the agency appeared to be aware, with other records transferred to the agency in sealed cartons with instructions not to open with which the agency complied).

Based on the clear language that the D.C. Circuit has used and how it has conducted its analyses, the Court concludes that the modified test should be interpreted to give meaning to the second factor as relevant ascertaining whether Congress manifested a clear intent to control records. Because the Committee only refutes the relevance of this factor and not the Agencies' representations about how they used the records, an argument the Court rejects, this factor weighs in favor of concluding that these are agency not congressional records.

## IV.  Conclusion

In reaching its conclusion that Congress has not manifested a clear intent to control the disputed documents, the Court again affirms the respect due to a coordinate branch of government. It also recognizes, as has the D.C. Circuit, that agencies frequently communicate with Congress about a range of budgetary and policy matters, and that FOIA's protections do not

shield all of those communications from disclosure simply because of Congress's involvement. *See Paisley*, 712 F.2d at 696. To deem the actions here – staffers simply copying and pasting a catch-all disclaimer into any communication they find appropriate - as a clear assertion of congressional intent would significantly broaden the scope of FOIA exemptions. Such an approach would contravene the D.C. Circuit's admonition that Congress's FOIA exemption cannot be interpreted to "undermine the broad spirit of disclosure that animates the Act." *Id.*

For the foregoing reasons, the Committee's Motion for Summary Judgment, ECF No. 96, is **DENIED**; and American Oversight's Cross-Motion for Summary Judgment, ECF No. 100, is **GRANTED.**

**SO ORDERED.**

Signed:    **Emmet G. Sullivan**
           **United States District Judge**
           **September 24, 2025**